**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| LA'TONYA BRYANT | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No.: 21-cv-00545-MJM** |
| | ) | |
| MAYOR & CITY COUNCIL OF | ) | |
| BALTIMORE, | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**</u>

Defendant, Mayor & City Council of Baltimore ("Defendant" or "the City"), by and through its attorney, Elisabeth B. Hofmann, respectfully files this Memorandum in Support of Defendant's Motion for Summary Judgment pursuant to Fed. R. Civ. Pr. 56. Plaintiff's case is without merit and appropriate for dismissal by this Court for the reasons stated below.

## I.    INTRODUCTION

This action is brought by former employee La'Tonya Bryant ("Plaintiff") alleging claims of age discrimination pursuant to the Age Discrimination in Employment Act, as amended, 29 U.S.C.A. § 623 et. seq.; disability discrimination and retaliation pursuant to The Americans with Disabilities Act of 1990, as amended 42 U.S.C.A. § 12101 et. seq. ("ADA") and Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C.A. § 791 et. seq. ("RA"); violation of the FMLA pursuant to the Family and Medical Leave Act, 29 U.S.C.A. § 2601 et seq.; and corresponding state law claims under the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't § 20-601 et. seq.

The parties have completed discovery and, as explained in detail below, Plaintiff's claims

1

of discrimination cannot hold water.  In fact, her claims are the type of claims that federal summary judgment proceedings are meant to keep from proceeding to trial.  The record simply does not support her allegation that she was terminated because she exercised her right to family medical leave, especially when her supervisor urged her to take that same family medical leave.  Nor is there a scintilla of evidence to infer that Plaintiff was not accommodated for her medical condition, or that she was retaliated against on account of her condition.  As shown below, Plaintiff's medical condition was apparent to her supervisor at the time he discussed with her the first set of findings from the Baltimore City Office of the Inspector General that did not reflect favorably on Plaintiff.  At that time, despite the Inspector General's report, her supervisor retained her due to her skill-set and institutional knowledge; but it was when the Inspector General's second report was released, directly implicating Plaintiff's integrity, that her supervisor made the decision to terminate her.

Plaintiff's remaining claim that she was terminated because of her age fares as poorly as her disability claims.  There is no record evidence to support her assertion.  Rather, the evidence presented below reveals that Plaintiff was terminated only after the internal investigation by the Office of Inspector General directly called into question Plaintiff's integrity and truthfulness.

There is no evidence, and no possible interpretation of the facts even in the light most favorable to the Plaintiff, that could lead a reasonable fact-finder to determine that her termination was due to her disability or her age rather than due to the findings of a well-documented internal investigation.  For the reasons outlined herein, the Court should dismiss the Complaint in its entirety.

## II.    STATEMENT OF FACTS

La'Tonya Bryant ("Plaintiff") was first hired by the Mayor and City Council of Baltimore ("Defendant" or "the City") on August 20, 2012, as Chief of Staff to then-Director of the Baltimore

2

City Department of Human Resources ("DHR"), Ronnie Charles. **Defendant's Answers to First Interrogatories cited herein as Exhibit 1, p. 3.** She was promoted to Deputy Director of HR Administration in April 2015 by Mary Talley, then-Director of DHR. **Id. at p. 3-4; Office of the Inspector General Interim Report of Investigation 2017-0799, attached hereto as Exhibit 2, at p. 3.** Under Mary Talley, Plaintiff worked alongside Jacia Smith, Deputy of HR Operations. **Bryant Deposition Transcript, attached hereto as Exhibit 3 at p. 10-11.** Plaintiff's duties as Deputy Director for HR Administration included the agency's budget; staffing; contracts and solicitations; logistics; and facilities management. **Id. at p. 10.**

Plaintiff was never subjected to any formal discipline under Mary Talley, but in April 2016 she was counseled by Ms. Talley after an incident in which Plaintiff misrepresented the nature of her relationship to a person who had recently passed away. **Id. at p. 41-45.** Ms. Talley wrote up a note detailing her conversation with Plaintiff, a copy of which was kept in Plaintiff's personnel file. **Write-Up from Meeting Between Plaintiff and Mary Talley on April 4, 2016, attached hereto as Exhibit 4; Quinton Herbert Deposition Transcript Vol. 1, p. 127-29, attached hereto as Exhibit 5**. In the two-page note, Ms. Talley expressed her concern with Plaintiff's misrepresentation as well as Plaintiff's reaction to being asked to speak about it. **Exhibit 4.**

### A. *WorkBaltimore*

In the fall of 2017 and 2018, DHR hosted a city-wide job fair called WorkBaltimore. **Office of the Inspector General Final Report of Investigation 2017-0799, attached hereto as Exhibit 6, at p. 2.** DHR employees organized and ran WorkBaltimore. **Id. at p. 2-3.** The agency held frequent "Steering Committee" meetings to plan and coordinate the event. **Id.** Steering Committee meetings were attended by DHR Leadership – Mary Talley and her two Deputies, Jacia Smith and Plaintiff – and by the Chiefs of all DHR's individual divisions, known collectively as

the Executive Team.  **Jacia Smith Deposition Transcript p. 39-40, attached hereto as Exhibit 7.**  The Executive Team and the Steering Committee were functionally the same, as they were made up of the same people almost entirely.  **Id.**

In 2017, WorkBaltimore was financed via three avenues: fundraising efforts through the Baltimore City Foundation (the City's fundraising mechanism for internal agencies); funds from DHR's own General Fund to be used at their discretion; and a loan from the Innovation Fund, a self-sustaining City fund that disperses loans for projects or incentives and must be paid back in full according to pre-agreed terms.  **Exhibit 6 at p. 3-4.**  Plaintiff had the job of "Logistics Chair" for WorkBaltimore, but was also listed as co-chair of the Finance Committee.  **Id. at p. 4.**

Plaintiff, as Deputy Director of Administration, was generally responsible for all DHR's budget and financial matters, and acknowledged as much in her deposition.  **Id.; Exhibit 3 at 10.** Plaintiff was the signatory and project monitor for the $100,000 loan that DHR received from the Baltimore City Innovation Fund on April 21, 2017.  **Innovation Fund Letter of Agreement, attached hereto as Exhibit 8.**  The Innovation Fund loan was to be repaid in full by June 30, 2018.  **Id.**  As of September 2018, DHR had made no repayments whatsoever, and had not requested an extension of payment.  **Exhibit 6 at p. 4.**

After 2018, DHR transitioned WorkBaltimore to a different agency, the Mayor's Office of Economic Development.  **WorkBaltimore Transition Memo, attached hereto as Exhibit 9.**

### B. Office of the Inspector General Investigation – Interim Report

In the first half of 2018, the Office of the Inspector General for Baltimore City ("the OIG") conducted an internal investigation into DHR leadership after receiving anonymous emails with complaints from employees.  **See generally Exhibit 2.**  The investigation was expansive, looking into allegations of a toxic workplace environment and pervasive "harassing and humiliating"

conduct by Mary Talley, Jacia Smith, and Plaintiff. **Id. at p. 1.** Employees who were interviewed by the OIG reported that morale was depleted within DHR, that they were afraid to present new ideas or disagree with leadership, and that many were afraid to even speak to the OIG or air their complaints for fear of retaliation. **Id.** The OIG interviewed 42 individuals, including current and former DHR employees as well as senior level managers for other City agencies. **Id. at p. 2.**

On July 17, 2018, the OIG released an Interim Report of its investigation. **See generally Exhibit 2.** The Interim Report noted findings of a high turnover rate of employment within DHR, particularly of Division Chiefs and Executive Assistants to the Director; a "culture of fear" under which employees were afraid to make mistakes in their work, question or challenge the Director's initiatives, or to speak out about the environment at DHR for fear of retaliation; and a classification of Director Talley and her two Deputies, including Plaintiff, as "Toxic Leadership." **Id.** Director Talley tendered her resignation shortly after the Interim Report was released. **Exhibit 5 at p. 20-21.** The Mayor's Chief of Staff asked Quinton Herbert to step in and replace Mary Talley as (interim, at the time) Director of DHR shortly thereafter. **Id.**

Upon stepping into the Director role, Mr. Herbert met with Plaintiff and Jacia Smith often, relying on them for their institutional knowledge and guidance for the agency's many projects. **Id. at p. 85-87.** Despite the fact that the Interim Report had categorized Plaintiff and Ms. Smith as part of the so-called toxic leadership headed by Mary Talley, Mr. Herbert felt that "a certain level of stability at the top of the agency was a good thing" and he looked to Plaintiff and Ms. Smith "to make the transition a smooth one and to get the agency back on track." **Id.** Mr. Herbert specifically said to Plaintiff and Ms. Smith that he was not considering any adverse employment action against them based on the Interim Report, but did also ask them whether there was "anything else that [he] should know" that might come out, to which both answered in the negative. **Id. at p. 131-32.**

### C. Plaintiff's Vacation Leave and FMLA Leave

After WorkBaltimore 2018, in late September, Plaintiff requested a long leave of absence of 3-4 weeks.[1]  **Id. at 60-61; Exhibit 3 at p. 56-57.**  Mr. Herbert initially told Plaintiff that he could not approve that long of a vacation, given that he was new to the agency and she was one of the executives.  **Exhibit 5 at p. 60-61.**  Ms. Smith, by this time, was preparing to transition into the new job she had accepted with the Baltimore City Department of Recreation and Parks, a move which was to occur in mid-October 2018.  **Exhibit 7 at p. 10-13.**  Plaintiff said to Mr. Herbert that she was tired from the move the agency had just made from its former location on Baltimore Street, which had taken place at the same time as the planning and execution of WorkBaltimore 2018.  **Exhibit 5 at p. 61.**

Eventually, Plaintiff said that she also needed to seek medical attention for her foot.  **Id.**  Plaintiff had a torn Achilles tendon, an injury she had sustained in September of 2017.  **Exhibit 3 at p. 51.**  From the time of her injury until she had surgery in November 2018, she saw a physical therapist, wore a "boot" foot brace off and on, and saw a specialist for regular treatment.  **Id. at p. 52.**  In September of 2018, Plaintiff was wearing the "boot" regularly enough for her colleagues to observe it.  **Exhibit 5 at p. 61.**  By that time, she was consulting with her doctor about the possibility of having surgery on her torn Achilles tendon, which was not repairing on its own.  **Exhibit 3 at 52-53.**  Upon hearing that Plaintiff intended to address a medical issue during this time, Mr. Herbert then counseled her on the possibility of taking leave under the Family and Medical Leave Act ("FMLA"; colloquially known and referred to as "FMLA leave").  **Exhibit 5 at 61-62.**  Mr. Herbert told Plaintiff that "if your leave is related to your injury, then you can put in a request for FMLA", pointing out to her that even if he couldn't approve a long vacation for

---

[1] In their respective depositions, Plaintiff stated that the leave she originally requested was for 3 weeks, and Mr. Herbert stated that Plaintiff had requested a full month.

6

her, she could still take protected leave under the FMLA to tend to her medical needs. **Id.**

Mr. Herbert ultimately approved "a couple of weeks" as "vacation" leave for Plaintiff, classified as a "respite." **Id.; "Respite" Leave Slip, attached hereto as Exhibit 10.** That leave began on October 8, 2018, was set to run until November 2, 2018, and was approved by Mr. Herbert on October 3, 2018. **Exhibit 10.** Plaintiff, meanwhile, continued to consult with her doctor to determine whether she would in fact need surgery on her torn Achilles tendon, and kept Mr. Herbert updated. **Exhibit 3 at 54-55; Email from Plaintiff re: checking in while on leave, attached hereto as Exhibit 11.** Mr. Herbert directed Plaintiff to complete FMLA paperwork so that her FMLA leave could begin, if she indeed needed to have surgery, after her "respite" leave, and directed Njukang Asong, DHR's internal HR Business Partner who facilitated FMLA and ADA paperwork, to follow up with Plaintiff to obtain the necessary paperwork. **Exhibit 5 at p. 64-66.** Mr. Asong sent Plaintiff the FMLA paperwork on October 4, 2018. **Exhibit 5 at p. 53.** Plaintiff sent her completed FMLA paperwork to Mr. Asong on October 26, 2018. **Exhibit 3 at p. 51.** Mr. Herbert never received the completed paperwork himself, but acknowledged that he always intended to approve the request. **Exhibit 5 at p. 55-57.**

### D. Office of the Inspector General Investigation – Final Report

In the course of its investigation and leading to the finalization of its Interim Report, the OIG received three additional anonymous emails which raised additional issues with DHR operations. **Exhibit 2 at p. 2.** The Interim Report noted that the OIG was continuing to investigate those issues, and that they would be addressed separately in a later, final report. **Id.** The Final Report, completed on September 21, 2018, again noted that the OIG had "identified additional areas of concern regarding DHR operations" in the course of its investigation. **Exhibit 6 at p. 1.** These concerns involved (1) the funding of WorkBaltimore and (2) a smoking cessation program

run by DHR known as "Smokey Crush & Leaf."  **Id.**

### i.  *Funding of WorkBaltimore*

The Final Report noted that DHR spent over $425,000 on WorkBaltimore in 2017.  **Id. at p. 3.**  It was also noted that several DHR employees had expressed "particular concern" regarding the Innovation Fund loan.  **Id. at p. 4.**  The OIG had obtained from Plaintiff an accounting of all expenditures purportedly covered by the Innovation Fund, and conducted its own review of the document provided by Plaintiff compared with the general ledger for DHR's Innovation Fund account.  **Id.**  In doing so, the OIG reported, it found numerous discrepancies between the accounting documents Plaintiff had provided and the general ledger records.  **Id.**  When asked about the discrepancies, Plaintiff said to the OIG that she did not create the list, nor did she review its contents for accuracy before sending it to the OIG, and furthermore that she could not provide an explanation for the discrepancies.  **Id.**  Plaintiff said to the OIG that she was "not involved" in the financial planning for WorkBaltimore, but did not deny that she was "generally responsible" for DHR's budget and finances.  **Id.**

### ii.  *Smokey Crush & Leaf*

DHR began a smoking cessation initiative in 2015 that involved two characters named Smokey Crush and Leaf who would perform at City events to create awareness for the City's smoking cessation programs.  **Id. at p. 5.**  During the course of the OIG's investigation, some employees expressed particular concerns about the program and the characters, questioning whether it was a proper use of resources or even effective.  **Id.**  While looking further into the program, the OIG discovered that Plaintiff's daughter, Quiera Bryant, had been hired as one of the rotating roster of performers appearing in costume as either Smokey Crush or Leaf.  **Id.**  Quiera Bryant was hired after auditioning for DHR employees.  **Id.**  Plaintiff told the OIG that she believed

8

she "stepped out" of the room during Quiera Bryant's audition, but that she informed all DHR employees present at the audition that Quiera was her daughter. **Id. at p. 7.** The OIG discovered that Quiera Bryant was paid $100 for each performance and had a one-year contract as a performer, beginning November 23, 2015, and that she was also employed full-time by the City Parking Authority, beginning July 13, 2015. **Id.**

The Baltimore City Code requires that certain employees file Financial Disclosure Statements to the Board of Ethics every year. **Id.** Plaintiff was in the category of employees who were required to file. **Id.** Among other things, the Financial Disclosure Statements require covered employees to report the employment of any members of their family by the City. **Id.** Reviewing Plaintiff's financial disclosures, the OIG found that she had filed a disclosure in April 2015 that purported to cover January 1, 2015 through December 31, 2015; that she filed a disclosure in March 2017 purporting to cover January 1, 2017 through December 31, 2017; and that she had not filed a financial disclosure at all covering January 1, 2016 through December 31, 2016. **Id.; Bryant Financial Disclosure dated April 30, 2015, attached hereto as Exhibit 12; Bryant Financial Disclosure dated March 27, 2017, attached hereto as Exhibit 13.** Furthermore, the OIG noted that Plaintiff did not disclose Quiera Bryant's employment with DHR as a Smokey Crush & Leaf performer on any of the disclosures covering or purporting to cover the time that Quiera performed as Smokey Crush or Leaf. **Exhibit 6 at p. 7.** Plaintiff did, however, disclose her daughter's employment with the City Parking Authority in her financial disclosure forms filed in 2017 and 2018. **Id.** When asked about her disclosures, Plaintiff reported to the OIG that she thought she had disclosed her daughter's employment with DHR and that she believed she had filed a disclosure every year. **Id.**

### E. Decision to Terminate Plaintiff

9

The OIG's Final Report was sent directly to then-Mayor Catherine Pugh. **Letter from Mayor Pugh to Inspector General Isabel Cumming, attached hereto as Exhibit 14.** On October 26, Mayor Pugh referred the Final Report to Quinton Herbert, requesting that the OIG brief him directly and asking him to determine the appropriate disciplinary action for Plaintiff. **Id.**

After receiving and reviewing the Final Report, Mr. Hebert also looked through Plaintiff's personnel file, and reviewed the notes that Mary Talley had written up about her conversation with Plaintiff about a misrepresentation in April 2016. **Herbert Deposition Transcript Vol. 2 at 252-53, attached hereto as Exhibit 15.** In addition to the findings of the Report itself, Mr. Herbert also considered what Plaintiff had said to the OIG investigators relating to her fiscal responsibility to the agency, or dereliction thereof, and her responses when asked about a Financial Disclosure that she should have filed for the year 2016. **Id. at p. 239-47**. It was Mr. Herbert's opinion that Plaintiff's responses "indicated to me that, at a minimum, this was negligence on Ms. Bryant's part and, at worst, it was blatantly dishonest. So, under any scenario, it was unacceptable for someone in executive leadership." **Id. at p. 241.**

Approximately one week later, on November 9, 2018, Mr. Herbert sent a letter to Plaintiff informing her that her employment with the City of Baltimore was terminated effective immediately, citing the OIG Final Report and investigation which "focused *inter alia* on your failure to disclose a familial relationship to a contractual DHR employee and maintenance of financial records related to the WorkBaltimore 2017 Convention." **Separation Letter, attached hereto as Exhibit 16.** Mr. Herbert's letter also noted that he considered both the findings of the OIG and the information that Plaintiff herself provided in response. **Id.**

The two Deputy Director positions previously filled by Jacia Smith and Plaintiff were not directly filled. **Exhibit 15 at 178-79.** Instead, two Assistant Deputy positions were created. **Id.**

Chi-Chi N'yaga-Nash and Steven Serra were the employees who filled the two Assistant Deputy positions. **Id.** Tonya Brinkley was eventually promoted as the sole Deputy Director of DHR, reporting directly to Mr. Herbert. **Id.** Ms. Brinkley was born on September 28, 1964. **EEOC Position Statement p. 5, attached hereto as Exhibit 17.**

Plaintiff filed a complaint with the EEOC on September 4, 2019. **Plaintiff EEOC Complaint, attached hereto as Exhibit 18.** The EEOC issued a formal Notice Of Right To Sue, EEOC Form 161-B, on December 2, 2020, indicating that the agency was terminating its processing of Plaintiff's ADA charges and closing Plaintiff's ADEA charges. **EEOC Right to Sue Letter, provided by Plaintiff in discovery in response to Defendant's Request for Production, attached hereto as Exhibit 19.** Plaintiff filed suit against the City in Baltimore City Circuit Court on or about February 5, 2021. **ECF No. 2.** The City filed Notice of Removal on March 3, 2021. **ECF Nos. 1, 6.**

### III.    STANDARD OF REVIEW

The Supreme Court has stated that summary judgment is not disfavored and is to be used whenever appropriate in order to arrive at a just, speedy, and inexpensive resolution of the action. *Celotex Corp. v. Catrett*, 106 U.S. 317, 327 (1986). Summary judgment may be granted in favor of the moving party "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This Court must ask itself "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). The Court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weight the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

The Plaintiff may not defeat a motion for summary judgment merely with unsupported allegations, nor with a "scintilla" of evidence in support of her position; instead there must be evidence on which a jury could reasonably find for the Plaintiff. *Id.* at 248, 252; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The Plaintiff may not rely on "mere speculation, or the building of one inference upon another" to argue that a genuine issue of material fact exists. *Beale v. Hardy*, 769 F. 2d 213, 214 (4th Cir. 1985). While the evidence must be viewed in the light most favorable to the non-moving party, the non-moving party is only entitled to the benefit of the doubt for a "reasonable inference." *Hinkle v. City of Clarksdale*, 81 F. 3d 416, 421 (4th Cir. 1996). "The court . . . has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to trial." *Church v. State of Maryland*, 180 F. Supp. 2d 708, 715 (D. Md. 2002) (citing *Felty v. Graves-Humphreys Co.*, 818 F. 2d 1126 (4th Cir. 1987)).

## IV.    ARGUMENT

The McDonnell Douglas proof scheme analysis is applied to claims brought pursuant to the Americans with Disabilities Act of 1990, as amended 42 U.S.C.A. § 12101 et. seq. ("ADA"); Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C.A. § 791 et. seq. ("RA"); the Age in Employment Discrimination Act, 29 U.S.C.A. § 623 et. seq.; the Family and Medical Leave Act, 29 U.S.C.A. § 2601 et seq.; and the Maryland Fair Employment Practices Act[2], Md. Code Ann., State Gov't § 20-601 et. seq., where the claims are based on circumstantial and not direct evidence of discrimination. *Ennis v. National Ass'n of Business and Educational Radio, Inc.*, 53

---

[2] The Maryland Fair Employment Practices Act was modeled after federal antidiscrimination legislation. See *Molesworth v. Brandon*, 341 Md. 621, 632-33 (1996). As such, Maryland Courts look to federal cases interpreting anti-discrimination law for guidance in interpreting the MFEPA, and the elements that make up MFEPA claims can be found echoed in federal jurisprudence. *See, e.g.*, *Kohli v. Domino's Pizza*, 103 Md. App. 694, 714 n.7 (1995); *Caire v. Conifer Value Based Care, LLC*, 982 F. Supp. 2d 582, 599 (D. Md. 2013) (quoting *Lewis v. Univ. of Md., Balt.*, No. SAG-12-298, 2012 WL 5193820, at *4 n.3 (D. Md. Oct 18, 2012) (citing *Ridgely v. Montgomery Cnty.*, 164 Md. App. 214, 232 (Md. App. 2005))).

F.3d 55, 57-58 (4th Cir. 1995); *Mayers v. Washington Adventist Hospital, et al.*, 131 F. Supp. 2d 743, 748 (S.D. Md. 2001); *Westmoreland v. TWC Administration LLC*, 924 F. 3d 718 (4th Cir. 2019); *Sharif v. United Airlines, Inc.*, 841 F. 3d 199, 203 (4th Cir. 2016); *Foster v. GeneDx, Inc.*, 417 F. Supp. 3d 673, 688-89 (D. Md. 2019).  Under this framework, if Plaintiff is able to present a *prima facie* case, the burden of production shifts to the City to demonstrate a non-discriminatory reason for its actions. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973); *see also Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000).  Once the City offers a legitimate, non-discriminatory reason for its actions, the burden shifts back to Plaintiff to show that the reasons proffered by the City are pretextual and the true reasons for its actions are discriminatory.  *Id; see also Brandon v. Molesworth*, 104 Md App. 167, 186 (1995) (relying on Title VII cases governed by *McDonnell Douglas* to resolve questions as to the proper interpretation of the Maryland Fair Employment Practices Act).  Importantly, while the burden of production shifts among the parties, the burden of persuasion always remains on the Plaintiff. *Texas Dep't of Comty Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *Lamb v. Qualex, Inc.*, 33 F. App'x 49,59 (4th Cir. 2002).

## A. PLAINTIFF'S DISCRIMINATION CLAIMS BASED ON HER MEDICAL CONDITION FAIL AS A MATTER OF LAW

### 1. Plaintiff cannot establish a claim of failure to accommodate.

The elements of a failure to accommodate claim under the Americans with Disabilities Act, the Rehabilitation Act, and the Maryland Fair Employment Practices Act are the same. *See e.g. Rhoads v. FDIC*, 257 F. 3d 373, 387 n. 11, 388 n. 13 (noting a case with a claim under the RA, "whose relevant provisions parallel those of the ADA") (4th Cir. 2001); *Caire v. Conifer Value Based Care, LLC*, 982 F. Supp. 2d 582, 599 (D. Md. 2013).  In order to prevail on these claims, Plaintiff must show that (1) she was a qualified individual with a disability under the statute; (2)

that the City was aware of her disability; (3) that she could perform the essential functions of her position with a reasonable accommodation; and (4) that the City refused to make that reasonable accommodation. *Reyazuddin v. Montgomery County, Maryland*, 789 F. 3d 407, 414 (4th Cir. 2015) (citing *Wilson v. Dollar Gen. Corp.*, 717 F. 3d 337, 345 (4th Cir. 2013); *see also Cole v. Fam. Dollar Stores of Maryland, Inc.*, 811 Fed. App'x 168, 176 (4th Cir. 2020). In the case at bar, Plaintiff can satisfy the first three prongs of her *prima facie* case. It is undisputed that damage to Plaintiff's Achilles tendon rendered her "disabled". It is undisputed that Mr. Herbert was aware of Plaintiff's medical condition as it was obvious to him because Plaintiff was wearing a medical "boot", and also because Plaintiff briefly discussed her need for time off work to undergo surgery to her foot. Plaintiff can likely satisfy the third prong as well. She requested medical leave and (but for the intervening findings contained in the OIG report) would have returned to work and capable of performing the functions of her position, with or without additional accommodations.

Plaintiff cannot, however, satisfy the fourth prong. Plaintiff cannot dispute that the City accommodated her medical condition when it approved her leave under the FMLA and the ADA. Her subsequent termination while on FMLA and/or ADA did not alter that fact. The case of *Cole v. Family Dollar Stores of Maryland, Inc.* is instructive on this issue. In *Cole*, the Fourth Circuit affirmed a grant of summary judgment to the employer who had granted the plaintiff's request for multiweek medical leave, but later terminated her because of "additional, unrelated absences." 811 Fed. App'x at 176. Even though the later absences were related to the plaintiff's disability, the Court found that there was no genuine dispute of material fact as to whether the employer accommodated the employee. *Id.* The Court found that the employer had granted the employee the requested accommodation and had fired the employee for a separate, legitimate, nondiscriminatory reason of two unexcused absences. *Id.*

14

Here, similar to the plaintiff in *Cole*, Plaintiff requested, and was given, three weeks of vacation leave. Furthermore, Plaintiff was advised by the City, through her supervisor Quinton Herbert, to take advantage of FMLA leave. It is nonsensical for Plaintiff to claim that the City denied her a reasonable accommodation in the form of leave, when the City urged her to take FMLA leave and granted her request for vacation leave. The City is therefore entitled to summary judgment as a matter of law on Plaintiff's failure to accommodate claims.

## 2.    Plaintiff cannot establish a claim of disability discrimination for unlawful discharge.

Plaintiff alleges that the City discriminated against her by terminating her employment shortly after her disability-related leave began. *See* ECF. No. 2 at ¶¶ 66, 78, 91. To establish a claim of unlawful discharge based on disability, Plaintiff must show that (1) she is a qualified individual with a disability; (2) she was discharged; (3) she was fulfilling her employer's legitimate expectations at the time of discharge; and (4) the circumstances raise a reasonable inference of unlawful discrimination. *Rohan v. Network Presentations*, LLC, 375 F.3d 266, 273 (4th Cir. 2004); *Mayers v. Washington Adventist Hospital, et al.*, 131 F. Supp.2d 743, 748 (S.D. Md. 2001). Disability must be "a but-for" cause of the employment decision, and Plaintiff cannot succeed by proving only that her disability was merely a "motivating factor." *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 174-75 (2009). Similar to her failure to accommodate claim, Plaintiff can establish the first and second prongs of her disability claim of wrongful discharge. The City does not dispute that Plaintiff was disabled or that she was terminated. Plaintiff cannot, however, establish the last two prongs.

As to the third prong, Plaintiff's disability discrimination claims must fail because she cannot show that she was performing at her employer's legitimate expectations at the time of her discharge. Plaintiff was fired as a direct result of the findings from the Office of the Inspector

15

General's internal investigation, which implicated her integrity and truthfulness. Her supervisor, Mr. Herbert, felt that Plaintiff's responses to the OIG indicated negligence at best and blatant dishonesty at worst, and, as he stated in his deposition, determined that termination was the only course of action he could take. Plaintiff's misconduct was completely separate from her disability, as was the decision to terminate her; the protected status of disability does not protect an employee from legitimate discipline. *Id.*; *see also Ennis v. Nat'l Ass'n of Bus. & Ed. Radio Inc.*, 53 F. 3d 55, 61-62 (4th Cir. 1995); *Evans v. Technologies Applications & Serv. Co.*, 80 F. 3d 954, 960-61 (4th Cir. 1996) ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff."); *Coleman v. Anne Arundel County Police Dept.*, 136 Md. App. 419, 433-34 (Md. App. 2001) (*affirmed on appeal* 369 Md. 108 (2002)) ("an employee on [protected disability] leave is not entitled to anything more than what he/she was entitled to if he/she had not taken leave.") (discussed by *Ensor v. Jenkins*, No. CV ELH-20-1266, 2021 WL 1139760, at *37 (D. Md. Mar. 25, 2021).

Plaintiff also cannot satisfy the fourth prong as to any of her disability discrimination claims, as the record is utterly bereft of any evidence that would give rise to an inference of discrimination. To be sure, Plaintiff's "proof" that her medical condition was the basis for her termination is entirely premised on the fact that her termination was effective only a few days after her surgery. But temporal connection alone is not, alone, sufficient to show a correlation of causation. *See*, *e.g.*, *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F. 3d 299, 309 (4th Cir. 2006) (affirming summary judgment for employer where the "actions that led to [plaintiff's] probation and termination began before her protected activity"); *Coleman v. Anne Arundel County Police Dept*, 136 Md. App. 419, 433-34 (2001) (collecting cases where courts have upheld employees' termination while on protected leave if the reasons for termination are unrelated to the leave).

Here, the facts clearly demonstrate not only that the OIG's independent investigation brought factors to Mr. Herbert's attention in late October 2018 that he felt he had to act on, but also that prior to learning of the OIG's findings, Mr. Herbert approved Plaintiff's leave both for her "respite" time and for the time she requested under the FMLA to tend to her injury, thus granting her the accommodation for medical leave that she desired and required. These are not "circumstances that give rise to an inference of discrimination" and Plaintiff will not be able to point to any legitimate evidence – other than mere conjecture or a building of inferences – that demonstrates any other interpretation of the facts. *See*, *e.g.*, *Ennis v. National Ass'n of Business and Educational Radio, Inc.*, 53 F. 3d 55, 62 (4th Cir. 1995) ("At bottom, [employee] imputes to [employer] discriminatory motive, without factual support.").

### 3.      Plaintiff cannot establish that she was retaliated against due to her medical condition

To establish a claim of retaliation under the fair employment practice statutes, Plaintiff must show "that [she] engaged in protected activity, that the employer took adverse action against [her], and that the adverse action was causally connected to the plaintiff's protected activity." *Sharif v. United Airlines, Inc.*, 841 F. 3d 199, 203 (4th Cir. 2016) (see also *Waag v. Sotera Defense Solutions, Inc.*, 857 F. 3d 179 (4th Cir. 2017)). Plaintiff can clearly demonstrate that she engaged in protected activity by requesting and taking medical leave and that she was subsequently terminated. Plaintiff cannot, however, rationally satisfy the third element because she cannot demonstrate a causal connection between her use/request for medical leave and her termination.

In *Sharif v. United Airlines, Inc.*, the Fourth Circuit held that the employer did not retaliate against the plaintiff when they terminated him after an internal investigation revealed that he had falsified FMLA leave, where the employee had also made dishonest representations to the investigators. 857 F. 3d at 205-06. The Court noted, in particular, that United Airlines had

17

previously approved every one of the plaintiff's requests for FMLA leave, and that "this is not the record of a company that is historically hostile to FMLA leave in any discernable way." *Id.* at 205.

Much like the plaintiff in *Sharif*, Plaintiff cannot prove, under any interpretation of the facts that does not rely on inference or conjecture, that the adverse employment action taken against her was retaliatory for her taking medical leave. In *Sharif*, the internal investigation itself was related to the plaintiff taking FMLA leave, *see id.* at 205-06. Here, by contrast, the OIG's investigation had nothing to do with Plaintiff's FMLA requests, and in fact was completed in September 2018 before she even made her request for "respite" leave; and furthermore was not even seen by her supervisor, Mr. Herbert, until late October 2018, when Plaintiff's leave already had been approved and begun. Again, the only evidence Plaintiff can muster is a temporal connection between the time of her surgery and the time of her termination, both in early November. But her "respite" leave and FMLA leave were both discussed with Mr. Herbert and approved by him in early October 2018. Although there must generally be "some degree of temporal proximity to suggest a causal connection," *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F. 3d 474, 501 (4th Cir. 2005), "mere temporal proximity is not necessarily enough to create a jury issue as to causation" in a retaliation claim. *Ensor v. Jenkins*, No. CV ELH-20-1266, 2021 WL 1139760, at *39 (D. Md. Mar. 25, 2021).

## 4. Plaintiff's interference claim under the FMLA will fail because the City did not interfere with her taking of leave

In *Sharif*, the Fourth Circuit described a claim for interference under the FMLA:

> The FMLA provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." Id. § 2615(a)(1). The substantive rights guaranteed by the FMLA are prescriptive, and a plaintiff seeking redress for employer interference with an entitlement is only required to show that he or she qualified for the right that was denied.

> *Sharif v. United Airlines, Inc.*, 841 F. 3d 199, 203 (4th Cir. 2016) (citing *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F. 3d 541, 546 (4th Cir. 2006).

Here, Plaintiff cannot prove her claim for interference under the FMLA because, although she can show that she was qualified for the right – she was, indeed, an employee for more than 12 months at the time she was fired – she cannot show that a right under the FMLA was *denied* to her. It is undisputed that her FMLA leave was not only granted, but was also encouraged by her superior, Mr. Herbert. As several courts have clarified, the FMLA does not itself protect employees against legitimate disciplinary actions. *See Coleman*, 136 Md. App. at 433-34 ("Turning first to the language of the statute, we note that the FMLA provides that an employee on FMLA leave is not entitled to anything more than what he/she was entitled to if he/she had not taken leave."); *see also Ensor*, 2021 WL 1139760 at *37 (quoting *Coleman*: "'if [the employee] would have been terminated because of poor work performance regardless of whether [he or] she took leave, then [the employer] did not violate FMLA'" (brackets in original)).

## B. PLAINTIFF'S AGE DISCRIMINATION CLAIMS FAIL BECAUSE THE EMPLOYEE WHO REPLACED HER IS OLDER THAN PLAINTIFF

To succeed on an age discrimination claim under the Age Discrimination in Employment Act, Plaintiff must first establish a *prima facie* case by showing that (1) at the time of her firing, she was at least 40 years of age and thus in a protected class; (2) she was qualified for her job and was meeting her employer's legitimate expectations; (3) she was terminated; and (4) she was replaced by someone substantially younger with comparable qualifications. *Westmoreland v. TWC Administration LLC*, 924 F. 3d 718, 725 (4th Cir. 2019); *see also Warch v. Ohio Cas. Ins. Co.*, 435 F. 3d 510, 513 (4th Cir. 2006) (abrogated on other grounds). Plaintiff must also prove by a preponderance of the evidence that age was the "but-for" cause of her termination, and that the City "*would not have fired her* in the absence of age discrimination." *Westmoreland* 924 F. 3d at 725 (emphasis in original); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009). As in all of Plaintiff's claims herein, if she meets her *prima facie* case, under the *McDonnell Douglas*

analysis the burden of production shifts to the Defendant to show a legitimate non-discriminatory reason for its decision.

Plaintiff here can satisfy the first and third prongs of her *prima facie* case for age discrimination, but cannot satisfy the second or fourth. It is undisputed that Plaintiff was terminated, and that she was over 40 years of age at the time. However, Plaintiff cannot establish that she was meeting her employer's legitimate expectations, nor can she establish that she was replaced by a younger employee.

Just as Plaintiff has failed to prove the third prong of her disability discrimination claim, *see* Section A.2., *supra*, she likewise cannot satisfy the second prong of this claim because she cannot prove that she met her employer's legitimate expectations under an ADEA analysis. Such a case "requires the employee to demonstrate that [s]he was 'qualified' in the sense that [s]he was doing his job well enough to rule out the possibility that [s]he was fired for inadequate job performance, absolute or relative." *Warch*, 435 F. 3d at 514-15. As demonstrated through the evidence and as noted above, Plaintiff was fired directly as a result of the internal OIG investigation that revealed significant concerns with her integrity and truthfulness, qualities that were essential to her job as a high-level executive in Baltimore City government.

Plaintiff also clearly cannot satisfy the fourth prong of her ADEA *prima facie* case. Not only can Plaintiff not point to any evidence that shows that age was a "but-for" cause of her firing, the employee who ultimately took on the position of Deputy Director of DHR, Tonya Brinkley, is older than Plaintiff. Plaintiff was not replaced by a younger employee, as she claims in her Complaint.[3] There is, again, no evidence Plaintiff can point to, other than that borne of conjecture and inferences, that can show that her age was a but-for cause of her firing.

---

[3] In her deposition, Plaintiff mentioned a former DHR employee, Chi-Chi Nyaga-Nash. seems to have had, at the time of her filing, a belief that Ms. Nyaga-Nash directly replaced her and has alleged that Ms. Nyaga-Nash was

## V. CONCLUSION

Even if Plaintiff were able to meet her burden to prove a *prima facie* case on any single one of her claims, she cannot produce any evidence that rebuts the City's legitimate non-discriminatory reason for firing her – that an independent internal investigation implicated her integrity. The record is entirely devoid of any evidence of pretext, or any other evidence to suggest that this reason was not the City's true reason. Instead, the record clearly shows that the City accommodated Plaintiff's requested medical leave under the FMLA, the ADA, the RA, and the MFEPA, and that the employee who filled Plaintiff's position after her termination was older than Plaintiff. There is no possible interpretation of these facts by any reasonable juror that could lead to a judgment for Plaintiff. The City is entitled to summary judgment as a matter of law on each of Plaintiff's claims.

Respectfully submitted,

_____/s/_____
Elisabeth B. Hofmann, Esq.
Federal Bar No.: 22099
Assistant Solicitor
Labor, Employment & Personnel
Baltimore City Department of Law
100 N. Holliday Street
Baltimore, Maryland 21202
(410) 545-7391
elisabeth.hofmann@baltimorecity.gov

*Attorney for Defendant, Mayor & City Council of Baltimore*

---

younger than Plaintiff. In fact, Ms. Nyaga-Nash and another employee named Steven Serra both filled Assistant Deputy Director positions after Plaintiff's termination. In her deposition, Plaintiff's only reference to any knowledge about Ms. Nyaga-Nash was something she saw on a LinkedIn page. *See* **Exhibit 3** at 68-72.