DEFENDANT'S EXHIBIT 2



# OFFICE OF THE INSPECTOR GENERAL
# BALTIMORE CITY

100 N. Holliday Street, Room 635
BALTIMORE, MD 21202

## CONFIDENTIAL
## INTERIM REPORT OF INVESTIGATION

**Date of Report: July 17, 2018**
**Case #: 2017-0799**

## EXECUTIVE SUMMARY

The Office of the Inspector General (OIG) received a complaint regarding the Department of Human Resources' (DHR) Executive Leadership Team: Director Mary Talley, Deputy Director La'Tonya Bryant, and Deputy Director Jacia Smith. The complaint alleged that members of the Executive Leadership Team were harassing and humiliating DHR employees.

Past and current DHR employees reported that Director Talley's behaviors have depleted workplace morale and caused employees to feel marginalized and degraded. Director Talley's behaviors have also allegedly created an environment where employees are fearful of presenting new ideas or suggesting modifications to Director Talley's initiatives. Employees reported that job satisfaction and productivity have suffered as a result of Director Talley's behaviors. Additionally, employees reported that, due to the toxic atmosphere at DHR, they have sought medical and psychiatric treatment.

Employees reported being afraid to complain about the environment at DHR. Some expressed reluctance to participate in this investigation for fear of retaliation or termination.

The OIG interviewed more than forty witnesses, including current and past DHR employees, and other individuals in City government. Evidence gathered during those interviews suggested: (1) that DHR has experienced an increase in turnover in recent years; (2) that a culture of fear exists at DHR, wherein employees are afraid of being terminated or retaliated against; and (3) that Director Talley has ridiculed and demeaned DHR employees. Additionally, the OIG determined that Director Talley has used her authority to try to identify whether an anonymous complaint about the DHR work environment came from a City employee.

OIG Case #<u>2017-0799</u>
Page 2

## OIG INVESTIGATION

<u>METHODOLOGY</u>

To investigate the allegations, the OIG interviewed 42 individuals:

- Twenty of the witnesses interviewed are current DHR employees. These individuals represented all levels of employment, from temporary employees to managers and Division Chiefs. The OIG interviewed at least one employee from every DHR division. Five employees refused to cooperate with the OIG's attempts to schedule an interview. Due to the nature of the allegations and the attendant fear asserted by many employees, the OIG did not force compliance. Many of the current employees interviewed expressed reluctance to participate in the investigation, despite assurances of confidentiality and anonymity, for fear that DHR leadership would find out and retaliate against them.

- Twelve of the witnesses interviewed were former DHR employees. This group was comprised of two categories of former employees: (1) employees that transferred from DHR to other City agencies; and (2) employees who were terminated or who resigned from DHR.

- Seven witnesses were senior level managers for other City agencies.[1]

- Finally, the OIG interviewed all three members of the DHR Executive Leadership Team.

During the course of this investigation, three additional anonymous emails were received by the OIG, which raised additional issues regarding DHR operations. Those issues are currently under investigation and shall be addressed separately in a final Report of Investigation.

<u>BACKGROUND</u>

DHR is responsible for attracting, developing, and retaining a diverse and quality workforce for the City of Baltimore. In order to accomplish that mission, DHR is charged with developing, implementing and administering the City's human resource policies, regulations, programs and related special projects.

Mary Talley was hired as Deputy Director of DHR under former-DHR Director Ronnie Charles in October of 2012. After Charles left DHR in 2014, Talley was appointed Director by then-Mayor Stephanie Rawlings-Blake.

---

[1] The majority of the information gathered during these interviews was not pertinent to the issues presented in this Interim Report of Investigation.

CITY005008

OIG Case #2017-0799
Page 3

La'Tonya Bryant joined DHR as Chief of Staff in August of 2012. She was later promoted to Deputy Director of HR Administration for DHR by Director Talley.

Jacia Smith was hired as DHR's Chief of Policy in October of 2015. She was promoted to Deputy Director of HR Operations in May of 2017.

As of June 1, 2018, there were 63 employees[2] spread throughout nine DHR divisions:

- Administration
- Classification and Compensation
- Employee Assistance
- Employee Benefits
- Human Resource Information Systems (HRIS)
- Training and Development
- Policy and Compliance
- Recruitment and Talent Acquisition
- Shared Services

The employees who work for DHR are responsible for supporting the HR needs of more than 35 City agencies and "quasi-agencies," which employ approximately 14,000 people.

For this interim report, the OIG focused on the following areas of concern at DHR:

1. Turnover Rate Increase
2. Culture of Fear
3. Toxic Leadership

**1. Turnover Rate Increase**

Since Fiscal Year (FY) 2011, 70 permanent DHR employees[3] have left DHR, either voluntarily or involuntarily. The chart below shows the rate of turnover in DHR since FY 2011. During the four FYs prior to Talley becoming Director, DHR lost 23 employees. In the four FYs that Talley has served as DHR Director, the turnover rate has more than doubled, with an overall loss of 47 employees.

---

[2] This number does not include individuals employed in a "temporary" capacity, such as Community Aides, Test Monitors, and Contract Service Specialists.

[3] This figure comes from HRIS, and accounts for DHR employees who have been terminated, have resigned or have transferred to another City agency. This number does not include employees who entered retirement.

CITY005009

OIG Case #2017-0799
Page 4



DHR Turnover by Fiscal Year

*This accounts for permanent DHR employees, and does not include those employed in a temporary capacity, such as community aides, test monitors, and contract service specialists*

While the increase in turnover is not in and of itself evidence of a failure of leadership, it may reflect a trend that has the potential to negatively impact DHR operations.

One of the positions impacted by the increased rate of turnover is that of Executive Assistant (EA) to the DHR Director. Based on information the OIG has obtained, Talley has employed six different EAs since becoming Director of DHR, four years ago.

Another group impacted by the high turnover rate is that of the DHR Division Chiefs. Since Talley became DHR Director, there have been six individuals whose tenure as Chief has lasted less than six months:

- Darrell Son was promoted to Chief of Benefits on July 1, 2014. He was discharged just over a month later.

- Louis LaRicci was promoted to Chief of Classification and Compensation on July 1, 2014. He resigned approximately three months later.

- Pamela Beckham was promoted to Chief of Training on July 1, 2014. She transferred to DPW roughly three months later.

- Robert Connolly was hired as Chief of the Benefits Division on January 5, 2015. He resigned from DHR within a month.

- Denyse Jeter-Williams was hired as Chief of Recruitment on January 5, 2015. She was discharged within the month.

- Stacey Jackson was hired as Chief of Policy on January 29, 2018. She resigned within two weeks.

CONFIDENTIAL ROI
Internal Use Only

CITY005010

OIG Case #2017-0799
Page 5

One witness described the high rate of turnover at DHR as a "brain drain," wherein experienced and intelligent HR professionals have been relieved of their duties or have left DHR to seek opportunities elsewhere. One of the DHR Deputies described turnover at the agency as "higher than normal." Director Talley pointed out that "it takes time to recruit and it costs money to recruit, and I don't have a lot of either."

## 2. Culture of Fear

Multiple witnesses pointed to the high rate of turnover as a factor that is driving the culture of fear at DHR. One witness reported that Director Talley constantly reminds DHR's non-Civil Service employees that they are at-will, and can be terminated at any time. Another witness heard Director Talley tell an employee whose Chief had been recently terminated, that if the employee was so upset about her former supervisor's termination, she could "join her."

Several witnesses pointed to the high rate of terminations among Director Talley's EAs as another factor that is driving DHR's culture of fear. Since becoming DHR Director, Talley has terminated four[4] EAs. Based on information in HRIS, none of the EAs were employed at DHR for longer than eight months. According to one witness, Director Talley previously bragged about the number of EAs she "went through" at her last job. During her interview with OIG, Director Talley estimated that she worked with four EAs during the ten years that she was employed at her previous job. Regardless of Director Talley's actual intent, witnesses reported the effect of these terminations has been to increase concern for job security.

Witnesses reported that DHR employees are routinely terminated or "performed out." According to one witness, the performing out process at DHR entails assigning an abundance of tasks, the performance of which is subjected to extreme scrutiny and criticism. This witness believed that the barrage of work, coupled with excessive supervision and hypercritical feedback, is deliberately designed to hasten the targeted employee's resignation.

During the course of the instant investigation, Chief of Recruitment and Talent Acquisition, Nicole Carter,[5] advised the OIG that she believed she was being "performed out" by DHR Leadership for her usage of FMLA leave. On May 8, 2018, Carter was placed on a Performance Improvement Plan (PIP). Carter advised the OIG that Director Talley acknowledged that the Recruitment Division was meeting its goals, but she also believed the division could be doing more. Carter's PIP included several vague objectives, like "Provide regular, consistent, and meaningful information" and "display balanced thinking, combining wisdom, sound judgment, analysis, experience, and perspective when making decisions or producing results." Carter reported that every assignment she completed was heavily scrutinized. Additionally, she reported

---

[4] An additional EA worked as a temp for DHR. After less than four months, Director Talley elected to replace her rather than extend a permanent job offer.

[5] Carter agreed to waive confidentiality and anonymity for the OIG's report.

CITY005011

OIG Case #2017-0799
Page 6

that a colleague, Chief of Policy Jason Ingram, was present during meetings in which her performance was discussed and scrutinized. Ingram confirmed that he has been present during meetings about Carter's assignments, at the behest of Deputy Smith. Carter opined that members of DHR's Executive Leadership Team deliberately made the workplace intolerable in an attempt to compel her departure from DHR. Their apparent efforts succeeded when, on July 13, 2018, Carter tendered her resignation from DHR. Carter reported that her fear of losing her job, and the insurance coverage that she needs following several recent health issues, prompted her to seek employment elsewhere.

Witnesses report that the fear-driven environment affects DHR employees in the following ways:

- Employees are afraid to make a mistake in their work

- Employees are afraid to question or challenge Director Talley's initiatives

- Employees are afraid to speak out about the environment at DHR

The latter fear has proven particularly problematic to this investigation, as many employees were reluctant to speak candidly to the OIG about their experiences in DHR.

### *Employees are afraid to make a mistake in their work.*

Every current and former DHR employee interviewed agreed that Director Talley has very high expectations for employees. Several witnesses, including one of the DHR Deputies, reported that Director Talley "expects perfection." According to one of those witnesses, employees who produce less than perfect outcomes are soon relieved of their jobs. For example, an HR Business Partner with less than two months' experience at DHR, was told to give a presentation on a complex HR topic. According to one witness, Director Talley believed the employee's presentation was unsatisfactory. Shortly thereafter, Director Talley ordered the employee's termination, despite the fact that his supervisor wanted to invest more time in developing his skills. According to HRIS, after the employee's termination from DHR, he was subsequently hired as a Community Aide by another City agency, and has since been promoted to HR Generalist.

One witness reported that Director Talley often writes off employees after their first misstep. According to that witness, once Director Talley makes up her mind that an employee is not meeting her exacting standards, all progressive discipline is merely a formality leading to termination, and not a genuine effort to improve the employee's performance. Another witness reported that Director Talley is more likely to terminate an employee than develop the employee's skillset. One of the DHR Deputies told the OIG that Director Talley is "not as tolerant" of employee mistakes, whereas this Deputy says she tries to "grow people." Director Talley acknowledged to the OIG that she makes assessments very quickly about the quality of an employee's work, and – if she believes a change needs to be made – she makes it.

Witnesses report that Director Talley's overt intolerance for imperfection has fueled the culture

CITY005012

OIG Case #2017-0799
Page 7

of fear at DHR. One witness reported that the fear she has experienced has nearly paralyzed her, inhibiting her ability to perform her basic job functions.

***Employees are afraid to question or challenge Director Talley's initiatives.***

One witness reported that DHR "is not a safe place to have your own opinion." This witness stated that employees that question or challenge Director Talley's ideas and initiatives are usually terminated.

During her interview with OIG, Director Talley stated that Chief of Benefits Ray Gulhar complained about the amount of work involved with the WorkBaltimore initiative. He has conveyed his concerns to Director Talley privately and during meetings with other DHR Chiefs. Gulhar reported that Director Talley has criticized him for talking too much.[6] Director Talley confirmed this to the OIG, saying that she recently placed Gulhar on a "Last and Final Warning," for "talking too much."

Seven witnesses reported that they are reluctant to provide honest feedback regarding the agency's operations to DHR Leadership. The fear of speaking up exists, according to one witness, because DHR is "an environment where they're not afraid to terminate you." Another witness stated that there is a fear of being next "on the chopping block" if an employee questions Director Talley's proposals. The fear of being terminated or "performed out" has led many employees to remain silent when they believed Director Talley was making a bad decision. Rather than giving a candid assessment of DHR initiatives, one witness stated that she simply agrees with Director Talley in order to avoid conflict. Another witness stated that she does not express her concerns when she believes Director Talley is making a mistake, because she does not want to be fired.

One witness reported that employees who have voiced concerns over particular DHR initiatives in the past, are often told that they can leave DHR if they don't like what is occurring. Another witness reported that, when employees have complained, Director Talley has threatened to find someone else who will do the job.

Even employees who are not concerned about being terminated, are reluctant to voice their opinions for fear of incurring some other form of retaliation. One witness stated that she disagreed with several DHR initiatives and practices, because she believed they were ineffective and a waste of time and resources. This witness never voiced her concerns because she wanted to avoid the "fallout" that she believed would likely follow, such as a poor performance evaluation.

Several witnesses advised the OIG about an incident in which a DHR Benefits employee was reprimanded for not requiring that her team walk through the downtown area for a WorkBaltimore marketing campaign called Friday Floods.[7] Director Talley, herself, acknowledged receiving a

---

[6] Gulhar agreed to waive confidentiality and anonymity for the OIG's report.

[7] "Friday Floods" is an initiative where DHR employees go into various Baltimore City neighborhoods to talk to residents and businesses about the WorkBaltimore job fair. According to Director Talley, DHR employees are

CONFIDENTIAL ROI
Internal Use Only

CITY005013

OIG Case #2017-0799
Page 8

complaint about an employee who – Director Talley believed – did not want to participate in the Friday Floods when it was "warm out." According to one witness, on the Friday in question, July 21, 2017, there was a Code Red Alert[8] in effect. Because of the extreme heat, and her concerns about the health of the members of her team, the Benefits employee elected not to force her team to participate in the Friday Flood. Several witnesses reported that Director Talley called the employee into her office and chastised her for failing to comply with her directives. According to one witness, after that incident, employees felt less likely to challenge Director Talley's directives or authority.

According to one witness, many DHR Chiefs use leadership meetings to praise Director Talley, rather than present new ideas. Another witness reported that DHR Chiefs give each other looks during Senior Team meetings, which include the Executive Leadership Team and DHR Chiefs, to keep one another from saying anything that could anger Director Talley. Even one of the DHR Deputies reported that she has observed meetings where everyone in the room was simply agreeing with Director Talley, rather than voicing concerns or making suggestions about the initiatives being presented. This witness told OIG that "maybe [the employees] haven't felt safe to express opposition in a manner that honors their expertise and professionalism, so rather than engage, they just [say] yes." This Deputy stated that DHR employees are "less inclined to offer suggestions, and more inclined to follow directives."

### *Employees are afraid to speak out about the harmful environment at DHR.*

During this investigation, many current DHR employees reported that they were afraid of what would happen if DHR Leadership were to find out they had spoken with the OIG. Employees cited Director Talley's close relationship with Senior City Officials as further driving this fear. According to one witness, Director Talley "has eyes everywhere and finds out everything." Two witnesses were reduced to tears when discussing their fears regarding cooperating with the OIG's requests for information.

Even assurances of anonymity were insufficient to alleviate most witnesses' anxiety of speaking candidly about the DHR environment. Director Talley and both Deputies acknowledged that they previously attempted to identify the person who submitted an anonymous complaint regarding the DHR environment. On October 25, 2017, an anonymous email was sent to members of the City Council, the Mayor's Chief of Operations, the Mayor's Chief of Staff, the City Solicitor, and the Baltimore Brew. The email – which was later forwarded to the OIG and contributed to the current investigation – detailed complaints about the disrespectful environment at DHR.

The OIG determined that Director Talley obtained a copy of the email, and asked Tonya Brinkley, DHR's Chief of HRIS, to track down the email's sender. Specifically, Director Talley wanted to

---

expected to walk for four to five hours during Friday Floods, which occur from June through late September.

[8] A Code Red Alert is declared by the Health Commissioner when the forecasted heat index is equal to or greater than 105 degrees. The OIG confirmed that a Code Red Alert was in effect on the Friday in question
.

CITY005014

OIG Case #2017-0799
Page 9

know if the complaint had been sent from a City computer. Brinkley contacted a representative at the Baltimore City Information & Technology (BCIT) to determine whether IP addresses from the email were being used by City computers. At no time was it disclosed to BCIT that the request was being submitted in an effort to identify the source of a complaint against Director Talley.

One of the DHR Deputies reported that she has had conversations with employees who told her that they are in fear for their jobs. She further stated that she "can see why people are fearful." The other DHR Deputy stated that she "would like to hope" that DHR employees are not scared, and noted that would be "really bad" if they were.

Director Talley reported that she was bothered by the fact that employees are afraid. She acknowledged that employees cannot perform their best if they are paralyzed by fear. Director Talley told OIG "if a lot of people are complaining about the same thing, then there's something to it," but she pointed out that she "certainly [doesn't] see it that way."

### 3. Toxic Leadership

According to the Society for Human Resource Management (SHRM)[9], toxic leaders are highly critical, and often act aggressively toward subordinates and threaten them with insults or tirades. Toxic leaders are unconcerned with or oblivious to employee morale. They humiliate and disrespect employees, and are not interested in developing employees' skills.

> ***DHR employees have heard Director Talley and the Deputies ridiculing other employees' clothes and bodies.***

The original complaint received by the OIG, along with information received from several witnesses, characterized Director Talley and the DHR Deputies as "the Mean Girls[10] of DHR." Numerous witnesses reported that they have heard Director Talley make unprofessional and disparaging remarks regarding the clothes and bodies of DHR and other City employees, as well as members of the public.

Based on the statements of several witnesses, it appears that this conduct typically occurs in one of two settings: (1) between Director Talley and the Deputies in Talley's office; or (2) during Senior Team meetings. Two witnesses reported overhearing conversations between Director Talley and her Deputies that took place in Talley's office, because the door was left open. Those conversations often involved personal criticisms about employees, as opposed to being

---

[9] SHRM is an international HR organization. This description of toxic leadership comes from SHRM HR Magazine's Are You a Toxic Leader or Just a Tough Boss? By Teresa A. Daniel and Gary S. Metcalf (July 1, 2015). Available at https://www.shrm.org/hr-today/news/hr-magazine/pages/070815-toxic-leader-or-tough-boss.aspx. During her interview with the OIG, Director Talley reported that she encourages DHR employees to receive HR certifications through SHRM.

[10] Mean Girls refers to the 2004 film starring Lindsay Lohan, about a group of malevolent, popular girls in high school.

CITY005015

OIG Case #2017-0799
Page 10

professional assessments of the employees' performance. Another witness described Senior Team meetings as having a "what happens here, stays here" feel. According to that witness, during those meetings, members of the Executive Leadership Team feel emboldened to critique employees' appearances.

Witnesses[11] provided the following examples of Director Talley's criticisms regarding attire and appearance:

- One witness reported that she regularly heard Director Talley and the Deputies laughing at employees' attire, and asking questions like "Did she look at herself before she left home?"

- Another witness reported that, after a Division Chief dyed her hair, she heard Director Talley tell another employee that it "looked like shit."

- According to one witness, Director Talley routinely asked her what she thought of other employees' attire and appearances.

- One witness reported that she was asked to deliver food for a meeting at DHR. As this employee was setting out the food in advance of the meeting, Director Talley demanded that her meal be placed far away from another employee's food because, according to Talley, the other employee "smell[ed] bad."

- Another witness advised that she overheard Director Talley tell one of the Deputy Directors that a particular DHR employee was "a doormat" who "did not have a mind of his own" and did whatever she told him to do.

- Tim Dodd, DHR's former Performance and Compliance Manager, once gave a presentation to Director Talley on the City's Pay-for-Performance program. Following the presentation, one witness heard Talley tell Dodd that she could not focus on the content of the presentation because his shirt was so wrinkled.

- One witness reported that she heard Director Talley and the Deputies laughing at poorer, less educated members of the public who attended the WorkBaltimore job fair. This witness stated that Director Talley used the name Sheneneh[12] in describing some WorkBaltimore participants. One of the DHR Deputies confirmed that Talley has used Sheneneh as a way of describing individuals. According to that Deputy, when selecting participant photos to post on the WorkBaltimore website after the event, Director Talley stated that she did not "want any Shenenehs in there."

---

[11] The examples presented herein were supplied by several witnesses.

[12] Sheneneh refers to a character from the 1990's sitcom, *Martin*.

CITY005016

OIG Case #2017-0799
Page 11

- Another witness reported that Director Talley once called the Deputies into her office to make fun of a citizen on Baltimore Street, as seen through Talley's office window, who appeared to be intoxicated.

- One witness reported that she overheard Director Talley tell another employee that she did not believe that degrees from the University of Phoenix were "real degrees."

- One witness reported that she heard Director Talley discussing the Labor Commissioner's dated clothing and hairstyle.

It is of note that several witnesses interviewed for this investigation reported that they never heard Director Talley or either Deputy discussing employees' clothes or bodies in an unprofessional manner. Those witnesses stated that all discussions regarding employees' clothes and bodies focused on the appropriateness of an employee's attire or efforts to address hygiene concerns. One current employee stated that Director Talley has only ever offered positive feedback on her appearance.

Director Talley categorically denied making fun of the body or attire of any DHR employees, and stated that the allegation offended her. She reported that she has tried to create an "inclusive environment" to achieve her "aspirational goals." Likewise, both Deputies denied ever having ridiculed employees' clothing or bodies.

### *Director Talley has berated and belittled employees, both publicly and in one-on-one settings.*

Numerous witnesses reported to the OIG that Director Talley has mistreated her EAs. Since becoming Director of DHR four years ago, Talley has employed six permanent EAs. Witnesses reported that Director Talley engaged in a variety of behaviors designed to intimidate and demean her EAs:

- One witness described a WorkBaltimore meeting, at which Director Talley "publicly excoriated" an EA after the EA made a mistake. While the witness agreed that a mistake had been made, the individual reported being uncomfortable with the way Talley reprimanded the EA in front of everyone at the meeting.

- One of Director Talley's previous EAs injured her foot and was required to wear a medical boot that made it difficult to walk. According to one witness, despite the EA's injury, Talley required the EA to hand-deliver a document to City Hall. The witness reported that this task could have been given to any of the able-bodied clerical staff nearby.

- Several former EAs reported that Director Talley regularly required them to run personal errands for her, typically by sending them to pick up food and/or drinks for her and the DHR staff. One former EA reported that Talley refused to consume meals or drinks from the café located on the lower level of the DHR building, because it was "not good enough." Instead, Director Talley demanded that the EAs

CITY005017

OIG Case #<u>2017-0799</u>
Page 12

pick up food and beverages from Starbucks, Dunkin Donuts, or restaurants located several blocks from the office. Another former EA estimated that she spent roughly ten hours each week performing these tasks, which took her away from her job responsibilities at DHR. This witness reported that Director Talley would not allow her to have meals delivered to DHR, and instead insisted that the EA walk to the restaurant to pick up the food and bring it back to the office. Yet another former EA reported that Director Talley deliberately made these tasks more challenging and demeaning than they needed to be, by requiring food to be picked up more often during inclement weather. According to one former EA, twice a week Talley required her to pick up a cookie and tea from the Starbucks located at 100 E. Pratt Street (four blocks south of the DHR office), despite the fact that there was a closer Starbucks located at 10 Light Street (only one block east of the office). This witness reported that Director Talley insisted that the closer Starbucks did not make the tea to her liking.

Several witnesses described instances where Director Talley admonished or degraded DHR employees in a public setting. Other witnesses observed Talley making demoralizing statements to employees during one-on-one interactions. Various witnesses reported the following examples where Director Talley engaged in inappropriate or oppressive behaviors against particular employees:

- One witness reported that Director Talley once gathered the Deputies and a group of DHR Chiefs into her office for a meeting. During the meeting, a Division Chief that was not present called Talley's phone. Director Talley cautioned the people in her office to remain quiet, and she placed the caller on speaker phone, enabling all present in the room to hear the entire conversation. The content of that conversation, which the caller believed had been private, later "became fodder for laughter" amongst those who heard it.

- Multiple witnesses recounted an incident that occurred at a DHR event, during which Director Talley told her employees that she had not wanted to hire Chief of Benefits, Rajesh Gulhar. Talley went on to state that she had been convinced to hire Gulhar, despite her reservations, by a former Deputy Director. A number of witnesses who were present considered this public statement to be inappropriate and disrespectful. Director Talley acknowledged making this statement, but reported that she did not intend to be disparaging. She reported that the comment has been taken out of context. According to Talley, Gulhar had been talking about how happy he was to work at DHR and how much he liked working with her, when she responded that she had been skeptical of hiring him.

CITY005018

OIG Case #2017-0799
Page 13

- One witness reported that Director Talley once told her "talking to you is like talking to a wall." This wall-themed abuse was reiterated by several other witnesses, who reported that they had heard Talley say (1) that she would rather "speak to a wall" than to a particular DHR employee; and (2) that another employee was "as dumb as a wall."

- One witness reported that Director Talley once called a former DHR employee "dumb as a dog" during a meeting.

Several witnesses provided consistent accounts of times when Director Talley undermined employees' confidence by repeatedly telling them that they were not intelligent or capable enough to be in their position:

- One witness reported having heard Director Talley tell DHR employees "you have no idea what you're doing," "you cannot do the job," and "you are nothing."

- Another witness stated that she heard Director Talley tell an employee that she did not have confidence in the employee's ability to perform her basic job function. A different witness reported hearing Talley discuss the aforementioned employee's lack of credentials and education with other DHR staff.

- Yet another witness reported that she was present when Director Talley told another DHR employee that she was "not trainable" and that she would never be able to grasp the nuances of her position. That witness reported that she disagreed with Talley's harsh assessment.

Witnesses who experienced Director Talley's denigration reported that it has damaged their sense of self-worth. One former employee stated that she is "shaken" and still struggling with her experience, even months after her employment with DHR ended. Another former employee advised that her self-esteem was "messed up" for a very long time because of her interactions with Director Talley. One witness reported that she has been seeing a therapist to help cope with working in DHR's acrimonious environment.

One of the DHR Deputies described Director Talley as intelligent and thoughtful, and denied that she has ever heard Talley call an employee "dumb." This Deputy reported that she has heard Talley say that an employee "didn't get it" or was "miscast" – meaning the employee was in a position that they were not equipped to perform. This witness reported that she has observed Director Talley be "hard," "harsh," and "relentless" with employees. She described the "relentless" behavior as Talley continuing to push an employee about an issue after the employee's body language reflected that he or she has had enough. This witness reported that she has seen Director Talley be relentless with DHR Chiefs, at which point the Deputy has intervened on the Chief's behalf.

CITY005019

OIG Case #<u>2017-0799</u>
Page 14

This Deputy also stated that, while she may not perceive interactions between Director Talley and DHR employees as being demeaning, the employees may interpret those interactions differently. The witness reported that a few employees have complained to her about the way Talley treated them. During those conversations, the Deputy has offered to speak to Director Talley on the employee's behalf. This Deputy reported that she has "run interference" for several employees.

The other Deputy stated that Director Talley has challenged her to grow professionally, and reported that she is proud to be a part of Talley's vision of making DHR a more strategic and transformative agency. She reported that she has heard Director Talley provide employees with direct feedback about their performance, but she has never heard Talley call an employee "dumb." This Deputy stated that employees have come to her with concerns about their interactions with Talley. According to this witness, Director Talley's delivery of critical feedback often puts employees on the defensive and "could use some refinement."

Director Talley reported that she has never berated or demeaned an employee. She denied ever publicly reprimanding an employee. Talley stated that confidential conversations regarding staff usually take place in either her office or in the offices of one of the Deputies, and always behind a closed door.

## INVESTIGATIVE FINDINGS

Based on the OIG's investigation, and the anecdotal evidence provided by various past and present DHR employees, it appears that a culture of fear exists at DHR. This culture of fear appears to have been created by Director Talley's actions including: ridiculing and demeaning employees before other DHR staff; berating and belittling employees both publicly and in one-on-one settings; and stifling dissent through placing employees in fear of losing their jobs. Employees' claims regarding how Director Talley has treated them, and the fear that treatment has induced, were corroborated by the Deputies, both of whom reported that DHR staff have come to them expressing concerns about such treatment. One of the Deputies stated that, even though she does not believe DHR is a toxic environment, she believes "there is work to be done," and that DHR leadership should "reevaluate the manner in which we communicate."

Given the nature of the various complaints and the fact that many of Director Talley's statements occurred in a private setting, the OIG was unable to corroborate each individual incident that employees considered demeaning or intimidating. However, the consistent nature of the complaints, and the similarity of examples provided by various witnesses, lends credence to the allegations. Even Director Talley acknowledged this when, during her OIG interview, she stated "if a lot of people are complaining about the same thing, then there's something to it."

Based on the OIG's findings, this matter is referred to Management to take whatever action is deemed necessary.

CONFIDENTIAL ROI
Internal Use Only

CITY005020

OIG Case #2017-0799
Page 15

Submitted By: _____    Date: 7/17/2018
            Special Agent Jennifer Caffrey

Approved By: _____    Date: 7·17·2018
           Inspector General Isabel Mercedes Cumming

CONFIDENTIAL ROI
Internal Use Only

CITY005021