LA'TONYA T. BRYANT      \*    IN THE
     Plaintiff          \*    U.S. DISTRICT COURT
  v.                 \*    FOR THE DISTRICT OF MARYLAND
MAYOR & CITY COUNCIL OF BALT.   \*
     Defendant       \*    Civil Action No.:  MJM-21-0545
                      \*

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### PLAINTIFF'S OPPOSITION TO DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT
### AND REQUEST FOR HEARING

Plaintiff La'Tonya T. Bryant, by and through her undersigned, hereby opposes Defendant's

Motion for Summary Judgment, and states as follows:

## I.  INTRODUCTION

Ms. Bryant comes before the Court seeking a denial of Defendant's Motion for Summary

Judgment and an opportunity to proceed to trial before a jury on all counts of her Complaint.[1]

## II.  FACTUAL MATTERS, FACTUAL DISPUTES, AND ARGUMENT

Ms. Bryant began working for Defendant in August of 2012.  *See* Pl.'s Answer to

Interrogatory No. 1, submitted herewith as "Exhibit A."  At first, she served as the Chief of Staff

to the Director of HR.  *See id*. at No. 2.  She served in this role until early 2015, at which time she

transitioned to Deputy Director of HR Administration.  *See id*.  As Deputy Director, she continued

to report to the Director of HR.  *See id*.  This was Mary Talley for most of Ms. Bryant's time as

Deputy Director, and Quinton Herbert at the end of her employment with Defendant.[2]  *See id*.

---

[1] In relation to the two counts of her Complaint concerning age discrimination (Counts XII and XIII), Ms. Bryant maintains that she was replaced by someone younger and that there are other indicia that her age played a role in her termination.  *See* Pl.'s Answer to Interrogatory No. 9, submitted herewith as "Exhibit A."  However, without conceding the matter, Ms. Bryant anticipates that the Court will grant Defendant's Motion as to these two counts. Though Ms. Bryant does believe she could establish a prima facie case for some of the same reasons argued in this Opposition in relation to her other counts (including that she was, in fact, meeting the legitimate expectations of her employer), that's likely as far as she could get with respect to her age claims in light of the record that was generated in discovery.  Conversely, the opposite is true as to the other counts of her Complaint, which are all supported by considerable evidence and should clearly survive Defendant's Motion.  These other counts (Counts I through XI), therefore, will be the focus of this Opposition.

[2] Ms. Bryant was terminated by Defendant on November 9, 2018.  *See* Def.'s Employee Exit Interview Form, submitted herewith as "Exhibit B."  On Defendant's Form, it states that Ms. Bryant's last performance appraisal was "satisfactory," as opposed to "unsatisfactory," and that her attendance was likewise "satisfactory."  *See id*.

Ms. Bryant would also report to others superior to her in the chain-of-command, such as Kimberly Morton, who was the Mayor's Chief of Staff.  *See id*.

At some point in late 2016 or early 2017, based upon a directive from then-Mayor Catherine Pugh for her Directors, like Ms. Talley, to come up with "strategic initiatives," Ms. Talley and a group of 12-14 members of upper management in the Department of Human Resources (hereinafter "Department"), including, but obviously not limited to, Ms. Bryant, came up with a project that would be known as "WorkBaltimore," which was then approved by Mayor Pugh's office.  *See* Pl.'s Depo. at 13-16, submitted herewith as "Exhibit C."  As its name connotes, WorkBaltimore was focused on securing jobs for Baltimore City residents.  This was the first time Ms. Bryant and the others in the Department had worked on something like this.  *See id*. at 17. Moreover, the initiative became so all-consuming to the entire staff of the Department that, for all intents and purposes, it was like having to work two jobs.  Here's how Mr. Herbert described it:

> The magnitude at which the planning and execution of the WorkBaltimore convention demanded was, essentially, a second full-time job.  Many staff complained that they could not do what they were getting paid to do for the city because they were spending most of their -- most, if not all, of their workday working on WorkBaltimore.

Herbert Depo. at 227, submitted herewith as "Exhibit D."  *See also* Underwood-Jordan Depo. at 5-6, 9-10, 20, submitted herewith as "Exhibit E."

There were various areas of responsibility associated with the organization and planning for WorkBaltimore that were divided up and staffed, and then chaired by various members of upper management in the Department.  Ms. Bryant was put in charge of "logistics."  *See* Pl.'s Depo. at 16.  This is how Ms. Bryant described the obligations of the logistics committee:

> It was getting space for the job fair, for lack of a better word, and a component of Work Baltimore was all these pre-trainings leading up to the bigger event where we had trainings in the communities, so we had to identify locations across the City that would allow us to host training opportunities to prepare people for work.

2

*Id.  See also* Underwood-Jordan Depo. at 21.

In addition to this logistics committee, there were many other committees, including a "finance committee."  *See* Gulhar Depo. at 52-53, submitted herewith as "Exhibit F."  The chair of the finance committee was Ray Gulhar.  *See* Def.'s Answers to Pl.'s Request for Admissions of Fact Nos: 4-5, submitted herewith as "Exhibit G."  *See also* Gulhar Depo. at 51.  Ms. Bryant was designated as co-chair of the finance committee, which she was tasked with in addition to her responsibilities to the logistics committee (and on top of her normal duties).  *See* Apr. 20, 2017 Letter by Talley and Attachments, submitted herewith collectively as "Exhibit H."  The aforementioned Mr. Gulhar has a "BA in political science and economics" and an "MA [in] economics."  Gulhar Depo. at 11.  The focus of his work for Defendant, independent of his obligations to WorkBaltimore, has been to "manage and administer the City['s] health and wellbeing programs for active employees, retirees, dependents, [and] COBRA."  *Id.* at 14-15.  According to Mr. Gulhar, "[M]y core function is finance.  I deal with money."  *Id.* at 130.  Mr. Gulhar had two accountants working under his direction, namely, Kirit Shah and Jovia Rwomushana.  *See id.* at 51-53.  Both of them also worked on the finance committee for WorkBaltimore.[3]  *See id.*  Here's how Mr. Gulhar explained the situation:

> [T]he entire department work[ed] for Work[Baltimore].  My employees, every one, was required to work with Work[Baltimore] in the different committees.  So I had three employees, they were working the finance committee.  That was Kirit [Shah], Jovia [Rwomushana], and Ann [Nichols].  They were under the finance.  The rest of my team, they were spread over with the other ten committees.  There were ten committees, which were -- they were reporting to [the] steering committee, chaired by Director Talley.

---

[3] Unlike Ms. Bryant, neither Mr. Gulhar, Mr. Shah, nor Ms. Rwomushana has been terminated by Defendant. *See* Herbert Depo. at 175.  Also unlike Ms. Bryant, Mr. Gulhar has never needed to take a period of medical leave during his employment with Defendant.  *See* Gulhar Depo. at 64-65.  Indeed, during the first three years of his employment, which began in May 2016, he "didn't even go to the doctor's because there was no need for it," and, since then, he has only gone for physicals.  *See id.* at 14, 65.

*Id*. at 52-53.

With respect to Mr. Gulhar's obligations as chair of the finance committee, he testified in deposition as follows:

> Q.   Okay.  Now, in your role as chair of the finance committee, you were responsible for maintaining the financial records associated with WorkBaltimore. Correct?
> A.   That's correct.
> Q.    And you tracked the money coming in and then going out for expenditures.  Correct?
> A.   That's right.

*Id*. at 53-54.  Immediately following this sworn testimony, seemingly realizing the damaging nature of his admissions to his current employer in this litigation,[4] Mr. Gulhar backpedaled and argued that he was "very insignificant" in the financing process -- despite his role as the committee chair.  *See id*. at 54-57.  Rather than take responsibility, he instead pointed the finger at Ms. Bryant and also said these types of decisions about incoming and outgoing funds were "collective efforts." *See id*.  As will be explained further below, the obligations Mr. Gulhar took responsibility for in his initial, above-quoted testimony absolutely <u>were</u> his actual assigned obligations, but, by his own admission, he chose to shirk them during the course of the WorkBaltimore project.   More specifically, as Mr. Gulhar claimed in his deposition, he was just too busy to do his assigned job as finance committee chair:

> [M]y head and my body was -- at that time, I was involved so much, I begged everyone, you know, release me so that I can focus -- my staff dedicated -- I attended every meeting they ask me.  I was physically there, <u>but</u> <u>mentally</u> <u>may</u> <u>not</u> <u>be</u> <u>there</u>.  But physically, I attended every meeting.

*Id*. at 58 (emphasis added).  Later in his deposition, Mr. Gulhar returned to this subject:

> I attend all the meetings, even though -- you know, I just said it all, physically I was there, my mind was working with my own projects.

---

[4]   It bears mentioning, in relation to this issue, that Mr. Gulhar explained in his deposition that he had gone online and "looked into" Ms. Bryant's case, noting that the case is "public" and that "you Google it and everything is right there."  Gulhar Depo. at 9-10.

So when -- you know, when you are -- if you put yourself in that shoes (sic), you will realize that half of the things you will not even remember, you know. Because when you have a disinterest in something – I mean, I have respect for Director Talley, but this was not my passion. …. This is not what I was hired for it. I was hired because there were multiple issue (sic) with the benefits program, and I won -- you know, I became the architect and designed my health plan. There -- you know, I worked -- I put a lot of energy -- WorkBaltimore -- I keep on saying I don't remember much. It's not something I don't want to answer your question, I don't remember it.

*Id*. at 128-29. Conversely, Ms. Bryant, who had roles on <u>two</u> WorkBaltimore committees on top of her regular, full-time responsibilities, worked very hard to perform her duties. *See id*. at 60-61.

The Court might be thinking at this point that it would be aided by more objective, detached sources of information regarding the true nature of Mr. Gulhar's and Ms. Bryant's assigned responsibilities as chair and co-chair of the finance committee. Fortunately, such sources exist. In a series of documents generated in real time by Defendant, it is made abundantly clear that Mr. Gulhar had every bit the level of responsibility as Ms. Bryant. Documents produced by Defendant dated April 20, 2017, which was a mere five months before the start of the WorkBaltimore Convention in 2017, refer to Ms. Talley, Mr. Gulhar, and Ms. Bryant -- in that order -- as the "designees for transaction approval regarding expenses for the Convention …." Apr. 20, 2017 Letter by Talley and Attachments. *See also* Herbert Depo. at 170. This same set of documents said to contact "Ray Gulhar, Finance Committee Chair at 410-396-7284; or La'Tonya Bryant, Finance Committee Co-Chair at 410-396-3851" with "any questions regarding the WorkBaltimore Convention …." Apr. 20, 2017 Letter by Talley and Attachments. In a separate, four-page document produced by Defendant, entitled "Work Baltimore – Finance Committee – Budget Procedures," there are repeated references to approval for deposits or expenditures needing to be given by "Ray or La'Tonya" or "Deputy Director Bryant or Chief Gulhar" or "Ray Gulhar or La'Tonya Bryant." *See generally* Work Baltimore – Finance Committee – Budget Procedures,

submitted herewith as "Exhibit I."  Without exception, every single time Ms. Bryant's name is mentioned in the document, Mr. Gulhar's name is mentioned right alongside it.[5]  *Id.*  It's also worth noting that such approvals by Mr. Gulhar or Ms. Bryant would occur as part of a broader undertaking by several other workers who had important roles.  *See generally id.*

The testimony of Julie Colucci, who was, and presumably remains, an "HR administrative officer" for Defendant,[6] also supports the conclusion that Mr. Gulhar, in his role as chair of the finance committee, was responsible for monitoring the financing of WorkBaltimore despite his contention that he was "very insignificant" in the financing process.  *See* Gulhar Depo. at 56.  *See also* Colucci Depo. at 8, submitted herewith as "Exhibit N."  Ms. Colucci testified as follows:

> Q    …. And are you aware that WorkBaltimore had a fin[ance] committee?
> A    Yes.
> Q    And was that run by Mr. Gulhar?
> A    He was the -- like the chair, I think.
> Q    Okay.  And Mr. Gulhar has two accountants on his staff under him; is that correct?
> A    Yes.
> ….
> Q    Okay.  And the two of them assisted Mr. Gulhar with his duties in relation to the finance committee, correct?
> A    Yes.
> Q    Were you part of the finance committee?
> A    No.
> Q    Did you interact with Mr. Gulhar in his role as chair of the finance committee?
> A    Yes.
> Q    And how frequently did that occur?

---

[5]  This same dynamic can be seen in other documents produced by Defendant as well.  *See, e.g.,* WorkBaltimore Finance Documents, submitted herewith collectively as "Exhibit J."  There are also documents Defendant produced which show Mr. Gulhar actively undertaking his responsibilities as the chair of the finance committee.  *See, e.g.,* Aug. 18, 2017 Email from Gulhar with Attachment, submitted herewith as "Exhibit K" (Mr. Gulhar is providing Ms. Talley with the working budget for WorkBaltimore); Oct. 20, 2017 Email from Gulhar without Attachments, submitted herewith as "Exhibit L" (Mr. Gulhar is providing Ms. Talley, Ms. Smith, and Ms. Bryant with the "[i]ncome and expense report" for WorkBaltimore).  *See also* Work Baltimore Committee Members Roster, submitted herewith as "Exhibit M" (identifying Mr. Gulhar as the sole "chair" of the finance committee, with Mr. Shah shown as the "lead" of said committee).

[6]  Ms. Colucci described her duties in this role as follows: "I am responsible for office management. I'm responsible for all our contracts in our department specifically.  I work on the budget.  Basically everything surrounding those items."  Colucci Depo. at 8, submitted herewith as "Exhibit N."

A    I -- I couldn't even say.  I mean, it was in relation to contracts and payments.  So, I mean, it was just on an as-needed basis.

Q    Okay.  Explain how you were interacting with him on contracts and payments.

A    Well, if there was a contract that we initiated for WorkBaltimore, I would make sure that they were aware so they knew where we were gonna have to spend money, you know.  Because the contracts all were tied to, you know, payments that were gonna have to be made at some point.

Q    Okay.  Did you interact with him with regard to other issues in terms of WorkBaltimore?

A    I mean, just surrounding payments and cost of things.  I don't recall any other reason to.

Q    Okay.  And was he providing you information about payment and costs or were you providing that to him or both or...?

A    It was, I would say, back and forth, you know.

….

Q    Okay.  And what, to your understanding, was the overall role of the finance committee in relation to WorkBaltimore?

A    To make sure the expenditures were tracked and managed properly.

*Id.* at 28-30.

So, all of this evidence makes clear that Mr. Gulhar was at least as responsible as Ms. Bryant for matters related to tracking and managing the financing of WorkBaltimore, if not more so since he was actually the chair of the finance committee.  *See* Gulhar Depo. at 51.  *See also* Pl.'s Response to Request for Admissions of Fact No. 13, submitted herewith as "Exhibit O" (Ms. Bryant "admits that she, like Rajesh 'Ray' Gulhar, had the authority to approve the payment of an invoice for WorkBaltimore 2017 expenditures out of the available buckets of funds associated with WorkBaltimore 2017.  The same would be true for WorkBaltimore 2018." (emphasis added)).  The only reason why Ms. Bryant may have ended up carrying more of the burden in relation to such matters would be because, as Mr. Gulhar readily admitted, he was derelict in his duties on account of his "disinterest" in WorkBaltimore and his having chosen to mentally tune out, if you will, in relation to his obligations as chair.  *See* Gular Depo. at 58, 128-29.  Needless to say, this shouldn't, and doesn't, absolve him of responsibility.

In relation to WorkBaltimore 2017, a so-called "Innovation Fund" loan of $100,000 was secured to help fund the initiative.[7]  *See* Pl.'s Depo. at 18-19.  Being a loan admittedly connotes that, in the ordinary course, it would need to be repaid.  But multiple witnesses, not just Ms. Bryant, testified that this was not the case.[8]  According to Ms. Bryant:

> A   Well, we were told that we did <u>not</u> have to pay the loan back.
> Q   Told by whom?
> A   We were told by Mary.  I heard it from Mary Talley, but she said that Kim Morton said we did not have to pay it back.[9]  She actually said it when we got the money, but she continued to say it as the time got near for us to pay it back.  I was saying, you know, we have to pay back the Innovation Fund.  She said, we don't have to pay it.  I asked her again, and that was a recurring conversation.
> Q   So beginning April 2017, Mary Talley said, we're not going to have to pay this back?
> A   Yes.

*Id*. at 28-29 (emphasis added).  This directive never changed; Ms. Bryant was always told that the loan did not have to be repaid.[10]  *Id*. at 33.  Witnesses, particularly Jacia Smith, confirmed Ms. Bryant's testimony.  According to Ms. Smith:

> Q   Okay.  Either in your role with the WorkBaltimore Steering Committee or by virtue of attending committee meetings, were you aware of a $100,000 loan taken for WorkBaltimore in 2017 from the Innovation Fund?
> A   Yes, yes.
> Q   Okay.  And were you present during meetings at which the subject of the payback of this loan was discussed?
> A   Yes.
> Q   And are you aware that there was a directive from Ms. Talley that the loan did <u>not</u> have to be paid back?
> A   Yes.

---

[7]  In its Motion, Defendant claims, falsely, that Ms. Bryant was "the signatory" of the Innovation Fund Letter of Agreement related to this loan.  *See* Def.'s Motion at 4.  As the Court can plainly see, Ms. Bryant did <u>not</u> sign this Letter.  *See id*. at Exhibit 8.

[8]  This testimony refutes the assertion by Defendant in its Motion that the "Innovation Fund loan was to be repaid in full by June 30, 2018."  Def.'s Motion at 4.

[9]  As indicated previously, Ms. Bryant reported to both Ms. Talley and Ms. Morton (who was then the Mayor's Chief of Staff), each of whom was superior to Ms. Bryant in the chain-of command.  *See* Pl.'s Answer to Interrogatory No. 2.  These were the same persons who had initially notified Ms. Bryant in the first place about the Innovation Fund being made available for the WorkBaltimore project.  *See* Pl.'s Depo. at 18-19.

[10]  Despite this express directive from her superiors in the chain-of-command, which rendered the payback of the loan, for all intents and purposes, a voluntary endeavor, Ms. Bryant still wanted to pay back the loan by using, for instance, money that would be coming in as a reimbursement from an insurance carrier for flood damage.  *See* Pl.'s Depo. at 30-33.  *See also* Smith Depo. at 88, submitted herewith as "Exhibit P."

Q   Tell me what you know about that.

A   It was my understanding that the Innovation Fund is a pot of money the City, the agencies, have access to for innovative things.  It was my understanding that we had been instructed by the administration that there was no -- that loan need not be repaid.

….

Q   Okay.  And did Ms. Talley convey where she received that information?

A   I believe she received that information from the Mayor's Office, whatever that meant in this context.

Smith Depo. at 34-36 (emphasis added), submitted herewith as "Exhibit P." *See also* Colucci Depo. at 31 ("Q.  [A]re you aware of a directive from Mary Talley that the [Innovation Fund] loan did not have to be paid back?   A.  I have a memory -- a vague memory of that, yes.").

Upon examination by defense counsel in her deposition, Ms. Smith was later asked about the repayment issue in relation to the time after Ms. Talley's employment with Defendant ended in or about July of 2018.  *See* Smith Depo. at 115.  *See also* Herbert Depo. at 20-21.  Ms. Smith's testimony was that the payback of the Innovation Fund loan was still not required, even at that point, which is consistent with the aforementioned testimony of Ms. Bryant that the directive regarding the non-payback of the loan, which originated from Ms. Morton, remained continuously in place.  *See* Smith Depo. at 115; Pl.'s Depo. at 28-29, 33.

With respect to documentation, through spreadsheets, used to track the incoming and outgoing funds associated with WorkBaltimore in general and the Innovation Fund in particular, that task was not one that fell upon Ms. Bryant.  *See* Def.'s Motion at Exhibit 6 at 4.[11]  As stated

---

[11]  In this exhibit to Defendant's Motion, which was a report prepared by the Baltimore City Office of Inspector General in September 2018, it is represented that Ms. Bryant had said she did not "create the list" of expenditures.  *See* Def.'s Motion at Exhibit 6 at 4.  It is important to note that Ms. Bryant's assertion in this regard is fully consistent with a comment she made in an exchange of emails earlier that same month with one of the investigators with the OIG (a copy of which was provided by the defense very late in discovery after all depositions had been completed).  Specifically, when Ms. Bryant was asked to provide "information pertaining to the finances for Work Baltimore 2017 and 2018," her response was that "WB 2017 and 2018 expense information has been requested[;] I will forward once received."  *See* Sept. 10-12, 2018 Email Exchange, submitted herewith as "Exhibit Q."  This assertion clearly connotes that this information was not in her personal possession, which one would expect had she, in fact, created it herself.  Rather, she was simply passing it along, as directed by the investigator.

by Mr. Gulhar, "Mr. Shah … would show how much money came in and how much got spent every week.  We would submit it to the steering committee."  Gulhar Depo. at 71-72.  *See also id*. at 57 ("Q.  Okay.  So the weekly report, who was generating that?  A.  That was generated by Kirit Shah.").  Mr. Gulhar went on to say:

> There was (sic) hundreds of documents, Mr. Lebowitz, you know, everybody was involved with it.  In addition to my team, all other teams, they were working with a spreadsheet.  There were making changes, sending it to us, bring it to the steering committee.  The numbers were changing every day.  I -- I -- I don't know if it helps you because numbers not got matured at any time, they were changing every day. ….

*Id*. at 73.  *See also id*. at 57.  Ms. Colucci also discussed this issue in her deposition, noting that she, too, likely added information to the spreadsheets which purported to be tracking incoming and outgoing funds:

> Q   Okay.  So the documents that were attached to this, do you know when they were generated initially?
> ….
> A    I believe they were generated during the WorkBaltimore planning process as donations and that kind of thing came in.
> Q   ….  So this particular document, was this something, to your knowledge, that was added to over time and this was like the last one?
> Or what is your understanding as to how this document was generated?
> A   I mean, I can't speak to that.  I do know it's a log of our expenses and what we paid out at the time.  But I don't know, I can't say if it was added to over time.  I would think it was.
> Q   Well, was this a document that you added information to yourself?  And I'm talking, again, about the Bates stamp from 357, which is this page, to, I believe, 366.  Hold on one second.  Yes, 366, which is the one that I scrolled down.
> ….
> A   I could have.  I don't remember specifically.  I know that I have added -- I did add things to similar documents.  I don't know if this is the one.
> ….
> Q    Okay.  And with respect to similar documents that you added information to, whether it was this or something else, what types of information did you add?
> A   The same thing, expenses and payments and contract information and vendors, that kind of thing.
> Q   Okay.  And the expenses and payments that you input, were these things that you were monitoring yourself?

> A   Yes.  If it was something that I was involved in and I knew about, then I would track it.

Colucci Depo. at 65-69.[12]

In light of these dynamics, the paperwork itself used to track incoming and outgoing funds for WorkBaltimore may not have jibed precisely with the reality of what was actually coming in and out.  This is because there were a lot of "chefs in the kitchen" generating the paperwork -- none of whom was Ms. Bryant.[13]  Of course, that does not mean that the funds going in and out were actually improper.  *See id.* at 83 ("Q  Okay.  So when you were going through this process in 2017 and 2018 [in relation to WorkBaltimore] [d]id any problems come on your radar in terms of the financing?  A  Did any problems?  I mean, I don't recall any problems.").  This is where reconciliation comes into the picture, and that had not been finalized yet in relation to WorkBaltimore 2017 at the time Ms. Bryant was wrongfully fired.  *See id.* at 64-65.  Here's how Ms. Colucci described the reconciliation process: "[I]n this case, I think I compared all of our receipts and any invoices to any money that we raised, any expenses that we paid, and created a worksheet, a workbook, to outline those to make sure that, you know, we paid everything and everything was accounted for."  *Id.* at 64.  When Ms. Colucci completed this process in or about January 2019, there was nothing unusual, if you will, about it that she could recall.  *See id.*

For his part, Mr. Herbert, when asked about discrepancies in the same spreadsheet discussed with Ms. Colucci (i.e., the one that is Bates-stamped 357-366) that were some of the

---

[12] Submitted herewith for the Court's edification, as "Exhibit R," and without conceding their admissibility at trial, are the bates-stamped pages referenced in Ms. Colucci's above-quoted testimony.  Ms. Bryant is providing this so the Court can see for itself what was being discussed.  Along with other attachments, it accompanied an email sent from Mr. Gulhar to Ms. Colucci in January of 2019, approximately two months after Ms. Bryant's termination.  *See* Jan. 14, 2019 Email from Gulhar, submitted herewith as "Exhibit S."

[13] Mr. Herbert admitted in deposition -- though his testimony is, admittedly, not the epitome of clarity -- that he had no reason to disbelieve Ms. Bryant's claim that she did not "create the list" of expenditures.  *See* Herbert Depo. at 232-33.  Perhaps this is because he was aware of the email exchange referenced in footnote 11 above, though this has not been verified.  As noted in said footnote, Ms. Bryant was not provided a copy of this email in advance of the completion of depositions such that an inquiry about it could not have been made of Mr. Herbert.

same discrepancies referenced in the OIG report dated September 21, 2018, *see* Def.'s Motion at

Exhibit 6 at 4 n. 4, Mr. Herbert knew nothing about any of them.  *See* Herbert Depo. at 199-202.

Despite that testimony, however, Mr. Herbert was, in fact, fully briefed on the state of

everything in the Department well in advance of Ms. Bryant's termination.  Specifically, upon his

assignment by Mayor Pugh as Interim Director of Human Resources in or about late July of 2018,

and thereafter, Mr. Herbert would meet with Ms. Bryant and Ms. Smith, who were the two Deputy

Directors.  *See id.* at 20-21, 102-04, 181-83.  In her deposition, Ms. Bryant made clear that the

subjects discussed at these meetings were all encompassing.  This dynamic came up when she was

asked about what Mr. Herbert would know in relation to the case:

> A   Quinton terminated me, and he knew about Work Baltimore.  He knew about things I told him about the Innovation Fund, and my request for FMLA.
> Q   Really quickly: you said the things you told him about the Innovation Fund.  What specifically was that?
> A   Remember, I talked about that sort of intro meeting where we went down our list of priorities, so I would have given him an overview of Work Baltimore, Innovation Fund, our work budget standing, all of that stuff, so just an overview I would have given him.
> Q   So that was the time that you updated him on what was going on with the Innovation Fund?
> A   The flood, <u>all of it</u>, yup.[14]

Pl.'s Depo. at 89 (emphasis added).  *See also id.* at 103 ("It was everything that came to mind, you

know.  I was pretty organized, so I feel confident in saying that I told [Mr. Herbert] everything

[that] was, you know, of priority and significance.").  There was also a typed agenda for this

meeting which has Mr. Herbert's handwriting on it.  *See* July 2018 Agenda, submitted herewith as

"Exhibit T."  *See also* Herbert Depo. at 182.  Ms. Smith talked in her deposition about this agenda

and the meeting:

---

[14]  For all intents and purposes, Mr. Herbert confirmed in his deposition that he had, in fact, been apprised of this situation by Ms. Bryant, though other aspects of his testimony on this issue are disputed between the parties. *See* Herbert Depo. at 213-14; Smith Depo. at 115; Pl.'s Depo. at 33.

It's my understanding that this document was from a meeting that we had after Mary [Talley]'s departure. We were trying to see all of the things necessary for where we worked and everything, so this is like a cadre of things that were happening and needed immediate attention, so WorkBaltimore was probably among the list of things that needed to be discussed.

Smith Depo. at 91-92. Ms. Smith then went on to discuss the reconciliation process in relation to

WorkBaltimore 2017:

> Q   Next, I'll scroll down here, this is page 2. There is a section Employee Benefits Division, and then it says Chief, Ray Gulhar. Do you see that?
> A   Yes.
> Q   And then, within that list, there is a reference to the 2018 WorkBaltimore Convention and then immediately below that, 2017 WorkBaltimore Close-out. Do you know what the WorkBaltimore Close-out discussion was about?
> A   Just recalling, trying to reconcile all of the expenditures and the deposits, so just marrying the books at the end of the program.
> Q   Okay. And was this a process you were personally involved in?
> A   By virtue of being on the Steering Committee, so I am aware of it but not involved with.[15]

*Id.* at 92-93.

After learning about "all of it," to borrow Ms. Bryant's phrase, Mr. Herbert not only didn't want to fire Ms. Bryant, he thought she was doing a good job -- because she was. And his own testimony on this subject actually only further supports the concept that he was well-informed about the state of affairs in the Department early on in his tenure:

> Q   Okay. All right. When you were working along with Ms. Bryant -- so once you came on over to the department of HR as the interim director -- how often did you interact with her at work? ….
> A   Initially we met more frequently because, again, we were coming -- it was -- there was a lot of turmoil in the agency.
> I was new to the agency. And so I was leaning on Ms. Bryant and Jacia Smith, who was the other person acting in a deputy capacity for institutional knowledge and for where we were on certain projects and the like.
> So we would have senior team meetings. And, you know, we would get together in my office. Or I would go into their office. And we would meet more frequently.
> When we moved to 7 East Redwood, which would have been, I want to say, late September of 2018, our offices were fairly close.

---

[15]  As detailed above, this process would ultimately be completed by Defendant in early 2019.

> Ms. Bryant's office was down the hall, directly down the hall from mine.
> Ms. Bryant's -- Ms. Smith's office was off to my right.
>       And so we would -- it wasn't uncommon for us to, like, coalesce in one of
> our offices or in my office a couple times a week.
> ….
>       Q   Okay.  And when you went to her and requested information from her,
> was she good at providing that for you and getting it to you?
>       A   Yes.  La'Tonya was responsive.
>       Q   Okay.  Did you find her to be professional in the workplace?
>       A   Yes.
>       Q   Did you think when you two were working together day in and day out
> that she had integrity?
>       A   From my perspective, yes.

Herbert Depo. at 85-88.  *See also id*. at 130 ("As I told you, I had no problems with Ms. Bryant's

performance while I was there with her.").[16]

This is not surprising as Ms. Bryant was, in actuality, a hard-working and stellar employee.

*See* Mar. 9, 2015 MAPS Salary Exception Form, submitted herewith as "Exhibit U"; Smith Depo.

at 23 ("I thought [Ms. Bryant] was a good colleague, professional, hard worker.").  And, prior to

her unjust termination, she had never once been disciplined in her many years working for

Defendant, as Mr. Herbert admitted.  *See* Herbert Depo. at 129.  *See also* Pl.'s Depo. at 41.

This is presumably why Ms. Bryant colleagues were so stunned by her termination in

November 2018.  *See* Smith Depo. at 67-68 (describing "shock or disbelief" expressed to her by

other Department employees upon hearing of Ms. Bryant's termination); *id*. at 69 ("I thought Ms.

Bryant was really good at her job, so her being terminated was just shocking.").  *See also* Ashton

Depo. at 69, submitted herewith as "Exhibit V."

This is also presumably why Mr. Herbert did not take issue with anything in the July 2019

Report from the Office of Inspector General in relation to either Ms. Bryant or Ms. Smith, both of

---

[16]  In its Motion, at one point, Defendant argues that Ms. Bryant was not fulfilling her employer's legitimate expectations at the time of discharge.  *See* Def.'s Motion at 15-16.  Even if one were to put aside the fatally flawed nature of Mr. Herbert's purported reasons for firing Ms. Bryant, this testimony by Mr. Herbert makes clear -- or at least creates a dispute of fact – regarding this issue.  Ms. Bryant absolutely <u>was</u> fulfilling these legitimate expectations.

whom were mentioned in said Report.  *See generally* Def.'s Motion at Exhibit 2.  He testified

regarding this issue as follows:

> The one from July -- this is important -- the one from July, it also references behavior by Jacia and La'Tonya.
>
> We had a meeting very early on when the office was still on Baltimore Street, before the move.  And we were going through the priority issues of the agency.
>
> They expressed to me that they didn't feel that the report was fair, because they were also victims of workplace harassment by Mary Talley.  They felt they were somehow coerced into going along with her.
>
> And I expressed to them that there was -- at that time, there was no intention of any adverse employment action for either of them.[17]

Herbert Depo. at 131-32.

So, from the summer into the early fall of 2018, Mr. Herbert was made largely, if not fully,

aware of the goings on in the Department, including WorkBaltimore 2017, and everything was

copacetic.  Then, Ms. Bryant needed and requested medical leave for surgery related to a disabling

health condition -- and within weeks she was out of a job.[18]

As a preliminary matter, on the subject of Ms. Bryant's leave and health condition,

Defendant has admitted in this case that Ms. Bryant's "physical impairment during her

employment by Defendant constituted a disability under the state and/or federal anti-

discrimination laws."  Def.'s Answer to Pl.'s Request for Admissions of Fact No. 11.[19]  Defendant

also made other pertinent admissions related to the applicable laws.  For instance, Defendant

admitted that "in the fall of 2018, prior to her termination, Plaintiff was an employee of Defendant

who was eligible for leave under the FMLA," that Ms. Bryant "had accrued sufficient paid leave

---

[17]  It bears mentioning that Mr. Herbert treated the handling of this report far different than he treated the next one.  In this situation, he conferred with Ms. Bryant and Ms. Smith to get their take on things and gather information from them about what had occurred.  When the next report came out, Mr. Herbert did not even speak with Ms. Bryant before firing her unjustly.  *See infra* Footnote 31.

[18]  In fact, Ms. Bryant's termination occurred within just 72 hours after the surgery which necessitated her taking of the medical leave.  *See* Pl.'s Depo. at 116.

[19]  As such, pursuant to Fed. R. Civ. P. 36(b), this matter is "conclusively established" and Ms. Bryant need not and will not belabor the point.

by the fall of 2018 to cover the entire period of time that she was going to be away from work on medical leave,"[20] that "a blank FMLA form was provided to Plaintiff by Defendant in early October of 2018,"[21] and that Ms. Bryant "submitted her completed FMLA paperwork[22] to Defendant on October 26, 2018." *Id.* at Nos. 2, 3, 14, 16. *See also* Def.'s Jan. 14, 2022 Answer at ¶ 124 ("The City admits that Plaintiff submitted Federal (sic) Medical Leave Act paperwork.").

Prior to October 2018, Ms. Bryant made Defendant, including Mr. Herbert individually, aware of her disabling condition and her need for leave associated with the medical treatment of same. As she stated in her Answers to Interrogatories:

> Plaintiff's disabling health condition was known to Defendant in multiple ways.
> First, she regularly spoke with her coworkers and superiors about it and how she was medically treating it, including, but not limited to, Quinton M. Herbert and his predecessor, Mary H. Talley.[23] With regard to Mr. Herbert, in particular, Plaintiff informed him, in approximately late September 2018, about how she would soon require medical leave and medical treatment in the form of surgery on her right foot due to a long-standing tear in her Achilles tendon. The surgery would also address other health issues associated with Plaintiff's right foot. Mr. Herbert, as was the case with others, was also made aware by Plaintiff that she had been

---

[20] In relation to this particular dynamic, Mr. Herbert expressly recognized in deposition the following:
    Q  Okay. Do you agree that reasonable accommodation under the ADA includes permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment?
    A  Yes.
    …
    Q  Okay. Do you agree that an example of reasonable accommodation under Maryland law is permitting an employee to use paid or unpaid sick leave, disability leave, medical leave or other leave which is available under the employer's existing policies?
    A  Yes.
Herbert Depo. at 31-32. *See also* 29 C.F.R. § 1630.2(o) appx.; COMAR § 14.03.02.05.B.(7). It should also be noted that firing Ms. Bryant cost her -- and saved Defendant -- massive amounts of paid leave, which created a financial benefit to Defendant for terminating her. *See* Pl.'s Answer to Interrogatory No. 13 (Ms. Bryant "had about 185.5 days of various forms of leave available to her when she was terminated. She was paid out for approximately 53.5 of those days, but she lost the remaining 132 days (185.5 – 53.5 = 132). Long story short, separate and apart from the leave payout she received at the time of her termination, which she would have been entitled to eventually receive whenever she ultimately left Defendant's employ, she would still have had enough leave (132 days' worth) to more than cover the entirety of her would-be medical leave from late 2018 into early 2019, with plenty left over."). *See also id.* at No. 13 n.6 ("Based upon Plaintiff's salary of $135,500.00 at the time of her termination, and assuming a five-day workweek, each day of this leave has a value of $521.15.").

[21] Mr. Herbert was aware of this fact in real time. *See* Herbert Depo. at 53, 58. *See also* Oct. 3-4, 2018 Email exchange and Oct, 4. 2018 Email and attached FMLA form, submitted herewith collectively as "Exhibit W"; Pl.'s Depo. at 113.

[22] *See* Pl.'s Completed FMLA Form, submitted herewith as "Exhibit X."

[23] Many workers, in addition to Mr. Herbert and Ms. Talley, knew, in real time, about Ms. Bryant's condition and medical treatment. *See. e.g.,* Ashton Depo. at 56; Colucci Depo. at 53; Smith Depo. at 63.

undergoing physical therapy treatment for some time before her November 2018 surgery. Mr. Herbert and Plaintiff additionally talked, specifically, about Plaintiff wearing her orthopedic boot cast during the office's relocation from East Baltimore Street to Redwood Street in or about August 2018.

     ….

Pl.'s Answer to Interrogatory No. 5 (footnote omitted).

In her Answers to Interrogatories, Ms. Bryant further explained that, when she and Mr. Herbert discussed "her health and her need for medical leave in approximately late September of 2018, he expressed frustration and displeasure to [Ms. Bryant] about her taking of said leave." *Id.* at No. 10. Ms. Bryant described Mr. Herbert's reaction in her deposition as a "gesture and a moan." Pl.'s Depo. at 75. *See also id.* at 77 ("Q …. So your testimony is he made that sort of scoffing reaction when you told him you would have to take off additional time for surgery; is that correct? A That's correct.").[24] For his part, Mr. Herbert concedes that he was, in fact, disapproving of Ms. Bryant being off from work for an extended period of time, but claims that was the case only if time off was for a vacation, as opposed to being for medical leave. *See* Herbert Depo. at 60-63. He claims, contrary to Ms. Bryant's position, that he was fully supportive of Ms. Bryant taking medical leave under the FMLA.[25] *See id.* at 56-57, 63. *See also id.* at 258 (in

---

[24] It should be noted that Mr. Herbert's reaction was a continuation of antagonism towards the taking of leave shown by his immediate predecessor, Ms. Talley. *See* Pl.'s Depo. at 67 ("Director Talley did not like people to use leave at all."). *See also id.* at 67-68, 81-87; Smith Depo. at 54-56; Pl.'s Answer to Interrogatory No. 10. And Mr. Herbert himself has demonstrated a proclivity towards firing workers in the Department who were in need of medical leave. More specifically, in addition to firing Ms. Bryant in November 2018, Mr. Herbert also made the decision to terminate Lisa Watkins soon thereafter in March 2019. *See* Herbert's Mar. 29, 2019 Letter, submitted herewith as "Exhibit Y." In early 2019, after Ms. Watkins had sought medical leave as a reasonable accommodation on account of her disabling health condition and related treatment, Mr. Herbert denied the request (even though Ms. Watkins's position was thereafter never even filled by Defendant to this day) and Mr. Herbert went so far as to cruelly refuse to let Ms. Watkins voluntarily resign, insisting that she be involuntarily terminated instead. *See id.*; Watkins's Mar. 3, 2019 Letter, submitted herewith as "Exhibit Z"; Herbert Depo. at 116-17. Ms. Watkins, who filed a Charge of Discrimination with the EEOC, Charge No. 531-2019-01554, concerning her mistreatment/termination before sadly passing away thereafter, had actually worked with employees on their FMLA-related issues as part of her work duties for Defendant. *See* Herbert Depo. at 110; Smith Depo. at 50.

[25] Mr. Herbert also claims that he would have approved of Ms. Bryant's medical leave request and "believe[s] he did. *See* Herbert Depo. at 56. It should be noted that no documents were produced by Defendant showing the internal written communications that occurred in the Department in response to the submission of Ms. Bryant's completed FMLA paperwork.

describing his version of a conversation he claims to have had with Ms. Bryant, Mr. Herbert testified that he said to Ms. Bryant, "'If what you're saying to me is that this was in any way related to your foot, get the FMLA paperwork from [N]J [Asong] and submit it and then you're on FMLA leave, which is different than me granting one month's vacation.'").[26]  Of course, no matter what you call it, leave in any form would obviously result in Ms. Bryant being away from the office.

So, how was Ms. Bryant being off from work going to affect Defendant in general and Mr. Herbert in particular?  A useful piece of evidence in trying to answer this question comes from a memorandum that Joanne Ashton, Chief of HR Shared Services and Recruitment for Defendant, drafted at the direction of Mr. Herbert on or about October 10, 2018.  *See* Oct. 10, 2018 Email and Draft, submitted herewith as "Exhibit AA."  *See also* Ashton Depo. at 7-10, 58-59.  By this point, in early October 2018, Ms. Bryant forthcoming medical leave was clearly known to Mr. Herbert, and others, and there would need to be adjustments made to account for same.  *See* Ashton Depo. at 59-61.  In this draft, among other things, it states that

> [w]ith the transfer of Deputy Jacia Smith to Parks and Recreation[27] and the medical leave for Deputy La'Tonya Bryant, members of the leadership team will report directly to [Mr. Herbert] until a replacement is named for Deputy of HR Operations and Deputy Bryant returns to the office: Sandy Curtis, Ray Gulhar, Margo Brunner-Settles, Tonya Brinkley, Jason Ingram and Joanne Ashton.

Oct. 10, 2018 Email and Draft.  Ms. Ashton discussed this dynamic in her deposition:

---

[26]  There is a dispute of fact between the parties as to this issue.  The suggestion from Mr. Herbert's testimony that Ms. Bryant's taking of FMLA leave was his idea is not something that's conceded by Ms. Bryant, at all.  *See, e.g.,* Pl.'s Response to Req. for Admission of Fact No. 30.  *See* Pl.'s Depo. at 75 and 77.  *See also id.* at 81 ("Q   So when you had discussions with your doctor, and you took away from those discussions that you would likely need surgery, what you're saying is you <u>always</u> <u>intended</u> to use FMLA for that surgery?  A   <u>That's</u> <u>correct</u>." (emphasis added)).  Defendant, in its Motion, repeatedly tries to make evidentiary use of the idea that Mr. Herbert supposedly "urged [Ms. Bryant] to take FMLA leave" to support the notion that it did not violate her rights in firing her after having requested and just begun to take said leave.  *See* Def.'s Motion at 15.  *See also id.* at 19 (claiming that Ms. Bryant's FMLA leave was "encouraged by her superior, Mr. Herbert," and even going so far as to claim that this dynamic of the case is "undisputed.").  A superior "scoff[ing]" and "express[ing] frustration and displeasure" at an employee's desire and need to take medical leave related to surgery, as determined by that employee in consultation with her physician, cannot really be squared with Defendant's position.

[27]  This transfer occurred in mid-October, shortly after the preparation of this draft.  *See* Smith Depo. at 13.

> Q.   In that timeframe when Ms. Bryant was going to be out on medical leave, did Mr. Herbert take on other direct reports?
> A.   Yeah, he took on all of us.  All of the chiefs that were within the agency all were reporting to him.

Ashton Depo. at 60-61.  Ms. Colucci testified about this as well:

> Q    Back in this timeframe, so this is October of 2018, was Ms. Bryant's going on medical leave going to add to the responsibilities of the other folks in the HR department?
> A    Yes.
> Q    And that would include Mr. Herbert, correct?
> A    I would think so.

Colucci Depo. at 56.  *See also* Smith Depo. at 44.

What likely upset Mr. Herbert, in reality, was the absence of Ms. Bryant from the workplace, not that the absence was for vacation as opposed to medical leave, as he claimed.  *See* Herbert Depo. at 60-63.  It was clearly going to make his life more difficult.

As all of this is going on, Mr. Herbert received the September 2018 report from the Office of Inspector General.[28]  *See* Def.'s Motion at Exhibit 6.  Having previously been fully briefed about WorkBaltimore 2017 and the Innovation Fund loan situation, among other things, there is really only one piece of information in the Report that might have even conceivably come as "news" to Mr. Herbert, which was, as noted in his termination letter to Ms. Bryant, her alleged "failure to disclose a familial relationship to a contractual DHR employee."[29]  Def.'s Motion at Exhibit 16.

---

[28]  It was apparently received by him in the latter part of October 2018, though the precise date is unverified because different dates have been represented by Defendant in the litigation.  In its Motion, Defendant essentially goes with October 26, 2018 on account of that being the date the matter was "referred" to Mr. Herbert by then-Mayor Pugh.  *See* Def.'s Motion at 10, 17, 19.  *But see* Sept. 4-5, 2018 Email Exchange, submitted herewith as "Exhibit BB"; Herbert Depo. at 207-08 (showing that Mr. Herbert was in communication with the OIG concerning its investigation as of early September 2018 and showing that the OIG reaching out to him to discuss "some things [they] discovered/learned along the way," but Mr. Herbert testified that he is unable to recall whether or not he met "with Mr. D'Angelo [of the OIG] about any preliminary findings" at or about that time).  *But see also* Def.'s Answer to Interrogatory No. 12, submitted herewith as "Exhibit BB-1" (claiming that the report was received by Mr. Herbert on "November 2, 2018").  Ms. Bryant obviously cannot speak to the date when another person saw something outside of her presence, but the lack of clarity coming from Defendant about the date is obviously something that should be construed to the detriment of Defendant and not Ms. Bryant under the circumstances.

[29]  As will be explained further below, the "familial relationship" is between Ms. Bryant and her daughter, Quiera Bryant, who has been employed as a W-2 employee by the Baltimore City Parking Authority since July of

Mr. Herbert essentially admitted in deposition that this was the real reason, from his perspective, for Ms. Bryant's termination.  According to Mr. Herbert, "If [this was] disclosed to the Ethics Board and the Ethics Board doesn't have an issue with it, we're not sitting here [in deposition] today, probably."  Herbert Depo. at 243.  But here's the thing, basically everything about that comment by Mr. Herbert in the termination letter regarding Ms. Bryant's supposed "failure to disclose" is nonsensical and just plain wrong -- and he knows it.

First of all, there's no non-speculative evidence that it wasn't disclosed.  The main piece of "information," if you will, regarding the non-disclosure is that supposedly no one has the financial disclosure form for 2016 on which the disclosure could have been referenced.[30]  *See* Herbert Depo. at 162-63.  In other words, the only would-be evidence is the lack of evidence.  However, Ms. Bryant maintains that she did, in fact, submit the form in 2016 (as well as in every other year of her employment) and she has consistently made this assertion.  *See* Pl.'s Depo. at 34, 37.  And, importantly, Mr. Herbert has been aware of Ms. Bryant's assertion in this regard from the beginning.  *See* Herbert Depo. at 244 (admitting that Ms. Bryant said to the OIG investigator that "she believed that she" filed the form for 2016).[31]  On a related note concerning the lack of

---

2015 and briefly served as an independent contractor performer in late 2015 and into early 2016 in relation to Defendant's so-called "Smokey Crush and Leaf" smoking cessation campaign.  *See* Pl.'s Responses to Req. for Admissions of Fact Nos. 17, 20, 23, and 25.  *See also* Pl.'s Depo. at 23-24 (describing campaign); Def.'s Motion at Exhibit 6 at 7 n.11.  Defendant had great difficulty securing performers for the campaign, with frequent "no shows" at the auditions.  *See* Colucci Depo. at 38.  *See also id.* at 89-90 (agreeing that the campaign sent out newsletters to Defendant's employees asking them to audition because they were having such difficulty finding people).  Quiera Bryant, who has a background in theater, agreed to audition, along with others, and was selected to perform in the campaign by Defendant through a contract signed by Ms. Talley.  *See id.* at 84.  *See also* Mascot Agreement, submitted herewith as "Exhibit CC."  Ms. Bryant stepped out of the room and did not participate in Quiera's audition.  *See* Pl.'s Depo. at 25-26.

[30]  For a detailed explanation for why Quiera Bryant's independent contractor role with Smokey Crush and Leaf would not have been referenced on either the 2015 form or 2017 form, the Court is referred to Ms. Bryant's Response to Defendant's Requests for Admissions of Fact, which provides considerable detail regarding this issue.  *See* Pl.'s Responses to Req. for Admissions of Fact Nos. 17, 20, 23, 25.  *See also* Def.'s Motion at Exhibits 12 and 13; Herbert Depo. at 159-61.

[31]  Mr. Herbert, following this admission, went on to hyperbolically (and falsely) allege in his deposition that Ms. Bryant supposedly "couldn't remember" whether she filed the form in 2016, and then said "that's not the type of thing that one forgets."  Herbert Depo. at 244.  Critically, this accusation does not actually jibe with the language of the September 2018 Report of the Office of Inspector General, which simply stated, consistent with what Mr. Herbert

evidence, there is no evidence that the Ethics Board to which these forms are submitted took issue

with any supposed non-submission for 2016.  You would expect, in the absence of receipt of the

form, that the Ethics Board would do something.  They were certainly entitled to.  *See, e.g.,* Balt.

City Code, Art. 8, § 3-23(c) (allowing for a late fee to be imposed by the Ethics Board for any

document filed after the applicable deadline, which did not occur here).[32]  *See id.* at §§ 5-1, et seq.

(providing for a formal complaint process, including, significantly, an opportunity for the accused

to cure, that can be initiated by anyone to allege a violation of the Article, which did not occur here

either).  *See also* Def.'s Motion at Exhibits 12 and 13 (financial disclosure form notes, on its face,

that the "Late Fee" is "$2/Day").  This dynamic also supports Ms. Bryant's assertion that she did,

in fact, always submit these forms.  Moreover, just because Ms. Bryant didn't have a copy doesn't

mean it wasn't submitted.[33]  She explained this in her deposition.  *See* Pl.'s Depo. at 36-37.

---

first said about what Ms. Bryant "believed," that Ms. Bryant "believed that she had filed a financial disclosure form every year that she was employed with DHR."  Def.'s Motion at Exhibit 6 at 7.  Significantly, as Mr. Herbert admitted in deposition, he never spoke, at all, with Ms. Bryant directly about any of this, *see* Herbert Depo. at 226, which obviously could have given him greater clarity regarding this subject -- something he was obviously and consciously trying to avoid.

[32]  It should be noted that a more detailed process for addressing a failure to timely submit the financial disclosure form went into effect in February 2020.  *See* Balt. City Code, Art. 8, § 9-5.1.  Even in the worst-case scenarios, it only provides for suspensions, not terminations.  *See id.* at § 9-5.1(e).

[33]  There is every reason to believe that the inability to locate the form is, in actuality, Defendant's fault and not that of Ms. Bryant.  More specifically, throughout this litigation, Defendant has had to concede that it has lost, and therefore could not produce, numerous critical documents.  *See, e.g.,* Def.'s Answers to Request for Admissions Nos. 19 and 20 (Defendant admitted that, "in response to Plaintiff's discovery requests in this case, Defendant did not produce the audio or video recording of any interview of Plaintiff, or any other person, by the Office of Inspector General," and that "in response to Plaintiff's discovery requests in this case, Defendant did not produce any notes or summaries generated as a result of any interview of any person, other than Plaintiff, by the Office of Inspector General."); *id.* at No. 17; Sept. 27, 2022 Email from Defense Counsel (partially redacted), submitted herewith as "Exhibit DD" (despite admitting that "some or all of the current or former employees of Defendant identified in Defendant's Answers to Interrogatories were/are provided with Defendant-owned cell phones to use during their employment by Defendant," Defendant could locate and produce only a handful of texts from Mr. Herbert alone).  *See also* Pl.'s Answer to Interrogatory No. 13 (noting, in an objection, that Defendant had failed to produce Ms. Bryant's payroll records); May 20, 2022 Email from Defense Counsel, submitted herewith as "Exhibit EE" (referencing Defendant's non-production of "historic payroll data"); Sept. 7, 2022 Email from Defense counsel, submitted herewith as "Exhibit FF" (referencing the late production of the extremely critical page 2 of Quiera Bryant's Mascot Agreement, which Ms. Bryant only received after all depositions had been taken); *supra* Footnote 11 (likewise concerning a critical document that Ms. Bryant only received after concluding all depositions).  While certainly no accusatory finger is being pointed at defense counsel herself, Defendant, which is a very large bureaucratic entity, has shown a proclivity for misplacing and losing documents, and that dynamic matters in a case where Defendant is claiming that a missing document is the fault of Ms. Bryant.

Second, the concept that Ms. Bryant would try to -- or even conceive of the need to -- hide Quiera's role as an independent contractor performing on occasion for the Smokey Crush and Leave campaign is objectively absurd. The primary reason it's absurd is that there was nothing to hide because there was nothing hidden about it. As stated by Ms. Smith, "it wasn't a secret, like La'Tonya's daughter doing the acts or the appearances on the Smokey Crush wasn't -- it was known to Director Talley at the time. It wasn't like a covert operation." Smith Depo. at 73. Ms. Colucci, who worked directly with Quiera Bryant in relation to her performing for the Smokey Crush and Leaf program, testified as follows:

> Q    Did you personally interact with Quiera when she was performing in this role?
> A    Absolutely, yes.
> Q    And how many times did that happen?
> A    Whenever she was scheduled to perform or we talked about her, you know, setting up, you know, agreeing to work a performance, I would interact with her.

Colucci Depo. at 48-49. *See also id.* at 40 ("Q   At the time that [Quiera] was auditioning, were you aware that she was Ms. Bryant's daughter?  A   Yes."). In addition to Ms. Talley, Ms. Smith, Ms. Colucci, and Ms. Bryant, another person in the Department who knew about Quiera Bryant performing as an independent contractor for the program was Lisa Evans. *See* Pl.'s Depo. at 92. Moreover, Ms. Bryant's own boss (and Mr. Herbert's immediate predecessor as the Director of the Department) -- Mary Talley -- was the person who contracted with Quiera Bryant to provide these services. *See* Mascot Agreement, submitted herewith as "Exhibit CC." The contract is signed by Ms. Talley herself. *See id.* This was just never something that was going to get Ms. Bryant in any "hot water," if you will. Also, there is no dispute that Ms. Bryant did report Quiera Bryant's W-2 employment as an administrative assistant with Defendant's Parking Authority in her 2017 financial disclosure form (and again in 2018). *See* Pl.'s Depo. at 40. *See also* Def.'s

Motion at Exhibit 6 at 7 and Exhibit 13; Quiera Bryant's June 29, 2015 Offer Letter, submitted herewith as "Exhibit GG." If Ms. Bryant supposedly feared alerting anyone to her daughter having some sort of business relationship with Defendant, why did she do so freely in 2017 (and again in 2018)? It is critical to note that Mr. Herbert would have been on notice of Ms. Bryant's 2017 and 2018 forms, and their express reference to Quiera Bryant's W-2 employment with Defendant, when he decided to unjustly fire Ms. Bryant. *See* Def.'s Motion at Exhibit 6 at 7 (OIG report informed its readers, such as Mr. Herbert, that Ms. Bryant "disclosed her daughter's employment with PABC in her financial disclosure forms filed in 2017 and 2018 ….").

Third, it is important to highlight that Defendant does not now have, and has not in the past had, any anti-nepotism policy that would have applied to Ms. Bryant. According to Ms. Smith:

> Q    …. It's my understanding that there was, and still is, no official nepotism policy in place with respect to employment with the Baltimore City government; correct?
> A    That is correct.

Smith Depo. at 41. More importantly, Mr. Herbert is aware personally of this as well:

> Q    And my understanding, from a prior witness, is that the city, at least at that time, and, I assume, currently, but I'll break it down, the city at that time didn't have an anti-nepotism policy, correct?
> A    It did not. I don't believe it did, no.
> Q    Does it now?
> A    It does not.

Herbert Depo. at 188. This, again, speaks to the concept that there would have been no reason to hide and nothing to fear in relation to Quiera Bryant having performed for Smokey Crush and Leaf. It also speaks to the very modest nature of the supposed -- but untrue -- infraction allegedly committed by Ms. Bryant.

Fourth, and perhaps most importantly, Quiera Bryant's brief provision of services to Defendant as an independent contractor never needed to be reported by Ms. Bryant anyway,

making this whole dynamic a complete and utter "red herring."  This is because Quiera Bryant was

<u>not an</u> <u>employee</u> in relation to the Smokey Crush and Leaf campaign but, rather, an independent

contractor, and while personnel like Ms. Bryant are obligated to report certain family members

who were "employed by the City" (as Ms. Bryant did in her 2017 and 2018 forms in relation to

Quiera's W-2 employment with the Parking Authority), they need not report those who are

independent contractors.  *See* Def.'s Motion at Exhibits 12 and 13; Mascot Agreement at 2.  Ms.

Colucci, who was heavily involved in the Smokey Crush and Leaf campaign,[34] testified as follows:

> Q    And the performers for Smokey Crush & Leaf would sign contracts
> with the city, correct?
> A    That's correct.
> Q    And they were contractors with the city; is that correct?
> A    Yes.
> Q    <u>They</u> <u>were</u> <u>not</u> <u>employees</u> <u>of</u> <u>the</u> <u>city, correct</u>?
> A    <u>Correct</u>, yes.
> Q    And they weren't paid on the city's payroll like I presume you get paid,
> correct?
> A    Correct.

Colucci Depo. at 39 (emphasis added).  This testimony is <u>precisely</u> consistent with the Mascot

Agreement itself, which states as follows: "It is understood and agreed that the Contractor is an

independent contractor and not entitled to receive any City employee benefits or worker' (sic)

compensation.  In addition, the City shall not be responsible for any state or federal withholding

taxes or for FICA and any state unemployment insurance."  Mascot Agreement at 2.

For his part, Mr. Herbert, who has an extensive background in labor and employment law

and human resources matters, *see* Herbert Depo. at 12-15, was and remains fully aware of the

distinction between an independent contractor and an employee:

> Q    Okay.  All right.  I wanted to talk briefly about the difference -- okay.

---

[34]    Ms. Colucci is personally identified in the Mascot Agreement as the point of contact on behalf of
Defendant in the event the contracted performer has "any scheduling conflict or impediment to performance …."  *See*
Mascot Agreement at 2.  *See also* Colucci Depo. at 37.

> I want to talk to you briefly about the difference between an independent
> contractor and an employee. You would agree with me that an independent
> contractor and an employee are <u>not</u> the same thing, correct?
>
> A    <u>That's</u> <u>correct</u>.

*Id*. at 26 (emphasis added). *See also id*. at 239 (in discussing the "findings of the OIG in their

report," Mr. Herbert stated that Ms. Bryant's "daughter worked <u>on</u> <u>a</u> <u>contractual</u> <u>basis</u> for the

agency in which [Ms. Bryant] served as deputy director ...." (emphasis added)). As with Ms.

Colucci's testimony, Mr. Herbert's testimony is likewise fully consistent with the Mascot

Agreement -- he knows what it means. As noted above, the financial disclosure form concerned,

among other things, certain family members being "employed by the City." In relation to Smokey

Crush and Leaf, Quiera Bryant was not "employed by the City." *See* Def.'s Motion at Exhibits 12

and 13; Mascot Agreement at 2. *See also* Balt. City Code, Art. 8, § 2-9 (defining "employee," to

mean, in pertinent part, "any employee of the City who is not an official."). Even if one wanted

to stretch the financial disclosure form beyond its reasonable and logical parameters to try to argue

that Quiera Bryant, in relation to Smokey Crush and Leaf, was "doing business with the City" such

that she needed to be identified in the form (and putting aside that Defendant's Ethics Code does

not even make referenced to the phrase "independent contractor"), the definition of "business with

the City" requires payment of a minimum of "$5,000" for the services provided, *see* Balt. City

Code, Art. 8, § 7-1, and Quiera Bryant's Mascot Agreement <u>caps</u> her payment at half that sum --

"$2,500." *See* Mascot Agreement at 2. And there's zero reason to believe Quiera even received

anywhere near $2,500 during her short time performing for the campaign. *See supra* Footnote 29

(noting that she only performed "in late 2015 and into early 2016").

Lastly, with respect to Ms. Bryant's supposed non-submission of the form in 2016, even if

it happened and even if Quiera Bryant's independent contractor role with Smokey Crush and Leaf

had to be reported and wasn't, it's just not an offense that gives rise to termination.[35]  In fact, not submitting this form is apparently so common that, in 2020, the Baltimore City Code was amended to allow for even higher fines for the non-submission of the forms since, apparently, the prior amount of the fine of $2.00 per day wasn't sufficiently motivating.  See Balt. City Code, Art. 8, § 9-5.1.  And, as noted above, *see supra* Footnote 32, the new provision talks about suspensions and not terminations.  *See id*. at § 9-5.1(e).    So, in the past, there were fines that could be imposed (albeit lower ones) and an opportunity to cure was required if a complaint was filed, and even now the focus is on fines and rectifying the situation, not firing folks.  All humans make mistakes, and this dynamic of our shared experience as humans is recognized by these very Code provisions, which allow for such mistakes, if necessary, to be fixed.  Yet, that didn't stop Mr. Herbert from making the wrongful decision to wrongfully fire Ms. Bryant.[36]

On account of her wrongful firing -- while having just begum her finite period of medical leave for which she had sufficient paid leave to cover[37] -- Ms. Bryant has suffered considerable damages.  *See* Pl.'s Answers to Interrogatory Nos. 5 and 13.

In terms of that aforementioned medical leave, as admitted by Mr. Herbert himself, "[l]eave [under the ADA] can be considered an accommodation when there is a specified return date …" and "under normal circumstances you would not -- you would not discipline an employee for using leave [as] [t]hat frustrates the purpose of the Family [and] Medical Leave Act."  Herbert Depo. at 29-30.  Needless to say, to borrow Mr. Herbert's phrasing, it would also "frustrate the purpose" of

---

[35] It should be noted that both Ms. Smith and Ms. Ashton testified that they were unaware of anyone having ever been fired for an issue on one of the financial disclosure forms.  *See* Smith Depo. at 79; Ashton Depo. at 73.

[36] Mr. Herbert admitted in deposition that there were disciplinary options available to him short of termination.  *See* Herbert Depo. at 218-19.

[37] *See* Pl.'s Completed FMLA Form.  *See also* Def.'s Answers to Req. for Admissions of Fact Nos. 2-3; Pl's Answer to Interrogatory No. 13.

the ADA and its state analog. Ms. Bryant was obviously frustrated by having been wrongly fired, and that's what prompted her filing of this suit and her pursuit of justice from this Honorable Court.

## III. FURTHER ARGUMENT

### A. Preliminary Matters

As an initial matter, it is important to note, particularly in light of the page restriction imposed upon this Opposition, that the facts and arguments above, *see supra* Part II, should give this Honorable Court essentially everything it needs to deny Defendant's Motion and permit her to proceed to trial before a jury of her peers. As such, while some of these facts and arguments will be discussed further below, the majority of pertinent information has already been presented.

Also, it must be noted that, in addition to (or consistent with) the admissions referenced previously, *see supra* Part II, Defendant also makes a number of important admissions in its actual Motion, which narrows down considerably the issues that Ms. Bryant needs to address with this Opposition. For instance, Defendant states that it "does not dispute that Plaintiff was disabled or that she was terminated." Def.'s Motion at 15. *See also id*. (Defendant agrees that Ms. Bryant was a "qualified individual with a disability."). Defendant further admits that it is "undisputed that Mr. Herbert was aware of Plaintiff's medical condition …." *Id*. at 14. Defendant also concedes that Ms. Bryant "requested medical leave and (but for the intervening findings contained in the OIG report)[38] would have returned to work and [been] capable of performing the functions of her position, with or without additional accommodations." *Id*. Finally, Defendant states that Ms. Bryant "can clearly demonstrate that she engaged in protected activity by requesting and taking medical leave and that she was subsequently terminated."[39] *Id*. at 17.

---

[38] Needless to say, Ms. Bryant does not concede the parenthetical part of this assertion by Defendant.

[39] *See Sillah v. Burwell*, 244 F. Supp.3d 499, 513 (D. Md. 2017) ("Plaintiff's request for an accommodation is a protected activity under the ADA."); *Fenicle v. Towson Univ*., Civ. A. No.: ELH-18-0917, 2018 WL 5885526 at

Lastly, though of little import, Ms. Bryant will briefly address the fact that the dates referenced in Defendant's Motion at page 11 are incorrect. The correct dates, with respect to the end of the EEOC process, are set forth in paragraph 29 of the Complaint. *See* Notices, submitted herewith as "Exhibit HH." And suit was actually filed on November 9, 2020 in the Circuit Court for Baltimore City. *See* File-Stamped first page of Complaint, submitted herewith as "Exhibit II."

### B. Defendant Cites and Relies Upon Wholly or Partially Inadmissible Documents

In their Motion, Defendant repeatedly cites and relies upon documents that are either filled with inadmissible hearsay or are otherwise inadmissible, which is objectionable and inappropriate. *See* Fed. R. Civ. P. 56(c)(2). An example of this is the two OIG reports that Defendant makes considerable use of in asserting its facts and arguments. *See generally* Def.'s Motion. *See also id.* at Exhibits 2 and 6. While there are some exceptions to the rule against hearsay that might allow for the admission of certain parts of these reports (such as, perhaps, statements attributed to Ms. Bryant herself or that go to the issue of notice rather than substance[40]), other parts of the reports would not be admissible as substantive evidence.[41] Additionally, Defendant's Exhibit 4, which purports to be a memo written by Ms. Talley to herself and never given to Ms. Bryant, *see* Pl.'s Depo. at 44, regarding an interaction Ms. Talley had with Ms. Bryant in which Ms. Talley largely recounts her own supposed assertions and thoughts, is just inadmissible, self-serving hearsay.[42] Finally, Defendant has submitted to the Court its own unsworn position statement provided to the

---

*7 (D. Md. Nov. 8, 2018) ("Notably, requesting a workplace accommodation based on one's disability is a protected activity under the ADA.").

[40] *See Benedi v. McNeil-PPC*, 66 F.3d 1378, 1385-86 (4th Cir. 1995).

[41] *See Williamson v. Prince George's Cnty.*, Civ. A. No. DKC-10–1100, 2011 WL 280961 at *2 n.1 (D. Md. Jan. 26, 2011) ("Although investigatory reports may be admitted as public reports or business records under Rules 803(6) or 803(8) of the Federal Rule of Evidence, any hearsay statements from third parties contained within those reports must be independently admissible." (citations omitted)). *See also United States v. Burruss*, 418 F.2d 677, 678 (4th Cir. 1969).

[42] It should also be noted that the allegations made by Ms. Talley in her memo to herself are not accurate, that Ms. Talley was actually the one who acted inappropriately, and that Ms. Bryant was not disciplined as a result of the memo. *See* Pl.'s Depo. at 40-45.

EEOC concerning Ms. Bryant's Charge of Discrimination.  *See* Def.'s Motion at Exhibit 17.  While Defendant admittedly makes use of it for a limited purpose in its Motion*, see id*. at 11, they do use it for the truth of the matter asserted in the exhibit.[43]  *See id*.

## C.  What Remains for the Court to Decide

In terms of Ms. Bryant's claims under the ADA and its state analog, the Rehabilitation Act, and the FMLA, the applicable law and standards to apply at summary judgment <u>do</u> vary from count to count -- sometimes more so than Defendant suggests.  For instance, Defendant neglect to highlight that, in the failure to accommodate setting, at least under Maryland law, "[a] failure to accommodate claim does not … require any showing of discriminatory intent." *Peninsula Reg. Med. Ctr. v. Adkins*, 448 Md. 197, 213 (2016).  And Ms. Bryant's FMLA interference claim is similar in that there is no requirement for her to show discriminatory intent (as Defendant does, in fact, imply in its Motion with its citation on page 18 to the Fourth Circuit's *Sharif* case).[44] Moreover, it remains an open question in this Circuit as to who bears the "ultimate burden" with respect to an FMLA interference claim, the employee or the employer, though the employer clearly does have a burden.[45]  Additionally, it appears that Maryland still applies the motivating factor

---

[43] In so doing, Defendant recited the full date of birth of a witness in violation of Fed. R. Civ. P. 5.2(a).

[44] With respect to these claims, i.e., Ms. Bryant's failure to accommodate claims under federal and state law as well as her FMLA interference claim, it should go without saying that terminating a worker a matter of days into their would-be lengthier and finite period of necessary medical leave is <u>not</u> accommodating the worker and is <u>definitely</u> interfering with their entitlement to return to work at the <u>end</u> of their leave.  Ms. Bryant recognizes that Defendant is claiming that the OIG report is what gave rise to her termination, but this point just needs to be made, lest there be any doubt.

[45] *See Quigley v. Meritus Health, Inc*., Civ. A. No. CCB-14-2227, 2017 WL 412492 at *2 n.9 (D. Md. Jan. 31, 2017) ("If an employer denies restoration to the same or an equivalent position, the employer may avoid liability by showing it would have made the same employment decision even if the affected employee had not taken FMLA leave.  The Fourth Circuit has not resolved, however, if the employer bears the ultimate burden of proof with respect to establishing the limitations on its obligation to restore the employee." (citations and internal quotation marks omitted)).  *See also Jordan v. Radiology Imaging Assocs*., 577 F. Supp.2d 771, 785 (D. Md. 2008) ("Therefore, an <u>employer</u> that does not restore an employee returning from FMLA leave can avoid liability <u>by</u> <u>showing</u> 'that [the] employee would not otherwise have been employed at the time reinstatement is requested.'" (citations omitted) (emphasis added)); *Southard v. Wicomico Cnty. Bd. of Ed.*, Civ. A. No. SAG–15–61, 2015 WL 4993721 at *9 (D. Md. Aug. 20, 2015) ("Rather, 'an <u>employer</u> may deny restoration <u>when</u> <u>it</u> <u>can</u> <u>show</u> that it would have discharged the employee in any event regardless of the leave.'" (emphasis added) (citing *Yashenko v. Harrah's NC Casino Co*., LLC, 446 F.3d 541, 548 (4th Cir. 2006); 29 C.F.R. § 825.216(a))).

test, rather than a but for test, to the extent those concepts are applicable here. *See generally Taylor v. Giant of Md., LLC*, 423 Md. 628 (2011); *Ruffin Hotel Corp. of Md., Inc. v. Gasper*, 418 Md. 594 (2011). Lastly, Defendant disregards the concept of comparator evidence, which "refers to evidence that a 'similarly situated' individual with 'sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination.'" *Taylor*, 423 Md. at 632 n.2 (citations omitted).

By and large, however, the Court's rulings on all of Ms. Bryant's claims referenced above boil down to the concepts of pretext and/or whether Defendant's asserted basis for its termination of Ms. Bryant can and should override her position that she was not accommodated, had her rights interfered with, was discriminated against, and was retaliated against. Defendant maintains, incorrectly, that Ms. Bryant's "'proof' that her medical condition was the basis for her termination is entirely premised on the fact that her termination was effective only a few days after her surgery." Def.'s Motion at 16. This is hardly the case. First of all, to be sure, the exceedingly close timing of the sequence of events recounted above, <u>does</u>, in fact, satisfy the prima facie requirements of many of her claims.[46] But Ms. Bryant has so much more evidence than that.

Even within burden-shifting framework, there is ample evidence to demonstrate pretext

---

[46] *See, e.g., Davidson v. Samova, Inc.*, Civ. A. No. JKB-17-1067, 2017 WL 5564654 at *5 (D. Md. Nov. 20, 2017) ("[T]he Fourth Circuit has held that 'a causal connection for purposes of demonstrating a prima facie case [of retaliation] exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity.'" (citations and internal quotation marks omitted)). *See Sillah v. Burwell*, 244 F. Supp.3d 499, 513 (D. Md. 2017) ("Plaintiff alleges that she requested an accommodation for her disability and was terminated shortly after. Plaintiff's request for an accommodation is a protected activity under the ADA. Thus, Plaintiff has sufficiently alleged a retaliation claim under the ADA." (citation omitted)); *Sempowich v. Tactile Systems Technology, Inc.*, 19 F.4th 643, 653-54 (4th Cir. 2021) ("We have made abundantly clear that temporal proximity suffices to show a causal relationship. …. A plaintiff may establish a causal relationship simply by showing that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." (citations and internal quotation marks omitted)). *See also Hester v. Bell-Textron, Inc.*, 11 F.4th 301, 306 (5th Cir. 2021) ("There is certainly 'temporal proximity' between [plaintiff's] termination and his FMLA leave, because [defendant] terminated him in the middle of his FMLA leave.").

(or, in the case of FMLA interference and the failure to accommodate claims, that Defendant was simply not justified in terminating Ms. Bryant).  According to the Maryland Court of Special Appeals, "Pretext might be established by showing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'"  *Edgewood Mgmt. Corp. v. Jackson*, 212 Md. App. 177, 200 (2013) (citations omitted).  *See also Lockheed Martin Corp. v. Balderrama*, 227 Md. App. 476, 513 (2016).  Under federal law, as recently stated by the Fourth Circuit, "[i]n order to show pretext, a plaintiff may show that an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact.  Once the plaintiff offers such circumstantial evidence, the case must be decided by a trier of fact and cannot be resolved on summary judgment."  *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019) (citation omitted).  *See also Smith v. CSRA*, 12 F.4th 396, 421 (4th Cir. 2021) ("the Supreme Court has held that a plaintiff's prima facie case of discrimination, combined with evidence from which a jury could conclude that an employer's proffered justification was false, supports an inference of discrimination sufficient to defeat summary judgment." (internal quotations marks, bracket, and citations omitted)).[47]

---

[47] For what it's worth, the Seventh Circuit has also issued the following useful set of parameters:

> [W]e need not take an employer at its word. ….  Furthermore, if the employee offers specific evidence from which the finder of fact may reasonably infer that the proffered reasons do not represent the truth, the case then turns on the credibility of the witnesses.  In such circumstances, the employee creates a factual issue as to whether the employer's explanation is credible or merely a pretext for discrimination.  When the sincerity of an employer's asserted reasons for discharging an employee is cast into doubt, a fact finder may reasonably infer that unlawful discrimination was the true motivation.

*Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001) (internal quotation marks, brackets, and citations omitted).  *See also Morris v. McCarthy*, 825 F.3d 658, 671 (D.C. Cir. 2016) (plaintiff can satisfy its burden at summary judgment by "casting doubt on the objective validity of employer's explanation").

Comparator evidence can also be used to show pretext, though it is not required for a plaintiff to present such evidence in order to avoid the entry of judgment to the employer. *See Bryant v. Aiken Reg. Med. Ctrs., Inc.*, 333 F.3d 536, 545-46 (4th Cir. 2003).

Here, as recounted in much greater detail above, *see supra* Part II, which is incorporated herein by reference,[48] there is an abundance of evidence to establish the pretextual nature of Defendant's asserted reasons for Ms. Bryant's firing right after she requested medical leave and long before the completion of said leave (and her would-be return to work). While there is no reason to believe that Mr. Herbert instigated the OIG to look into the matters it examined in the fall of 2018, he nonetheless weaponized their report and used it as a means to an end. As a professional well-experienced and well-versed on the subjects of human resources and labor and employment law, Mr. Herbert knew that he could not legitimately deny Ms. Bryant from taking medical leave. As Defendant has freely admitted, both before the filing of their Motion and in the Motion itself, Ms. Bryant was entitled to take the leave and it was fully justified. But that doesn't mean Mr. Herbert liked it or would let it stand when given the change to blow the whole thing up. Indeed, he didn't like it. He made that clear to Ms. Bryant. He moaned, gestured, scoffed, and expressed frustration and displeasure at the prospect of the forthcoming medical leave.[49] As made clear above, his job and the obligations of the Department were going to be more difficult without Ms. Bryant being on site and working alongside him. So, despite knowing that the OIG report did not actually give him legitimate grounds to terminate Ms. Bryant, he did so anyway, which satisfied his need for some sort of retribution.

---

[48] To the extent that fact-based assertions below do not include citations to the record, it is because these facts have previously been recounted, with such citations, in Part II above.

[49] Moreover, though it obviously hadn't happened yet at the time of Ms. Bryant's firing, Mr. Herbert behaved improperly again in March of 2019 in relation to Ms. Watkins. *See supra* Footnote 24. Mr. Herbert was so vindictive towards her that, after claiming the Department just couldn't live without her, Ms. Watkins was never even replaced after she was gone, and Mr. Herbert wouldn't even let her quit but insisted on involuntarily firing her instead.

So, what did the OIG report give Mr. Herbert, in reality?  Nothing.  He already knew about the whole WorkBaltimore 2017 situation, including the status of the Innovation Fund.  And, to the extent that he didn't, any supposedly termination-eligible misdeeds associated with the tracking of incoming and outgoing monies for WorkBaltimore 2017 certainly should have fallen equally upon the head of Mr. Gulhar -- the chair of the finance committee.  Yet, Mr. Gulhar, who had never once taken medical leave while working for Defendant and has (thankfully for him) been the "picture of good health," if you will, was never even threatened with termination by Mr. Herbert, who also didn't even speak with Mr. Gulhar before terminating Ms. Bryant.[50]  *See* Gulhar Depo. at 50, 122.  It didn't matter that Mr. Gulhar was just as responsible, if not more so, for the finance issues related to WorkBaltimore as Ms. Bryant (particularly since WorkBaltimore was outside and independent of both of their normal duties).  He wasn't disabled and didn't need or take medical leave.  So, he wasn't bothered by Mr. Herbert about anything.[51]

Turning next to the ultimate "red herring" issue of the Quiera Bryant and Ms. Bryant's financial disclosure form for 2016, the only evidence that the form wasn't submitted to the Ethics Board by Ms. Bryant – who has always maintained that it was submitted – is that the form cannot be found.  But, as noted above, Defendant has misplaced lots of documents, as shown in this very litigation.  More importantly, Mr. Herbert knew that Ms. Bryant had maintained that she did, in fact, submit her form for 2016.  Moreover, no fine was imposed by the Board and no complaint was pursued as a result of the supposed non-submission of the form, which one would expect to have occurred had it not been submitted.  Mr. Herbert, as the Director of the Human Resources Department, can and certainly should be charged with knowledge of the lack of any such effort to

---

[50]  It should be noted that Mr. Herbert also didn't speak with Ms. Bryant or her prior supervisor, Ms. Talley. *See* Herbert Depo. at 92-93, 226.

[51]  Though not formally part of the finance committee, the other Deputy Director, Jacia Smith, also never took medical leave and was also not terminated or otherwise bothered by Mr. Herbert.  *See* Smith Depo. at 54.

secure the supposedly unfiled form.  And a failure to submit the form leads to the aforementioned fine or a complaint with an opportunity to cure, not termination.  Moreover, it is utterly nonsensical that Ms. Bryant would have ever tried to hide Quiera Bryant's independent contractor status with the Smokey Crush and Leaf campaign because it wasn't hidden from anybody and was, in fact, known to a wide array of personnel in the Department, including Ms. Bryant's own boss and then-Director of the Department, Mary Talley, who personally signed the contract with Quiera. Additionally, as Mr. Herbert is well aware, Defendant has not, and does not even now, have an anti-nepotism policy that would have applied to Ms. Bryant anyway, and, as he was also aware in real time, Ms. Bryant did report Quiera Bryant's W-2 employment on her 2017 and 2018 forms. Lastly, for the reasons explained in depth above, *see supra* Part II, Quiera Bryant's independent contactor status did <u>not</u> have to be reported on the financial disclosure form anyway because, as Mr. Herbert knows, an independent contractor is <u>not</u> an employee of Defendant such that reporting would have been necessary.  She also was not paid enough money to qualify as someone doing "business with the City," as Mr. Herbert should obviously also know.

Mr. Herbert also consciously twisted and contorted the actual language in the OIG's report to serve his needs.  The best example of this is his testimony that Ms. Bryant supposedly "couldn't recall whether she disclosed [Quiera having contracted with Smokey Crush and Leaf] or not, which, to me, again, is something you would remember."  Herbert Depo. at 243.  But that's not what the OIG report actually said.  Putting aside, for all of the reasons recited above, why Ms. Bryant did not have to disclose it anyway (and why Mr. Herbert would have known this), the OIG report says that Ms. Bryant -- who would have submitted the form about 2½ years earlier and was not provided the form by the OIG -- "thought she <u>had</u> <u>made</u> such a disclosure."  Def.'s Motion at Exhibit 6 at 7 (emphasis added).  In other words, her memory is that she thought she'd done it.

34

That's just the way humans often speak, and this is also being filtered through the mind of the author of the OIG report. So, equating another person's thought process being that something had been done by them with that person being wholly unable to recall doing it is disingenuous at best. But, again, it was a means to an end. In reality, Ms. Bryant was responsive to the OIG and behaved appropriately with them, just as she had always done with Mr. Herbert, by his own admission.

Finally, it should be noted that Mr. Herbert did not follow Defendant's own policy on discipline when firing Ms. Bryant. Among other things, the policy calls for giving the "employee a full chance to explain his or her actions." Def.'s PM-350 Policy, submitted herewith as "Exhibit JJ." As noted previously, Mr. Herbert didn't even speak with Ms. Bryant before her termination.

Long story short, neither this Court nor a jury at trial needs to take Mr. Herbert at his word. Nor should that occur. It is clear that Ms. Bryant has in this Opposition -- and will do so in even greater detail at trial -- cast doubt on the objective validity of Defendant's purported reasons for firing her, which are unworthy of credence and/or false or based upon mistakes of fact.

## IV.  CONCLUSION

For these reasons, and any further reasons presented at any hearing on Defendant's Motion for Summary Judgment, Plaintiff La'Tonya T. Bryant hereby respectfully requests that this Honorable Court deny Defendant's Motion in its entirety.

Respectfully submitted,

_____/s/  Neil R. Lebowitz_____

Neil R. Lebowitz, Bar No.: 25155
Lebowitz Law Firm
5850 Waterloo Road, Suite 140
Columbia, Maryland 21045
neil@lebowitzlegal.com
410-730-9010
Counsel for Plaintiff

35

## **REQUEST FOR HEARING**

Plaintiff La'Tonya T. Bryant hereby respectfully requests a hearing on Defendant's Motion

for Summary Judgment.

Respectfully submitted,


_____/s/  Neil R. Lebowitz_____
Neil R. Lebowitz, Bar No.: 25155
Lebowitz Law Firm
5850 Waterloo Road, Suite 140
Columbia, Maryland 21045
neil@lebowitzlegal.com
410-730-9010
Counsel for Plaintiff