IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LA'TONYA T. BRYANT                    *

     Plaintiff                          *

     v.                                 *       Civ. Action No.:  MJM-21-0545

MAYOR & CITY COUNCIL OF BALT.        *

     Defendant                          *

**PLAINTIFF'S
EXHIBIT
A**

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## PLAINTIFF'S ANSWERS TO INTERROGATORIES

Plaintiff La'Tonya T. Bryant hereby answers Defendant's Interrogatories under oath, and states as follows:

A.    The word usage and sentence structure of these Answers to Interrogatories may be that of the attorney assisting Plaintiff in the preparation of the Answers, and does not purport to be the exact language of Plaintiff.

B.    Some of Plaintiff's Answers to Interrogatories may be deferred, partially answered, and/or subject to supplementation or amendment pending further discovery.

C.    Although Plaintiff has attempted to state herein all applicable objections that are currently pertinent, as the case progresses Plaintiff may become aware of other objections to the Interrogatories.   Thus, Plaintiff reserves the right to state further objections as may be proper as the litigation continues.

D.    The information contained in these Answers is being provided in accordance with the provision and intent of the Federal Rules of Civil Procedure.  These Rules require disclosure of information that may not be admissible.  Plaintiff does not, by providing this information, waive any proper objection to this information's admissibility in evidence at trial.

E.    Plaintiff objects generally to these Interrogatories to the extent that they seek information that is not relevant to the subject matter of this action, seek the disclosure of confidential or privileged information that is protected by the attorney-client privilege, the attorney work-product doctrine, or other privilege or protection, seek information prepared in anticipation of litigation, are overly broad, are vague, are unduly burdensome,

are unnecessarily invasive into her private affairs, are not reasonably calculated to lead to the discovery of admissible evidence, or fall within any of the protections for responding parties set forth in Fed R. Civ. P. 26(b).

F.    The substance of all oral and written communications between Plaintiff and her counsel and any of such counsel's notes associated with any utterances by Plaintiff or case-related witnesses will not be provided in response to these Interrogatories as said information and documents are privileged, attorney work-product, and/or were prepared in anticipation of litigation. The communications referenced herein have occurred throughout counsel's consultation with and representation of Plaintiff.

G.    Plaintiff objects to these Interrogatories as being violative of Fed. R. Civ. P. 33(a)(1) in that, when broken down into discrete subparts, they exceed the limit of 25 that may be asked by one party. In particular, Interrogatory Nos. 4 through 9 contain a multitude of subparts which collectively push the total beyond 25.

H.    As Defendant will see, particular Answers below sometimes make express reference to other Answers. However, even in the absence of such a reference, in situations where there is information provided below in a given Answer to a given Interrogatory that is also responsive to any other Interrogatory or Interrogatories, said information can and should be construed by Defendant, in reviewing and making use of these Answers, as having been provided in response to that other Interrogatory or those other Interrogatories.

I.    Though not explicitly inquired about by Defendant in its Interrogatories, Plaintiff notes, as she did previously in her Complaint, that she exhausted her administrative remedies and otherwise fulfilled all necessary conditions precedent in advance of filing her claims in court against Defendant. In this regard, Defendant is referred to paragraphs 27 through 30 of Plaintiff's Complaint.

J.    Plaintiff in this case will presumably be giving a deposition. The information that Plaintiff will provide in her upcoming deposition should be considered as supplementing the information provided below.

**INTERROGATORY NO. 1:**    State any and all places that you have been employed in the last ten years. Include the dates of your employment, your job title(s) and duties, and the names of all supervisors under whom you worked.

**ANSWER NO. 1:** Plaintiff objects to this Interrogatory as overly broad in terms of

its temporal scope. Without waiving said objection, as of 10 years ago, in March of 2012,

Plaintiff was working for the D.C. Government's Child and Family Services Agency,

having begun her employment there more than a decade earlier in or about January of 2000. Prior to the time she left the employ of said Agency in August of 2012 to begin working for Defendant, her job title was Supervisory Management Services Liaison and she was responsible for managing a number of priority projects. Plaintiff's supervisor at the Agency, for approximately six years, was Ronnie Charles. Her prior supervisors were Brenda Donald and Allan Long.

Plaintiff was next employed by Defendant. She worked for Defendant for more than six years, from August 2012 until November 9, 2018. For further information regarding Plaintiff's employment by Defendant, please refer to Plaintiff's Answer to Interrogatory No. 2 below.

Thereafter, on or about January 13, 2020, Plaintiff secured employment with Lane Bryant as a sales associate. Plaintiff's employment with Lane Bryant, which was part-time, concluded on or about January 25, 2022. Plaintiff's supervisors were Makayla, Lindsey, and Adrienne.

Plaintiff also worked, part-time, from approximately November 9, 2020 until December 20, 2021, at WayForth, LLC, where her title was Project Manager. In this role, she primarily assisted seniors with making decisions about, and navigating the logistics of, moving into senior communities. Her supervisor was Operations Manager Robin Edgemon.

Finally, from December 22, 2021 to the present, Plaintiff has worked for the Baltimore City Department of Social Services, which is a Maryland state agency. Her title is Deputy Chief of Staff. She is full-time, and is employed on a personal services contract.

3

Her duties, generally, are associated with the development and implementation of data, management, and analysis strategies for the Office of the Chief of Staff. Her supervisors have been Chief of Staff Antonio Hayes and, on an interim basis, Deputy Director Sean Bloodsworth.

**INTERROGATORY NO. 2:**    State the date that you were first hired by the Department of Human Resources, the title(s) and duties of each position you held, and the names of all supervisors under whom you worked.

**ANSWER NO. 2:** Plaintiff was employed by Defendant starting in August of 2012. From that time through some point in the early months of 2015, she served as the Chief of Staff to the Director of Human Resources, who was Ronnie Charles and then Mary H. Talley. Thereafter, until her termination on November 9, 2018, Plaintiff's served as Deputy Director of HR Administration. In this role, her direct supervisors were Ms. Talley and then Quinton M. Herbert. Plaintiff would also report to others superior to her in the chain-of-command, such as Kimberly Morton, who was the Mayor's Chief of Staff.

Plaintiff's duties as Chief of Staff to the Director of Human Resources were primarily related to staffing, employee development, performance management, and the implementation of policies, programs, and staffing priorities and procedures as well as serving as an advisor, sounding board, facilitator, and liaison with other departments and third-parties for the Director, Deputy Director, and other members of executive leadership.

Her duties as Deputy Director of HR Administration were focused primarily on Defendant's day-to-day administrative operations and functions; managing her own direct reports by, among other things, meeting with them, assigning them work, coaching and

counseling them, and preparing their performance evaluations; recruiting, interviewing, and collaborating on the selection of senior professional and paraprofessional personnel; dealing with budgetary and fiscal matters; and collaborating on the conceptualization, development, and execution of special projects, initiatives, and agency priorities.

**INTERROGATORY NO. 3:**    If you have ever made a prior claim of discrimination against an employer or private entity, including but not limited to disability discrimination, identify the employer or other entity and set forth all details of the claim made by you and the ultimate disposition of your claim.

**ANSWER NO. 3:**  Plaintiff has not made a claim of discrimination against any employer or entity, other than the ones at issue in this case.

**INTERROGATORY NO. 4:**    In Counts I, II, and III of the Complaint, you allege that the City failed to provide a reasonable accommodation to you as required by the Maryland Fair Employment Practices Act, the Americans with Disabilities Act, and §504 of the Rehabilitation Act, respectively. Describe in detail each and every fact that supports this claim. Include in your answer the identity of each person you contend participated in the alleged act(s), the specific act(s) each person committed and when each act(s) occurred; the identity of every witness you claim observed, heard or notified you of the alleged denial of reasonable accommodation; date(s) you complained to management about the denial of reasonable accommodation; and any person(s), including their job title, that you complained to regarding your allegations of denial of reasonable accommodation.

**ANSWER NO. 4:**  Plaintiff objects to this Interrogatory because discovery is ongoing, depositions have yet to be taken, and Plaintiff is still in the process of gathering information to prosecute her case. Plaintiff further objects to this Interrogatory to the extent that it calls for a legal conclusion in relation to the meaning of "reasonable accommodation." Without waiving said objections, Plaintiff was on legally-protected medical leave as a reasonable accommodation when she was terminated by Defendant[1] on

---

[1]  At all times pertinent, as Defendant admitted in its Answer to Plaintiff's Complaint, Defendant has had well in excess of 500 employees and was the recipient of federal funds.

November 9, 2018. Had she not been terminated, Plaintiff's leave would have continued thereafter until its pre-determined and finite ending date, at which time she would have returned to work. Her termination by Defendant, therefore, interrupted Plaintiff's ongoing leave, resulted in the complete denial of this accommodation as of November 9, 2018, cost her paid leave to which she would have otherwise been entitled to receive during the course of her medical leave, and, needless to say, rendered her unemployed, thereby discontinuing her $135,500.00 salary and other benefits of her employment. Plaintiff was notified of her termination via phone by Njukang Asong and via letter signed by Quinton M. Herbert. Plaintiff was not privy to internal communications to which she was not a party involving Mr. Herbert and others in advance of her termination, so she cannot speak with precision regarding that issue at this time. As noted in the objection above, discovery is ongoing and depositions have yet to be taken. Plaintiff reserves the right to amend and/or supplement this Answer as the course of this litigation continues. For further information, Defendant is referred, specifically, to Plaintiff's Answers to Interrogatory Nos. 5, 10, and 12 and, generally, to her other Answers.

**INTERROGATORY NO. 5:**    In Counts IV, V, and VI of the Complaint, you allege that the City discriminated against you on the basis of disability. Describe in detail each and every fact that supports this claim. Include in your answer the nature of your disability and the date you were diagnosed; the identity of the medical provider or facility that diagnosed and/or treated your condition; the date on which you informed the City and/or its employee(s) or agent(s) of your disability; the date(s) of the alleged discriminatory act(s); the identity of each person you contend participated in the alleged discriminatory act(s); the specific act(s) each person committed; the identity of every witness you claim observed, heard or notified you of the alleged discriminatory act(s); date(s) you complained to management about the discrimination on account of your disability; and any person(s), including their job title, that you complained to regarding your allegations of discrimination on account of your disability.

**ANSWER NO. 5:**  Plaintiff objects to this Interrogatory because discovery is ongoing, depositions have yet to be taken, and Plaintiff is still in the process of gathering information to prosecute her case.  Plaintiff further objects to this Interrogatory to the extent that it calls for a legal conclusion in relation to the meaning of "disability" under the applicable laws.  Without waiving said objections, Plaintiff's disabling health condition was known to Defendant[2] in multiple ways.

First, she regularly spoke with her coworkers and superiors about it and how she was medically treating it, including, but not limited to, Quinton M. Herbert and his predecessor, Mary H. Talley.  With regard to Mr. Herbert, in particular, Plaintiff informed him, in approximately late September 2018, about how she would soon require medical leave and medical treatment in the form of surgery on her right foot due to a long-standing tear in her Achilles tendon.  The surgery would also address other health issues associated with Plaintiff's right foot.  Mr. Herbert, as was the case with others, was also made aware by Plaintiff that she had been undergoing physical therapy treatment for some time before her November 2018 surgery.  Mr. Herbert and Plaintiff additionally talked, specifically, about Plaintiff wearing her orthopedic boot cast during the office's relocation from East Baltimore Street to Redwood Street in or about August 2018.

Second, on account of Plaintiff's periodic, but extended, use of the aforementioned boot cast as well as her walking with a limp, Plaintiff's disabling condition would be readily apparent to any colleague or superior who observed her efforts to ambulate around the

---

[2] At all times pertinent, as Defendant admitted in its Answer to Plaintiff's Complaint, Defendant has had well in excess of 500 employees and was the recipient of federal funds.

office. She also elevated her right foot frequently, including in senior leadership meetings where others could see her doing so.

Third, at the time of her termination on November 9, 2018, Defendant was aware, by virtue of Plaintiff's FMLA paperwork that had been submitted by her to Defendant on the morning of October 26, 2018 as well as Plaintiff's communications with Mr. Herbert and others, that she had just days earlier undergone her surgical procedure, which would, needless to say, cause even more severe physical limitations in the weeks thereafter and require a continuing course of treatment. Indeed, during her recovery from surgery, Plaintiff would require the use, at various times, of a "knee scooter," crutches, and the aforementioned boot cast. Moreover, the overreliance on her left leg caused by the impaired condition of her right foot and the surgery thereon would eventually lead, starting in 2019, to the need for medical treatment on her left leg by, among other things, receiving a cortisone injection into her left knee, which was administered to her by an orthopedist named John-Paul Rue, M.D.

Turning more specifically to the failure of Defendant to accommodate Plaintiff, when Plaintiff took her legally-protected medical leave to tend to her disabling condition with surgery and the associated recovery therefrom, Defendant terminated her. As detailed above, she was fired just weeks after Mr. Herbert and others were made aware by Plaintiff of her need for said leave and a mere three days after the aforementioned surgery. Plaintiff's termination by Defendant interrupted Plaintiff's ongoing leave, resulted in the complete denial of this accommodation as of November 9, 2018, cost her paid leave to which she would have otherwise been entitled to receive during the course of her medical

8

leave, and, needless to say, rendered her unemployed, thereby discontinuing her $135,500.00 salary and other benefits of her employment.

As for the particular health care providers who "diagnosed and/or treated [Plaintiff's] condition," either in the months and years prior to and/or after Plaintiff's termination, those were Branden R. Rhodes, M.D. (and, previously, Robert Peck, M.D.) at Foot Centers of Maryland, LLC, who has been, and continues to be, her podiatrist; Suzanne Taylor, P.T. and Michelle Sarver, P.T.A. of United Physical Therapy, who provided physical therapy treatment to Plaintiff for an extended period of time; and the aforementioned Dr. Rue.

Additionally, it should be noted that there were other employees who had allegedly played some role in the matters which Defendant has pointed to as supposedly justifying its decision to fire Plaintiff but who were not likewise terminated by Defendant. To Plaintiff's knowledge, unlike her, these other employees were not suffering from a disabling condition which necessitated an accommodation such as medical leave.

For further information, Defendant is referred, specifically, to Plaintiff's Answers to Interrogatory Nos. 4, 10, and 12 and, generally, to her other Answers.

As noted in the objection above, discovery is ongoing and depositions have yet to be taken. Plaintiff reserves the right to amend and/or supplement this Answer as the course of this litigation continues.

**INTERROGATORY NO. 6:**    In Counts VII, VIII, and IX of the Complaint, you allege that the City retaliated against you after you engaged in a protected activity by requesting a reasonable accommodation. Describe in detail each and every fact that supports this claim. Include in your answer the identity of each person you contend participated in the alleged act(s), the specific act(s) each person committed and when each

9

**INTERROGATORY NO. 9:**    In Count XII and Count XIII of the Complaint, you allege that the City discriminated against you because of your age, in violation of the Maryland Fair Employment Practices Act and the Age Discrimination in Employment Act, respectively. Describe in detail every fact that supports this claim. Include in your answer the identity of each person you contend participated in the alleged act(s), the specific act(s) each person committed and when each act(s) occurred; the identity of every witness you claim observed, heard or notified you of the alleged discriminatory act(s); date(s) you complained to management about the discriminatory act(s); and any person(s), including their job title, that you complained to regarding your allegations of discrimination based on your age.

**ANSWER NO. 9:**    Plaintiff objects to this Interrogatory because discovery is ongoing, depositions have yet to be taken, and Plaintiff is still in the process of gathering information to prosecute her case. Without waiving said objections, following Plaintiff's termination by Defendant when she was 51 years old, it is her understanding that she was replaced by someone significantly younger than she was at the time. More specifically, a worker in her 30's was brought over to the Human Resources Department from Defendant's Transportation Department.    This younger worker, to Plaintiff's understanding, took on the performance of Plaintiff's former duties, and did so for many months. Moreover, Jacia Smith, who served in a Deputy Director capacity for Defendant, like Plaintiff, and was alleged to have committed improprieties, was not terminated. To Plaintiff's understanding, Ms. Smith was under 40 at the time of Plaintiff's firing and continues to work for Defendant to this day. Finally, in her role as Deputy Director of HR Administration, Plaintiff observed a pattern of Defendant making the working conditions of older workers more intolerable in a seeming endeavor to get them to resign.

Plaintiff was not privy to the internal communications to which she was not a party involving Mr. Herbert and others in advance of her termination, and she is still gathering

13

information related to same in discovery in this case. As noted in the objection above, discovery is ongoing and depositions have yet to be taken. Plaintiff reserves the right to amend and/or supplement this Answer as the course of this litigation continues.

**INTERROGATORY NO. 10:** If you contend that any agent or employee(s) of the City ever made a discriminatory statement which you claim supports any allegation in your Complaint, state in detail the statement that was made; the date(s) on which the statement was made; the person who made the statement; the person to whom the statement was made; whether the statement was made orally or in writing; the identity of any witnesses to the statement; and whether the statement was reported, and, if so, to whom the statement was reported. Please attach any and all such written statements to your response.

**ANSWER NO. 10:** Plaintiff objects to this Interrogatory because discovery is ongoing, depositions have yet to be taken, and Plaintiff is still in the process of gathering information to prosecute her case. Plaintiff further objects because this Interrogatory is overly broad and unduly burdensome in that it unreasonably asks Plaintiff to recite every discriminatory utterance by anyone in the entirety of Defendant's sizeable staff which could "support any allegation in [her] Compliant." Plaintiff simply cannot be expected to personally know this. Moreover, regardless of whether recited herein or not, essentially every verbal or written statement made by every "agent or employee" of Defendant is admissible in Plaintiff's efforts to prosecute her case under Fed. R. Evid. 801(d)(2), and she therefore reserves the right to make use of all such statements in this litigation. Finally, Plaintiff objects to this Interrogatory on the ground that it is seeking to require the production of documents through the use of an interrogatory, which is outside the scope of permissible uses of interrogatories under Fed. R. Civ. P. 33. While a party served with interrogatories may elect, at his or her discretion, to produce documents in responding thereto, *see, e.g.,*

14

*id.* at 33(d), such an election is within the exclusive province of the responding party and may not be compelled with an interrogatory.

Without waiving the above objections, Plaintiff had communications with both Quinton M. Herbert and his predecessor, Mary H. Talley, in which Plaintiff became of aware of their mutual dislike of the taking of leave. With respect to Mr. Herbert, who is the individual who signed Plaintiff's termination letter, when Plaintiff and he discussed her health and the need for medical leave in approximately late September of 2018, he expressed frustration and displeasure to Plaintiff about her taking of said leave. As for Ms. Talley, she had been antagonistic toward Plaintiff with respect to her going out on leave, and this had previously dissuaded her from actually taking time off from work in the past. An example of this dynamic can be seen in a set of handwritten notes by Ms. Talley that are contained in Exhibit 1 of Defendant's document production. During the time they worked together, Plaintiff also observed Ms. Talley questioning the need for other workers to take leave as well. It became clear to Plaintiff that Ms. Talley wanted those around her to continue working, even when important matters in their personal lives required attention.

Additionally, the discovery responses and document production received from Defendant in this litigation have shown that other former employees, such as Nicole Carter and Lisa Watkins (now deceased), also experienced difficulties with Defendant in relation to the taking of medical and/or FMLA leave. Plaintiff expects to learn more about these other workers' experiences, and any discriminatory statements that may have been made in relation to their situations, as the course of discovery continues.

15

Plaintiff was obviously not privy to internal communications to which she was not a party involving Mr. Herbert and others in advance of her termination, and she would therefore not have first-hand knowledge of all discriminatory statements they may have made. As noted in the objection above, discovery is ongoing and depositions have yet to be taken. Plaintiff reserves the right to amend and/or supplement this Answer as the course of this litigation continues.

**INTERROGATORY NO. 11:**    If you, or anyone acting on your behalf, obtained statements in any form (i.e., oral or written) from any person regarding any of the facts alleged in your Complaint, fully identify each such person, including name, telephone number and address of each person from whom any such statement was taken; the dates on which such statements were taken; and the names and addresses of the persons who took such statements. Please also attach a copy of each such written statement, a transcript of each such recorded statement, and a detailed summary of each such non-recorded oral statement.

**ANSWER NO. 11:** Plaintiff objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege, attorney work-product doctrine, or that were prepared in anticipation of litigation. Plaintiff further objects to this Interrogatory because discovery is ongoing, depositions have yet to be taken, and Plaintiff is still in the process of gathering information to prosecute her case. Plaintiff also objects to this Interrogatory on the ground that it is seeking to require the production of documents through the use of an interrogatory, which is outside the scope of permissible uses of interrogatories under Fed. R. Civ. P. 33. While a party served with interrogatories may elect, at his or her discretion, to produce documents in responding thereto, *see, e.g., id.* at 33(d), such an election is within the exclusive province of the responding party and may not be compelled with an interrogatory. Finally, Plaintiff objects to this Interrogatory on

16

Toneah Bryant's address is 7 Woodthorne Court, Apt. 10, Owings Mills, Maryland 21117.

And Nicole Greene's address is 12803 Woodmoore North Blvd., Bowie, Maryland 20720.

For further information, Defendant is referred to Plaintiff's other Answers to Interrogatories, including her Answers to Interrogatory Nos. 5, 10, and 15.

Plaintiff hereby reserves the right to call as a witness at trial any person identified in either party's written discovery responses or document production or by any party or witness in deposition.

**INTERROGATORY NO. 13:**    State fully and in detail the complete basis for determining the type and amount of actual, compensatory and punitive damages, financial or otherwise, you allege to have suffered as a result of any of the allegations in the Complaint. Your response should include an itemization for the various components of actual, compensatory, and punitive damage claims, including the precise basis for calculating the specific amount of all such damages.

**ANSWER NO. 13:**  Plaintiff objects to this Interrogatory because discovery is ongoing, depositions have yet to be taken, and Plaintiff is still in the process of gathering information to prosecute her case. Plaintiff further objects because some of the information and documents necessary to more fully answer this Interrogatory, even at this relatively early juncture, have not been provided by Defendant despite Plaintiff's requests for same. Specifically, Defendant's Answer to Plaintiff's Interrogatory No. 3 and its document production in response to Plaintiff's Requests for Production of Documents Nos. 11 and 12 are either lacking and/or simply factually inaccurate. For example, Defendant has not produced any actual payroll records, such as paystubs or earning statements. Further, Defendant has failed, to date, to provide Plaintiff's time and attendance records, other records of hours worked by her, her W-2's, or documents showing Plaintiff's own

19

non-wage employment benefits, including things like health insurance, retirement contributions, and other perquisites which she may have received during her employment. All of this was requested by Plaintiff, and the absence of this data adversely and unfairly impacts Plaintiff's ability to prosecute her claims for damages.

Without waiving the above objections, Plaintiff will start by making some preliminary comments concerning the subject of damages. First, in response to Defendant's inquiry in this Interrogatory about punitive damages, Plaintiff will seek such damages, to the extent recoverable, in the amount that the Judge and/or jury in this case determines is sufficient to punish Defendant for its alleged misconduct. Second, though not inquired about in this Interrogatory, Plaintiff is seeking liquidated damages in relation to her claims under the FMLA and the Age Discrimination in Employment Act. Third, Plaintiff is also seeking forms of relief that do not necessarily fall within the characterization of "actual, compensatory, and punitive damages," as set forth in this Interrogatory, but she will make mention of them nonetheless. Specifically, in addition to these forms of "damages," Plaintiff is seeking pre- and post-judgment interest, her reasonable attorney's fees, her expert witness fees, and costs; that an Order be entered by the Court compelling Defendants to re-hire her in her former (or substantially similar) position or that she be awarded front pay and front benefits in lieu of reinstatement; and for all other and further relief that the Court or a jury deems appropriate. Finally, Plaintiff

notes that, in calculating her losses, she will not be taking into account the collateral source of her unemployment benefits.[4]

With respect to her economic damages, Plaintiff lost her source of income when she was terminated by Defendant on November 9, 2018. She is seeking, in a nutshell, to recover what she would have earned, and would still be earning, in terms of wages and benefits had she remained employed versus what she actually ended up earning through her subsequent work for other employers up to this point and into the future.

At the time of her termination, Plaintiff was making approximately $135,500.00 per year in gross salary, plus benefits in the form of health, vision, and dental coverage, which were used by her as well as members of her family. All of this was lost due to her firing by Defendant.[5] Moreover, to her understanding, Plaintiff was due for a salary increase at the time of said termination and she would have expected to receive additional increases in pay and benefits as her tenure for Defendant continued. Additionally, Plaintiff had about 185.5 days of various forms of leave available to her when she was terminated. She was paid out for approximately 53.5 of those days, but she lost the remaining 132 days (185.5 − 53.5 = 132). Long story short, separate and apart from the leave payout she received at the time of her termination, which she would have been entitled to eventually receive whenever she ultimately left Defendant's employ, she would still have had enough

---

[4] Should Defendant require further information regarding the applicable law on this particular subject, its counsel can inquire of Plaintiff's counsel.

[5] Plaintiff was able to secure replacement insurance coverage soon after her termination through her husband's employer, but the cost of the coverage was higher than it had been when coverage was being provided by Defendant.

leave (132 days' worth) to more than cover the entirety of her would-be medical leave from late 2018 into early 2019, with plenty left over.[6]  The point is that Plaintiff would have continuously received her normal rate of pay, had she not been fired, for every single workday after November 9, 2018, all the way up until now and into the future.  And Defendant should get no credit for the 53.5-day payout because Plaintiff would always receive this sum (or a substantially similar sum) eventually.

In terms of her salary loss alone, as noted above, Plaintiff was making $135,500.00 per year on the date she was terminated.  Even if Plaintiff assumes, for purposes of this Answer, that she would receive no pay increases in the months and years since then and hereafter, which Plaintiff will not concede at trial, she would still have earned $461,221.15 in salary for the 177 weeks that have elapsed immediately following Friday, November 9, 2018 through this coming Friday, April 1, 2022.

During these same 177 weeks, through other employment, Plaintiff has earned approximately $60,432.77 in salary and hourly pay.  More specifically, this sum of $60,432.77 is her combined income over these weeks from Lane Bryant, where she worked from approximately January 13, 2020 to January 25, 2022 and made the gross sum of approximately $6,584.71 in pay over that time period; WayForth, LLC, where she worked from approximately November 9, 2020 through December 20, 2021 and made the gross sum of approximately $29,848.06 in pay over that time period; and the State of Maryland's Baltimore City Department of Social Services, where she has worked from December 22,

---

[6]  Based upon Plaintiff's salary of $135,500.00 at the time of her termination, and assuming a five-day workweek, each day of this leave has a value of $521.15.

2021 to the present and will have made in the neighborhood of $24,000.00 by April 1, 2022,[7] based upon her annual salary of $86,226.00. So, all told, at these places of employment, she has earned, in salary or hourly pay, a combined total of $60,432.77 ($6,584.71 + $29,848.06 + $24,000.00 = $60,432.77). Subtracting $60,432.77 from the aforementioned $461,221.15 results in an out-of-pocket salary loss alone of $400,788.38, just through April 1, 2022 and assuming that Plaintiff would have never gotten any raise whatsoever since her termination date over three years ago.

Needless to say, Plaintiff cannot specify the total amount of the salary loss that she will eventually request at trial because the sum continues to grow with each and every passing day, and may also be impacted by the future course of Plaintiff's earnings. At an absolute minimum, however, she will be seeking the recovery of a sum greater than the sum calculated herein ($400,788.38) for her non-benefit-related salary loss. This is the floor, not the ceiling.

As for her past and future losses in relation to the non-salary benefits associated with her employment by Defendant, Plaintiff is still gathering information and documents from Defendant which are necessary to fully address this subject. As such, Plaintiff anticipates supplementing this Answer with this information at a later time.

With respect to her non-economic damages, Plaintiff expects to recover damages for her past, present, and future losses in an amount that the Judge and/or jury in this case

---

[7] Plaintiff is using April 1, 2022 as a cut-off herein for the sake of simplicity in that it provides a precise number of full weeks since her termination, specifically, 177. Needless to say, this means that this $24,000.00 figure is inherently an estimate due to the fact that Plaintiff has not received her pay through April 1, 2022 just yet. However, as stated above, the figure is "in the neighborhood" of what Plaintiff anticipates she will end up actually receiving.

determines compensates her for her loss of prestige, loss of status, insult, mental and emotional strain, loss of enjoyment of life, inconvenience, embarrassment, upset, anguish, sleeplessness, stress, anxiety, depression, and other related types of losses that she has suffered and will continue to suffer.

Finally, as noted above, Plaintiff is still gathering information and documents in discovery to assist with the prosecution of her claims, and many of the monetary figures cited herein are not static, but are changing and increasing. As such, Plaintiff reserves the right to amend and/or supplement this Answer as the course of this litigation continues.

**INTERROGATORY NO. 14:**    Identify all health care providers who have treated or examined you for any reason in the past ten (10) years and include all details (e.g., the nature of the illness, disability or addiction and the date or dates during which such illness, disability or addiction existed; the circumstances surrounding the occurrence of such illness, disability or addiction; the names, addresses and telephone numbers of all doctors, physicians, psychiatrists, psychologists, therapists and hospitals which have seen, treated or examined you for such illness, disability or addiction).

**ANSWER NO. 14:**  Plaintiff objects to this Interrogatory to the extent that it is unnecessarily invasive into her private affairs and/or calls for her to divulge information protected by the doctor-patient privilege.    Plaintiff further objects because this Interrogatory is overly broad both in terms of its temporal scope and subject matter, and because it seeks irrelevant and immaterial information which is outside the permissible scope of discovery. Long story short, this Interrogatory, among other things, asks Plaintiff to provide the names of, and types of treatment administered by, health care providers whom she saw for issues and ailments -- over a full decade -- which are wholly unrelated to any matter at issue in this case. This is not a case in which the defense might need to explore other potential source(s) of a plaintiff's physical injuries, such as in a personal

24

is ongoing, depositions have yet to be taken, and Plaintiff is still in the process of gathering information to prosecute her case. In further objecting, Plaintiff notes that, as a now-former employee who was terminated while already away from the office on medical leave, Plaintiff had, and still has, very little in the way of "books, records, [and] papers" related to Defendant's termination of her. And, as an individual, as opposed to a business entity, she has no "agents [or] representatives" to speak of. Finally, the subject of whether she made a "due and diligent inquiry of [her] attorney" will not be addressed herein, as such an inquiry would clearly be privileged.

Without waiving the above objections, as indicated by her signature under oath below, Plaintiff can affirm that her Answers to these Interrogatories are true and correct to the best of her present knowledge, information, and belief.

<div style="margin-left:40%;">

_/s/ Neil R. Lebowitz_

Neil R. Lebowitz, Bar No.: 25155
Lebowitz Law Firm
8180 Lark Brown Road, Suite 201
Elkridge, Maryland 21075
neil@lebowitzlegal.com
410-730-9010
Counsel for Plaintiff La'Tonya T. Bryant

</div>

27

I HEREBY AFFIRM under the penalties of perjury that the assertions of fact in the

foregoing Answers to Interrogatories are true and correct to the best of my present

knowledge, information, and belief.


March 30, 2022
Date

La'Tonya T. Bryant


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this _30th_ day of March, 2022, a copy of the
foregoing Answers was served, via email, upon Elisabeth B. Hofmann, Esquire, Baltimore
City Dept. of Law, 100 Holliday Street, Baltimore, MD 21202, Counsel for Defendant.


_/s/ Neil R. Lebowitz_
Neil R. Lebowitz

28