1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF MARYLAND

3

4     LA'TONYA BRYANT

5              Plaintiff

6          vs.                    Case No.

7     MAYOR AND CITY COUNCIL OF        MJM 21-00545

8     BALTIMORE CITY

9              Defendant

10    _____/

11

12         The remote videoconference deposition of

13    La'Tonya Bryant was held on Wednesday, June 8, 2022,

14    commencing at 9:36 a.m., before Adena Z. Katz, a

15    Notary Public.

16

17    REPORTED BY: Adena Z. Katz

18

19

20

21

PLAINTIFF'S
EXHIBIT
C

```
 1   APPEARANCES:

 2

 3   ON BEHALF OF PLAINTIFF

 4   NEIL R. LEBOWITZ, ESQUIRE via remote

 5   videoconference

 6   Lebowitz Law Firm

 7   8180 Lark Brown Road, Suite 201

 8   Elkridge, Maryland 21075

 9   Email:  neil@lebowitzlegal.com

10

11   ON BEHALF OF DEFENDANT

12   ELISABETH B. HOFMANN, ESQUIRE via remote

13   videoconference.

14   JUSTIN CONROY, ESQUIRE via remote

15   vidoeconference

16   Baltimore City Department of Law

17   100 Holliday Street, Suite 101

18   Baltimore, Maryland 21202

19   Telephone:  410.545.7391

20   Email:  Elisabeth.hofmann@baltimorecity.gov

21   ALSO PRESENT: QUINTON HERBERT, Agency Representative
```

1    let's see.  Recruitment.  What's her name?  Alisa.

2    Alisa Underwood was Class and Comp.  There was a

3    little bit of back and forth, so she may have

4    reported to the director.  I believe Benefits

5    reported to the director, and Policy may have

6    reported to Jacia, but I don't recall with a hundred

7    percent certainty.

8        Q    Tell me about Work Baltimore.  Well, let

9    me ask a more specific question to start us off.

10   When did Work Baltimore--no, strike that.  It's hard

11   to know how to start.  Who came up with the idea for

12   Work Baltimore?

13       A    Well, the concept of Work Baltimore grew

14   from Mayor Pugh.  Apparently she had a meeting with

15   her cabinet.  They did bus tours, and she asked for

16   strategic initiatives.  Director Talley brought that

17   back to the leadership team, and--

18       Q    Let me interrupt you briefly.  You said

19   apparently Mayor Pugh had a meeting.  So how did you

20   learn about that?

21       A    Director Talley.  She brought it back to

1    the leadership team.  She did these bus tours.  They

2    toured, you know, different parts of the City and

3    she was asking the directors to come up with

4    strategic initiatives to address some of the

5    problems with Baltimore.

6        Q    When was this?  When did this conversation

7    first start happening?

8        A    You know, dates are not my strong suit, so

9    I would say maybe a year before Work Baltimore,

10   before the first work Baltimore, eight or nine

11   months before that.

12       Q    So what were the steps from the meeting

13   that Mayor Pugh held to Work Baltimore itself being

14   a project of the Department of Human Resources?

15       A    Okay.  The steps were an initial

16   meeting--I was just trying to remember if Director

17   Talley had a framework for it, and she asked us to

18   flesh it out, or whether we as a team conceptualized

19   it there.  I do remember us breaking out into groups

20   from our leadership team and just sort of doing a

21   brain dump, and then we came back and Director

1    Talley sort of put them all together, and we came up

2    with Work Baltimore.

3        Q    So who was the leadership team that you

4    mentioned?

5        A    It was the director, the deputies, and all

6    of the chiefs in the Department of Human Resources.

7        Q    All right.  Would those chiefs the people

8    that you mentioned that reported directly to you and

9    Jacia?

10       A    Correct, and those that reported to the

11   director, yes.

12       Q    About how many people is that?  It's okay

13   if you don't remember for sure, but if you can

14   estimate.

15       A    Twelve, fourteen maybe.

16       Q    Was there a division of responsibilities

17   in planning Work Baltimore?

18       A    Yes.  So after the idea was finalized,

19   Director Talley took it back to the mayor's chief of

20   staff and to the mayor-as I understand it-and it

21   took some time, but they said they liked it, and we

Deposition of La'Tonya Bryant    La'Tonya Bryant vs. Mayor and City Council of Baltimore

Case 1:21-cv-00545-MMJM    Document 75-5    Filed 12/05/22    Page 6 of 46

1    moved forward from there.  At that point we came up

2    with duties, I think we called them, for the

3    different areas of responsibility, and we just went

4    from there.

5        Q    So what was your area of responsibility?

6        A    My area was logistics.

7        Q    Can you explain what that would entail?

8        A    Logistics was--it may have been called

9    something else.  That's just what I'm calling it

10    now.  I don't recall the exact terminology we used.

11    It was getting the space for the job fair, for lack

12    of a better word, and a component of Work Baltimore

13    was all these pre-trainings that took place where we

14    had trainings leading up to the bigger event where

15    we had trainings in the communities, so we had to

16    identify locations across the City that would allow

17    us to host training opportunities to prepare people

18    for work.

19        Q    Okay.

20        A    The idea was that there would be 30 days

21    of pre-convention activities, and in this those 30

1    days, there would be multiple trainings, multiple

2    job readiness opportunities for the citizens of

3    Baltimore.

4        Q    So just to be clear, this was the first

5    time that you had all worked on something like this?

6    This was a pilot initiative, in other words?

7        A    Yes.

8        Q    So how was funding set up for it, for Work

9    Baltimore?

10        A    Well, that was a little tricky.  There was

11    some back and forth about who would pay for it,

12    whether or not we had budget-which we did not-and

13    ultimately the mayor came back and said that we

14    would have to raise money for it.

15        Q    So did you go about raising money for it?

16        A    We got permission from the Board of

17    Estimates to fundraise, and we got a--we got some

18    Innovation Funds.

19        Q    What are the differences then between the

20    money you got from the Board of Estimates and

21    Innovation Funds?

1    A    We didn't get money from Board of

2    Estimates.  We received--well, I don't know if Board

3    of Estimates had to approve that or not.  I don't

4    know.  We received from Board of Estimates

5    permission to fundraise for Work Baltimore to pay

6    for Work Baltimore.

7        Q    So permission to fundraise, what would

8    that look like?

9        A    Reaching out to businesses, organizations

10   that could help to, you know, put the event on, the

11   costs associates with the event.

12       Q    Can you explain what the Innovation Funds,

13   how that worked?

14       A    The Innovation Fund was--well, we just

15   received notice that we could get Innovation Funds.

16   Then we got the application, I guess, it was.  We

17   completed the application, and then eventually they

18   established a budget code for us to use, and that's

19   how it worked.

20       Q    You say you received notice that you could

21   get Innovation Funds.  Who did that come from?

1      A      It came through Kim Morton from Mary

2  Talley.

3      Q      And who completed the aprication?

4      A      Let's see.  I don't know who completed.

5  It may have been Katrina, or it may have been Julie.

6  Maybe Julie completed it, or it could have been

7  whoever was Mary's EA at the time.  I don't know who

8  completed the form.

9      Q      Did DHR ultimately receive funds from the

10  Innovation Fund?

11      A      Yes.

12      Q      All right.  I think at this time I would

13  like to show you exhibit one.  Now I did provide

14  these ahead of time to counsel and to the court

15  reporting system, so I don't know if everybody has

16  them available.  I think I can share my screen to

17  show them.  Haven't done that in a while, but I

18  think I can do that, so bear with me one moment.

19  All right.  Can everybody see my screen that I've

20  shared?

21      A      Yes.

1  Was it a presentation?  Was it an publication What

2  was it?

3      A    Now you're saying Smokey Crush and Leaf.

4  Do you want me to talk about the cessation program.

5      Q    No, I'm asking you specifically about the

6  Smokey Crush and Leaf characters, I guess, and how

7  that worked.

8      A    Okay.  So Smokey Crush and Leaf

9  were--Smokey Crush was a crushed up cigarette, and

10 Leaf was a tobacco leaf.  They had a story, which I

11 don't remember now, but it related to smoking in the

12 City of Baltimore, and they would go to events or

13 agencies and pass out smoking cessation material,

14 they had a song and a dance that they did as well.

15     Q    So these were performers?

16     A    They were performers, correct.

17     Q    Were there only two people doing the

18 performance?

19     A    Yes, at a time.

20     Q    At a time.  But was it only two people

21 hired to do the performance like the same people

1    every time?

2          A    No, there were multiple people.

3          Q    All right.  So how were the people chosen

4    to play those characters?

5          A    People had to audition.

6          Q    And when did those auditions take place?

7    A rough estimate is fine.  I'm just trying to get an

8    idea of when this was.

9          A    They took place at different times, some

10   on weekends, some during the day.  It just depended

11   on who was conducting the auditions.

12         Q    All right.  What year was this?

13         A    Oh goodness.  I don't know; maybe 2015 or

14   2014, somewhere around there.

15         Q    Okay.  So did you ever conduct any of the

16   auditions?

17         A    I did participate in a couple of them,

18   yes.  Probably more than a couple; probably a few.

19   We tried to always have at least two people.

20         Q    Who else would have been there conducting

21   the auditions other than you?

1            MR. LEBOWITZ:  Objection.  Calls

2    for--go ahead.

3        **A      When I was there--I'm sorry.  Go ahead.**

4            MR. LEBOWITZ:  Go ahead.

5        **A      When I was there, I was there with**

6    **Director Talley on occasion.  I was there with Julie**

7    **Colucci on occasion.  I was there with Lisa Evans on**

8    **occasion, and there's somebody else who was there**

9    **too.  I can't think of who that is now though, but I**

10   **can see him in my mind's eye.  I just don't know--**

11       Q    Were you there for the day that your

12   daughter auditioned?

13       **A      I was there, but not present when she**

14   **auditioned.**

15       Q    So was that a day of multiple auditions or

16   just hers?

17       **A      Multiple.**

18       Q    Did you know she was going to audition?

19       **A      Yes, I did.**

20       Q    Had you told anybody that she was going to

21   audition?  Had you told anybody that you work with

1    that she was going to audition?

2         A    Yes.   Everybody who was there knew she was

3    going to audition.

4         Q    Who was there?

5         A    On that day, it was Mary Talley, Lisa

6    Evans, Julie Colucci, and one other person who I

7    can't recall at this time.

8         Q    So you're saying you were there, but no

9    present, for her audition?

10        A    That's correct.

11        Q    You mean, you stepped out of the room?

12        A    Yes.

13        Q    Okay.   You mentioned earlier that you

14   oversaw contracts for the agency in conjunction with

15   the Contracts Division, I think you said.   So were

16   you in charge of the contracts for the performers

17   for Smokey Crush and Leaf?

18        A    What I did for that was I helped to

19   develop language in partnership with the Contracts

20   office, and because it was for a health benefit

21   related program, it was under Benefits, and Lisa

1       Q      Approved to advance where?

2       **A      To the Contracts office, to Board of**

3  **Estimates.**

4       Q      Okay.

5       **A      To the Director, 'cause the Director was**

6  **the one who had to sign them.**

7       Q      All right.  Going back to the Innovation

8  Fund for a moment-I'm sort of jumping ahead in

9  time-but that document as you said layed out the

10 terms of the funds that were received by DHR and the

11 terms-I just said that--I can pull it back up.

12 Actually, let me do that.  That will be easier.  Did

13 it include terms of when the loan had to be repaid?

14      **A      Yeah.**

15      Q      It did.  So was that loan paid back on

16 time?

17      **A      Well, we were told that we did not have to**

18 **pay the loan back.**

19      Q      Told by whom?

20      **A      We were told by Mary.  I heard it from**

21 **Mary Talley, but she said that Kim Morton said we**

1  did not have to pay it back.  She actually said it

2  when we got the money, but she continued to say it

3  as the time got near for us to pay it back.  I was

4  saying, you know, we have to pay back the Innovation

5  Fund.  She said, we don't have to pay it.  I asked

6  her again, and that was a recurring conversation.

7      Q    So beginning April 2017, Mary Talley said,

8  we're not going to have to pay this back?

9      A    Yes.

10     Q    Okay.

11          MR. LEBOWITZ:  Just really quick.

12 I'm hearing like a high-pitched buzz.  I don't know

13 if you can all hear it.  Is it just me?

14          MS. HOFFMAN:  No.  I can hear

15 something faint.

16          MR. LEBOWITZ:  I can still hear Miss

17 Bryant.

18          MS. HOFFMAN:  Yes, me too.

19          MR. LEBOWITZ:  Madam Court Reporter,

20 are you okay?

21          THE COURT REPORTER:  Yeah, I'm

Office (410) 821-4888
CRC Salomon, Inc.

2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com · info@crcsalomon.com

Facsimile (410) 821-4889
Page: 29

1  totally fine.  I can hear her.  I hear what you're

2  talking about though.

3           MS. HOFFMAN:  Thank you, Mr.

4  Lebowitz.

5      Q    So just to be clear, because if I

6  understand this right, because the conversations had

7  with Mary Talley, who was the Director who you

8  reported to, involved Mary saying we're not going to

9  have to pay this loan back, was there-I think the

10  answer should be--well anyway, I'll retract that.

11  Was there ever a conversation about an extension to

12  pay back the loan?

13      **A    No, not an extension, just the pay back.**

14      Q    Just the pay back, so all you discussed

15  was pay back?

16      **A    Mm-hmm.**

17      Q    At any point, did you have a conversation

18  with anybody about needing to pay the lane back?

19      **A    Oh, yeah.  I've had many conversations**

20  **with people about the need to pay the loan back.  As**

21  **I said before, we were pretty often tight on our**

1    budget.  We usually didn't have enough money.  One

2    of the things that happened-I don't recall the

3    year-we had a flood, so we were going to get an

4    influx of reimbursement because of the flood, and it

5    was my intention to pay back the Innovation Fund

6    from the money we got from the flood.

7         Q    So it was your intention to--I'm so sorry.

8    Give me one moment.  There's something popping up on

9    my computer.

10             Okay.  It was your intention to pay

11   back the Innovation Fund loan with the fund from

12   reimbursement from the flood.  Was that your idea?

13   Was that something anybody told you to do?

14        A    No, that was my idea.

15        Q    Okay.  Do you remember the amount of money

16   you got, the DHR got, in reimbursement for the

17   flood?

18        A    No, I don't because it didn't happen

19   before I left, before I was separated.

20        Q    It didn't happen: the flood?

21        A    The reimbursement didn't happen.

1    Q    Okay.

2    A    So we were working on that, but it hadn't

3   materialized at the point that I was separated.

4    Q    Who was me?

5    A    I was working on the flood stuff with the

6   risk management office and Julie Colluci from DHR.

7    Q    So did you discuss with anybody your idea

8   to use the flood money to pay back the Innovation

9   Fund?

10    A    Yes.

11    Q    Who did you discuss it with?

12    A    I discussed it with the members of the

13   leadership team.  I discussed it with Mary Talley

14   directly.  I probably even told Quinton about it.  I

15   talked to Julie Colluci, and I told our budget

16   analyst about it.

17    Q    And just being clear the leadership team,

18   that's what you've referred to as the deputies and

19   the chiefs, and that was about twelve or fourteen

20   people?

21    A    Yeah, I think it was about 12 people,

1    yeah.

2        Q    All right.  I don't know if I asked this

3    already.  I don't think we got an answer on it, so

4    when did you first start having--let me ask it as,

5    when did the conversations change about--when did

6    they go from we're not going to have to pay the

7    money back to well, we are going to have to pay the

8    money back?  What time was that?

9        A    **Well, it never changed.  It was always**

10   **we're not going to have to pay the money back.  I**

11   **always said, we are going to have to pay the money**

12   **back.  That was always it.**

13       Q    Okay.  So--well, what I'm asking is when

14   you said Mary's the one who always said, we're not

15   going to have to pay that back.  So Mary left city

16   employment went?

17       A    **I don't know.  Summer of whatever the last**

18   **Work Baltimore was.  I don't know.  2016 or 2017.**

19   **I'm sorry.**

20       Q    Okay, that's fine.  So is it fair to say

21   that after Mary left, is that when you began to

Case 1:21-cv-00545-MMJM     Document 75-5     Filed 12/05/22     Page 20 of 46

1  think, well, we could use the flood money to pay

2  back the Innovation loan?

3      **A     I always thought that, always.  I always**

4  **maintained that we had to pay the money back.  That**

5  **never changed on my part ever.**

6      Q     All right.  In your position, were you

7  required to file Ethics Board Financial Board

8  disclosures every year?

9      **A     Yes.**

10      Q     Did you file one in--well, did you file

11  one every year?

12      **A     Yes.**

13      Q     So in your seven years that you worked for

14  the City, you filed one every year?

15      **A     Yes.**

16      Q     All right.  I am going to show you--I am

17  going to pull up, rather, and show for

18  identification purposes, exhibits two and three.

19                    (Bryant Exhibit 2 and 3 marked for

20                     purposes of identification.)

21      **A     So, can everyone see my screen?  Okay.**

1    Q    Okay.  Would these be the financial

2    disclosures that you filed in 2015 and 2017?

3    **A    I believe so.**

4    Q    Okay.

5    **A    But at some point I had to do them online.**

6    **I don't know if these are just reproductions of**

7    **those or whether these the actual ones 'cause the**

8    **ones I did that were on a form also had my**

9    **signature.  I don't see my signature on these.**

10    Q    When you filed these disclosures, do you

11    always get a copy?

12    **A    No, they--I'm sorry.  I don't remember.  I**

13    **don't remember if the ones that I did online I got a**

14    **copy of.**

15    Q    So it's a--is it something that's

16    generally done online?

17    **A    Well, that's what I was saying.  When I**

18    **first started, they were all done on a form like**

19    **this, but there was a space to sign at the bottom,**

20    **and when you did it online, obviously you couldn't**

21    **sign, so what I'm saying is that either this was**

1    **done online, or if it was done on a form, I don't**

2    **see my signature where I would have signed.**

3    Q    Okay.  It was your testimony that you also

4    filed one in 2016, correct?

5    **A    Yes.**

6    Q    To your recollection, would that have been

7    something that you filled out hard copy rather than

8    online?

9    **A    I don't know.**

10    Q    Okay.

11    **A    It was--throughout my tenure, it was on a**

12    **form.  Then there was a period where it was online,**

13    **and I recall in that online time not being able to**

14    (inaudible) access one of mine, so I had to do a

15    form.  Which year that was, I'm not a hundred

16    percent certain, but I know that it was in the

17    middle.

18    Q    Okay.  So on exhibit two, I'm scrolling

19    down to page four.

20    **A    Mm-hmm.**

21    Q    This is the section--it's titled--the top

1    page is titled Schedule Six, Family Members Employed

2    by the City.  So here, again, I can hear an echoing

3    noise as well, but just checking if audio is still

4    fine for everybody.  Okay.  So this is the page

5    where you would have filled in the requested

6    information about a family member employed by the

7    City, correct?

8         **A    Yes.**

9         Q    Okay.  So here the information entered is

10   Quiera M. Bryant.  Is that your daughter?

11        **A    That's my daughter.**

12        Q    Okay.  And it's stated here that she was

13   employed by the Baltimore City Parking Authority as

14   an administrative assistant, correct?

15        **A    That's correct.**

16        Q    So this was during the year of 2017,

17   correct?

18        **A    Correct.**

19        Q    Okay.  I would like to ask you about an

20   incident, I suppose, from 2016.  Excuse me.  Let me

21   ask it this way.  Were you ever--do you have--can

1    you remember any time that you were disciplined by

2    the Director, Mary Talley?

3        A    Disciplined.  That's a very broad term.

4    No.  If you think about it, no, I wasn't

5    disciplined.

6        Q    Was there a conversation that you had with

7    Mary Talley in April of 2016 about somebody close to

8    you who had passed away?

9        A    Yes.

10        Q    Can you explain what that conversation was

11    from your perspective?

12        A    She basically--she basically accused me of

13    saying that somebody who was my niece was not my

14    niece, who had been murdered.

15        Q    Okay.  So the person who was

16    murdered-which is terrible, and I want to say I am

17    sorry for that-so this person was your niece?

18        A    Mm-hmm.

19        Q    Okay.  Why did--if you know or, you know,

20    to the best of your understanding, why did Mary

21    Talley say that she wasn't your niece?

1    A    Well, she said she wasn't my niece because

2    my sister and I are not blood relation.

3    Q    Okay.  So what is the connection with your

4    sister, if not blood?

5    A    She's my stepsister.

6    Q    Your stepsister.  So your parents were

7    married at a certain point?

8    A    Mm-hmm.

9    Q    Okay.  And so did anyone else in the

10   office know about the tragedy that had occurred?

11   A    Well, I told two people.  I told Director

12   Talley, and I told the previous deputy director, and

13   that was it.  I literally broke down in office, and

14   I had to leave.  Those are the only two people I

15   told.  After I was out, I did talk to the people

16   that reported to me, so they knew that I was out,

17   but that was it.

18   Q    Okay.  You were out for the funeral?

19   A    Mm-hmm, for the funeral, and then I helped

20   my sister do some things.

21   Q    How many days was that?

1      A     I don't know.

2      Q     Okay.

3      A     Two, three days.  I don't know.

4      Q     Okay.  Did anybody else in the office ever

5  speak to you about it or anything else some up?

6      A     Yeah, people talked to me about it.

7      Q     Can you describe what those conversations

8  were?

9      A     Well, you know, I am a very private

10  person, so I didn't tell people.  Director Talley

11  took it upon herself to tell people, and, you know,

12  people want to know, and I shared.  It's so painful.

13  I shared to the extent that I was able to, and, you

14  know, that's pretty much it.  I don't want to talk

15  about my niece's passing.

16      Q     Okay.  Would you like to take a break?

17  It's a little past 10:30?

18      A     Yup.

19      Q     If everyone's okay, we can take a five

20  minute break.

21                     (There was a brief recess taken.)

1    Q    Miss Bryant, I just need to ask you a

2  couple more questions about your sister just to

3  clear that information.  What's your stepsister's

4  name?

5    A    Lashawn Harris.

6    Q    Can you spell that, please?

7    A    L-A-S-H-A-W-N.

8    Q    Harris, common spelling, H-A-R-R-I-S?

9    A    Correct.

10    Q    Okay.  So who was married to who?  What

11  connected you?

12    A    My mother and her father.

13    Q    Okay.  What years were they married?

14    A    I have no idea.  I was very young.

15    Q    Okay.  So after the conversation that Mary

16  had with you, were you written up?  Did she give you

17  a write-up?

18    A    Mm-mm.

19    Q    You never received anything written?

20    A    No, nope.

21    Q    Okay.  Did you ever provide her with

1    details about, you know, confirming that you were

2    actually connected to Lashawn?

3         A    We had a very heated discussion, and she

4    said that I didn't tell her what our relationship

5    was, and I asked her why would I need to?  The only

6    thing I told was that my niece was murdered.  I,

7    mean, that really should have been the end of the

8    conversation in my opinion, and I used my leave, and

9    I left.

10        Q    Okay.

11        A    It's not her business.

12        Q    Okay.

13        A    It pissed me off; so mad about that, but

14   that's done.

15        Q    I am going to move on now.  So if I didn't

16   before-I don't believe I did-I would like to enter

17   exhibits two and three that I previously showed and

18   marked just for identification.  Exhibit two is

19   Financial Disclosure, 2015.  Exhibit three is

20   Financial Disclosure, 2017.

21                   MR. LEBOWITZ:  I would object for the

1     **A     Director Talley.**

2     Q     What dates?  I understand that you may not

3     remember the exact dates, but--

4     **A     I don't know.**

5     Q     -- the closer you can get to whenever it

6     was, whenever you had these, an appointment that she

7     dissuaded you from taking leave?

8     **A     It's not necessarily an appointment.  For**

9     **the most part, the year before when I took physical**

10     **therapy, I either went before work or after work, so**

11     **I did my full duty, but Director Talley did not like**

12     **people to use leave at all.  She just--there was**

13     **always some side comment about it, so dissuade in**

14     **that sense is what--**

15     Q     What kind of side comments?

16     **A     You off again?  You know, can this be done**

17     **before or after work?  That kind of stuff.**

18     Q     And those comments were directed to you?

19     **A     Everybody.  She did not discriminate in**

20     **that regard.**

21     Q     I know you said everybody, but can you

1    remember specific people or specific times this

2    happened with any specific person?

3        **A    I mean, she just--she just watched**

4    **everybody's leave, and she often had something to**

5    **say about it.  I don't have a specific time.  It was**

6    **just part of her way.**

7        Q    So was that something you observed even

8    before September 2017?

9        **A    Mm-hmm, just part of her way.**

10       Q    Okay.  And she--as Director, she was the

11   person who would review and approve any and all

12   leave requests, right?

13       **A    That's correct.**

14       Q    Other than Mary, was there anybody else

15   who made similar comments?

16       **A    Not that I recall.**

17       Q    Okay.  So if I didn't do it already, I

18   would like to enter exhibit four, which is the

19   Certification of Healthcare Provider, and I will

20   turn us now to exhibit five.  Again, I noted for

21   identification, this is your Answers to the

1  reads, Plaintiff had communications with both

2  Quinton Herbert and his predecessor, Mary Talley, in

3  which Plaintiff became-I think it's supposed to

4  be-became aware of their mutual dislike about the

5  taking of leave.  With respect to Mr. Herbert, who

6  is the individual who signed Plaintiff's termination

7  letter, the Plaintiff and he discussed her health

8  and her need for medical leave in approximately late

9  September of 2018.  He expressed frustration and

10  displeasure to Plaintiff about her taking of said

11  leave.  Can you elaborate on what that conversation

12  was and what was actually said?

13  **A    It was like--it was more of--I'm trying to**

14  **remember.  I think we were in Jacia's office, and I**

15  **told him about my pending surgery, and he's like,**

16  **uh.  It was more of like just, you know, expressed**

17  **displeasure about it.**

18  Q    Expressed displeasure in what way?  Did he

19  tell you he didn't want you to take the leave?

20  **A    No, it was a gesture and a moan.**

21  Q    A gesture.  What kind of gesture?

1    had already talked to him about it.

2         Q    Okay.  So the reason I'm asking a lot of

3    questions about this is 'cause I want to make sure I

4    understand what he was reacting to.  So your

5    testimony is he made that sort of scoffing reaction

6    when you told him you would have to take off

7    additional time for surgery; is that correct?

8         A    That's correct.

9         Q    Okay.  Did he tell you that he would

10   prevent you from taking the leave for your surgery?

11        A    No.

12        Q    Okay.  Was this a conversation where you

13   discussed FMLA?

14        A    No.  No.  It was actually a very short

15   interaction.  We--he was actually standing, and

16   after we talked, after I made my statement and he

17   reacted, he pretty much left, left the room.

18        Q    This was in Jacia's office, you said?

19        A    I believe it was.  I'm not a hundred

20   percent certain.

21        Q    So was Jacia present as well?

1    **necessarily that FMLA was mentioned every time or**

2    **maybe it was said like medical leave or for recovery**

3    **period, but that's what you use, you know.  When you**

4    **have a medical procedure, you use FMLA.**

5        Q    You say when you have a medical procedure

6    you use FMLA.  Why do you say that?  Is that general

7    policy?

8        **A    Yeah, it's the standard.  When you have a**

9    **medical procedure or you need leave in relation to**

10   **care for recovery from surgery or things like that,**

11   **you do that through FMLA.**

12       Q    So when you had discussions with your

13   doctor, and you took away from those discussions

14   that you would likely need surgery, what you're

15   saying is you always intended to use FMLA for that

16   surgery?

17       **A    That's correct.**

18       Q    Okay.  So and again, we have kind of

19   discussed a lot of this already, but this page 15

20   goes on to say, as for Miss Talley, she had been

21   antagonistic towards Plaintiff with respect to her

1    going out on leave, and this had previously

2    dissuaded her from actually taking time off from

3    work in the past.  So when was the time that you

4    were dissuaded from actually taking time off work?

5         A    I just, not just, but I remember one time

6    specifically only because it was tied to something

7    really important where I wanted to take off for a

8    significant period in February for my husband and my

9    25th anniversary.  We wanted to go on vacation and

10   everything, and I ended up having to reduce the

11   number of days that I requested.

12        Q    Okay.  So significant period; what was the

13   original amount of days that you wanted to take?

14        A    I want to say it was like 15 'cause we

15   wanted to go somewhere great, and I think I ended up

16   doing maybe eight or ten.

17        Q    Eight or ten work days?

18        A    Mm-hmm.

19        Q    Okay.  So you went from three weeks to two

20   weeks?

21        A    Yeah, probably about that.

1      Q      Okay.  And what was the conversation, or

2   what was communicated to you by Mary that led you to

3   reduce the time?

4      A      It was more a complaint about what was

5   before us and stuff like that and just--I don't

6   know.

7      Q      What was before us; what do you mean by

8   that?

9      A      What we had to do or if something

10  happened.  I don't remember if that was when the

11  other Deputy left or we--maybe the benefit

12  chief--something happened between me requesting it

13  and actually taking it.

14     Q      This was February 2018?

15     A      No, this wasn't '18.  This would have been

16  '17.

17     Q      Okay.

18     A      That would have been '17.

19     Q      You mentioned something had happened

20  around that time, something about a deputy had left?

21     A      Either that--yeah.

1      Q      Who were you referring to when you say

2   that, Jacia?

3      **A      The other deputy was (inaudible).  I don't**

4   **know if that was it, but it was something like that**

5   **that had Mary anxious and stuff, and she kept**

6   **saying, you're going to be off, you know.**

7      Q      So did she ever tell you that you had to

8   reduce the leave?

9      **A      No.  She never said, change your leave.**

10  **No, she did not.**

11     Q      She did approve the full amount?

12     **A      She initially approved the full amount,**

13  **yeah.**

14     Q      Any other occasions that you can recall--

15     **A      Not at that level of specificity.**

16     Q      Well, even if it's a lower level of

17  specificity.  Any occasion, any timing, any specific

18  words that stuck in your mind that you recall;

19  context of what was going on at the time; anything

20  to give more specificity about what you recall,

21  specifically as it relates as to Mary's comments to

1    you?

2        A    No.

3        Q    Was that no?

4        A    Not right off, I do not.

5        Q    Okay.  Again, we kind of have once more

6    discussed this a little bit already, but just

7    because it's in the Answers.  During--again, reading

8    from the Answers: during the time they worked

9    together, Plaintiff also observed Miss Talley

10   questioning the need for other workers to take leave

11   as well.  So in reference to this sentence, can you

12   remember who those other workers would have been?

13       A    Well, like I said before, she just made

14   general comments about people's use of leave whether

15   it was in just a conversation with she and I or the

16   deputies and me.  She regularly would review

17   balances.

18       Q    I'm sorry.  I didn't hear that.  She

19   regularly would what?

20       A    Regularly reviewed leave balances.

21       Q    Okay.  What does that mean, that she

1    reviewed leave balances?

2        A    She--you know, you can get a report and

3    see who has what type of leave available, and what

4    their balance was, and you know, their usage.

5        Q    How do you know that she did this?

6        A    Well, sometimes she asked me to get the

7    report, and one time--I do remember one time now

8    where she was going through that report and said

9    that Margo doesn't have any leave, and she said, I

10   should talk to her about that because, you know--I

11   don't know what Margo was doing, but I believe you

12   have leave.  It's not interfering with your work.

13   It's your leave.  And then I remember we had--I

14   don't--we had one man who was Jewish.  He had to

15   leave early-not early-he actually would work his

16   full schedule.  He needed to be home before sundown

17   or something, and she would balk about that.  I

18   don't recall whether he was officially hired or

19   whether he was a temp or what.

20       Q    You said she wouldn't talk about that?

21       A    Well, she would create what I perceived as

1    **artificial barriers to him leaving.**

2         Q    Okay.  Can you describe what those were?

3    You said you perceived them as artificial barriers.

4    What--

5         **A    Like, you know, she needs a cup, or is**

6    **this meeting scheduled, or just, you know,**

7    **prolonging conversations unnecessarily.  It was**

8    **insensitive and unnecessary.**

9         Q    Okay.  All right.  So I am now going to

10   page eighteen, and this is where you list a number

11   of people that you believe--actually, before I move

12   on to that.  Let me--while we're still--just because

13   the description you just gave of Mary's behavior

14   towards the Jewish employee.  You said that you're

15   not sure if he was officially hired, so was he a--

16        **A    I don't know if he was a temp or not.  I**

17   **just remember that situation.**

18        Q    And when did that occur?

19        **A    While she was there, while he was there.**

20   **Outside of that, I don't have a sense of timeline.**

21        Q    Do you remember his name, a first name or

Case 1:21-cv-00545-MMJM    Document 75-5    Filed 12/05/22    Page 40 of 46

1    one by one, and we'll just go through it that way.

2    Quinton Herbert, in your words, what is the extent

3    of his knowledge?

4        A    Quinton terminated me, and he knew about

5    Work Baltimore.  He knew about things I told him

6    about the Innovation Fund, and my request for FMLA.

7        Q    Really quickly: you said the things you

8    told him about the Innovation Fund.  What

9    specifically was that?

10       A    Remember, I talked about that sort of

11   intro meeting where we went down our list of

12   priorities, so I would have given him an overview of

13   Work Baltimore, Innovation Fund, our work budget

14   standing, all of that stuff, so just an overview I

15   would have given him.

16       Q    So that was the time that you updated him

17   on what was going on with the Innovation Fund?

18       A    The flood, all of it, yup.

19       Q    Okay.  Mary Talley.

20       A    I previously reported to her.  She would

21   know about the Innovation Fund.  She knows about

1    making things untenable, but she also knew about

2    Work Baltimore.  She'd know about the Innovation

3    Fund, the intent to use flood money.  She would know

4    about my surgery, my upcoming surgery.  Not so much

5    (audio cut out) and that's it.

6        Q    Lisa Evans.

7        A    Lisa Evans.  She would know about my

8    daughter.  She would know about the tobacco

9    cessation program.  I don't think she would know

10   about--she would know about--I think that's it.  I

11   know she would about my foot.  I think she left

12   before it got to the point where something was, you

13   know, going to happen.  That's it for Lisa.

14       Q    Jacia Smith.

15       A    Jacia Smith, she knows about it all.  She

16   knows about--she knows about Work Baltimore,

17   Innovation Fund, my daughter.  She was there when I

18   told Quinton, a couple of times when Quinton talked

19   about some things we've already discussed.  And

20   that's it for her.

21       Q    Sandy Curtis.

1    **A**    **No.**

2    Q    Any of their findings?

3    **A**    **No.**

4    Q    Did he ask you if there was anything else

5    outside of the findings that they had released in

6    the summer?  Did he ask you if there was anything

7    else other than what was released by the summer?

8    **A**    **Nothing comes to mind at this time.**

9    Q    Okay.  Did he ask you if there was

10    anything that he needed to know with him stepping

11    into the role after Mary left?

12    **A**    **Yeah, that's what the meeting was about.**

13    **I gave him the rundown.**

14    Q    Okay.  So your understanding of that

15    request, is there anything I need to know, was just

16    what's going on with the office?

17    **A**    **It was everything that came to mind, you**

18    **know.  I was pretty organized, so I feel confident**

19    **in saying that I told him everything was, you know,**

20    **of priority and significance.**

21    Q    Did he have any discussion with you and

1   October 4, 2018.  Can you take a look at these two

2   e-mails?

3      **A**     **Mm-hmm.**

4      Q     Read the whole thing, please.  Let me know

5   when you're ready.

6      **A**     **Okay.**

7      Q     Okay.  So if you take a look at the second

8   page.  It's an e-mail signed NJ, which is Mr. Asong.

9   Did Mr. Asong send you the FMLA paperwork form to be

10   filled out?

11      **A**     **Yes.**

12      Q     Was that in early October?

13      **A**     **Yes.**

14      Q     Okay.  And then you also saw the e-mail

15   from Miss Holdridge to NJ.  Does this refresh your

16   memory at all as to when the subject of you needing

17   FMLA leave started to come up?

18      **A**     **Well, it started to come up as I**

19   **recognized that in consult with my doctor that**

20   **surgery was going to happen, so that's when it came**

21   **up, and so like I said before, I did talk to**

1    **were as tach savvy as others.  There were just**

2    **little nuances, you know, that make things**

3    **unnecessarily unbearable, and you know, again, I**

4    **don't have a specific incident at this moment, but**

5    **you know, if something comes to mind before we**

6    **conclude, I will certainly share it.**

7    Q    Okay.  I think my last question was, there

8    was a line of questioning about getting confirmation

9    in relation to the approval of your FMLA.  Your

10   leave for purposes of the surgery started on the day

11   of the surgery on November 6, 2018, correct?

12   **A    Correcter.**

13   Q    And you were terminated within 72 hours on

14   November 9, 2018, correct?

15   **A    Correct.**

16   Q    I have no further questions.

17        MS. HOFFMAN:  All right.  May I?

18        MR. LEBOWITZ:  Sure.  If you have

19   questions based on mine, sure.

20        MS. HOFFMAN:  I do.

21        EXAMINATION BY MS. HOFFMAN:

1                      CERTIFICATE OF DEPONENT

2

3          I hereby certify that I have read and examined

4     the foregoing transcript, and the same is a true and

5     accurate record of the testimony given by me.

6

7          Any additions or corrections that I feel are

8     necessary will be made on the Errata Sheet.

9

10

11

12     _La'Tonya J. Bryant_____.

13     LA'TONYA BRYANT.

14

15     ___7/20/2022_____.

16     DATE

17

18     (If needed, make additional copies of the Errata Sheet

19     on the next page or use a blank piece of paper.)

20

21

Deposition of La'Tonya Bryant                          La'Tonya Bryant vs. Mayor and City Council of Baltimore

1                              ERRATA SHEET

2       Case: Bryant v. Mayor and City Council of Baltimore

3       Witness: La'Tonya Bryant              Date: 06/08/2022

4       PAGE/LINE            SHOULD READ          REASON FOR CHANGE

5                                                    uncertain of other persons
                                                     gender identity.
        25 Line 10          "Can see them (remove him) ..."

6                           Add. Ray Gulhar and Larry         I now recall instances where these
        73 Line 2           Harper-Short come to mind         two gentlemen weren't treated as well
                                                              as they could or should have been.

7

8                           Add: The previous deputy director        His resignation caused
        83 Line 4-6         had submitted his resignation.           additional work for Mary and I

9

10      88 Line 9           Remove: DA              EA is short for executive assistant
                            Add: EA

11

12

13

14

15

16

17

18

19

20

21

Office (410) 821-4888                2201 Old Court Road, Baltimore, MD 21208      Facsimile (410) 821-4889
CRC Salomon, Inc.                    www.crcsalomon.com - info@crcsalomon.com              Page: 122