1        IN THE UNITED STATES DISTRICT COURT

2         FOR THE DISTRICT OF MARYLAND

3   LA'TONYA T. BRYANT,              *

4        Plaintiff              * Civil Action No.:

5   v.                            * MJM-21-0545

6   MAYOR & CITY COUNCIL OF        *

7   BALT.,                        *

8        Defendant              *

9        *    *    *    *    *    *    *    *    *

10         VIDEOCONFERENCE DEPOSITION OF

11          QUINTON M. HERBERT

12             VOLUME I

13          AUGUST 12, 2022

14

15        *    *    *    *    *    *    *    *    *

16

17

18

19

20

21        Reported by: Sarah Thomas

PLAINTIFF'S
EXHIBIT
D

1   APPEARANCES:

2   NEIL R. LEBOWITZ, ESQUIRE

3           Lebowitz Law Firm

4           8180 Lark Brown Road, Suite 201

5           Elkridge, Maryland 21075

6           410.730.9010

7           neil@lebowitzlegal.com

8           On behalf of Plaintiff

9

10  ELISABETH BREVET HOFMANN, ESQUIRE

11          Assistant Solicitor

12          Labor & Employment Practice Group

13          City of Baltimore

14          100 North Holliday Street

15          Baltimore, Maryland 21202

16          elisabeth.hofmann@baltimorecity.gov

17          On behalf of Defendant

18

19

20  Also Present: Camille Shepherd

21          La'Tonya Bryant

1    **A    No.**

2    Q    Okay.  And if you spoke with

3    counsel -- without telling me what was

4    discussed -- for how long did you speak?

5    **A    Approximately an hour.**

6    Q    Okay.  Where did you attend college?

7    **A    Morgan State University in Baltimore,**

8    **Maryland.**

9    Q    And what's your undergraduate degree

10   in?

11   **A    I hold a Bachelor of Arts in**

12   **sociology.**

13   Q    Okay.  And where did you attend law

14   school?

15   **A    University of Maryland Francis King**

16   **Carey School of Law.**

17   Q    And when did you graduate from law

18   school?

19   **A    May of 2023 -- I mean 2003.  Excuse**

20   **me.**

21   Q    Okay.  Do you have any other formal

1    post-high school education?

2        **A      I have a diploma from the Baltimore**

3    **School of the Bible.  And I have about seven**

4    **out of ten courses completed towards a**

5    **doctorate of theology at the Andersonville**

6    **Theological Seminary.**

7        Q    Okay.  The diploma from the Baltimore

8    School of the Bible, when did you get that?

9        **A      That would have been 2006 or 2007.**

10       Q    Okay.  Do you have any

11   certifications?

12       **A      I am a formally trained mediator and**

13   **arbitrator through the -- through Triple A,**

14   **American Arbitration Association.  I am a Leon**

15   **Higginbotham fellow with the American**

16   **Arbitration Association.**

17       Q    Okay.  Do you belong to any

18   employment-related organizations -- employment

19   law related, I should say?

20       **A      I do IPMA-HR and SHRM.**

21       Q    What does IPMA stand for?

1      A      International Public Managers

2  Association for Human Resources.

3      Q      Have you belonged to employment

4  law-related organizations in the past, others?

5      A      Aside from IPMA-HR and SHRM, no.

6             I'm trying to think.  I am a member

7  of the Maryland Chapter of LERA, which is the

8  Labor and Employment Relations Association.

9             In fact, I'm the immediate past

10 president of that organization.  I am also a

11 member of the national chapter and serve on the

12 board of directors for the national chapter.

13            I also am a member of Maryland's

14 chapter of the Public Labor Employment [sic]

15 Relations Association, MDPELRA.

16     Q      Okay.

17     A      And I serve as the treasurer of

18 MDPELRA.

19     Q      All right.  How long have you worked

20 for the city of Baltimore?

21     A      I've been with the city of Baltimore

1   since 2013.

2       Q    Okay.  And in what roles have you

3   worked for the city of Baltimore?

4       A    I worked initially in the law

5   department as a labor and employment attorney,

6   in the city's law department.  From there, I

7   went on to serve as the deputy labor

8   commissioner for the city of Baltimore.  And

9   from deputy labor commissioner, I was appointed

10  as the director of human resources.  I've been

11  serving in that capacity since 2018.

12      Q    Okay.  And what did you do prior to

13  working for the city of Baltimore?

14      A    I worked for Baltimore City Schools.

15      Q    Okay.  Anywhere else?

16      A    Prior to my employment with Baltimore

17  City Schools, I was a entrepreneur.  I had a

18  solo law practice.

19      Q    Okay.  And anything else?

20      A    Before my law practice, I worked as a

21  public defender for Baltimore County.

1    other agency heads and cabinet members across

2    the enterprise to ensure that their specific

3    agency HR needs are met.

4         Q     In terms of your role as HR director,

5    initially you were serving in the capacity of

6    an acting director, correct?

7         A     It was interim.

8         Q     Interim?

9         A     Correct.

10        Q     Okay.  How did you come about

11   becoming the interim director of HR?

12        A     I received a phone call from the

13   chief of staff at the time.  This would have

14   been I want to say late July of 2018.

15             And the phone call was to inform me

16   that the mayor wanted me to go over to DHR and

17   to serve as the interim director, as the

18   director would be tendering her resignation.

19        Q     Okay.  And by that time -- well, at

20   that time, the current director of HR was Mary

21   Talley, correct?

1    **A      Correct.**

2    Q     And I think her employment ended

3    later, but she was no longer actively working

4    for the city by late July; is that correct?

5         Well, let me clarify "actively."  She

6    wasn't on site performing her duties as of late

7    July of 2018; is that correct?

8    **A      I don't recall the exact date.  I**

9    **believe that it may have been late July or**

10   **early August.**

11   Q     Okay.  And you said you got a call

12   from the chief of staff.  Who was that at that

13   time?

14   **A      Kimberly Morton.**

15   Q     Okay.  All right.  And then at a

16   certain point -- and I've seen it in the

17   recently produced documents -- you put in an

18   application for the position.

19        Do you recall when you did that?

20   **A      I do not.**

21   Q     Okay.  And why did you put in your

1      Q     Okay.  And -- so there wasn't a

2  parsonage?

3      A     No.

4      Q     And what are honorariums?

5      A     **Honorariums are payments for teaching**

6  **and/or speaking engagements.  Again, they**

7  **were -- it was a very small church made up**

8  **primarily of family members.  And they were few**

9  **and far between.**

10     Q     Okay.  All right.  I wanted to talk

11  briefly about the difference -- okay.

12          I want to talk to you briefly about

13  the difference between an independent

14  contractor and an employee.  You would agree

15  with me that an independent contractor and an

16  employee are not the same thing, correct?

17     A     **That's correct.**

18     Q     Okay.  Unlike a W-2 employee, you

19  would not withhold taxes for an independent

20  contractor, correct?

21     A     **Generally, that's correct.**

1      A     An accommodation under the ADA is a

2   change in the way things are done that allows

3   the employee to perform their job.

4            Leave does not -- leave traditionally

5   or generally does not allow an employee to

6   perform their job.  Leave can be considered an

7   accommodation when there is a specified return

8   date, at which point the employee will be able

9   to perform the essential functions of their

10  job, but it is not in and of itself an

11  accommodation under the ADA.

12     Q     Well, if it has a specified return

13  date under your explanation, wouldn't it be an

14  accommodation?

15     A     It would be on a -- yes, it would be

16  on a case-by-case basis.  It would depend upon

17  a number of factors.  It would depend upon what

18  the documentation received from the medical

19  provider says the employee would be able to do.

20  Or whether or not the employee would be able to

21  perform the essential functions of the job

1  **classifications, even given the additional**

2  **time.**

3      Q    Okay.  Do you agree that an employer

4  may not penalize an employee for using leave as

5  a reasonable accommodation?  Doing so would be

6  a violation of the ADA because it would render

7  the leave an ineffective accommodation.  It may

8  also constitute retaliation for use of a

9  reasonable accommodation?

10      **A    Again, generally speaking, leave**

11  **itself is not an accommodation.**

12          **I would say I agree that under normal**

13  **circumstances you would not -- you would not**

14  **discipline an employee for using leave.**

15  **Correct.  That frustrates the purpose of the**

16  **Family Medical Leave Act.**

17      Q    Okay.  Do you agree that absent undue

18  hardship, leave as a reasonable accommodation

19  includes the right to return to the employee's

20  original position?

21      **A    Provided that that is feasible.**

1      I don't think that the rule requires

2  that a person is returned to the actual

3  position, but that they are returned to a

4  similar position where they are not harmed.

5      Q    Okay.  Do you agree that reasonable

6  accommodation under the ADA includes permitting

7  the use of accrued paid leave or providing

8  additional unpaid leave for necessary

9  treatment?

10      A    Yes.

11      Q    Okay.  Do you believe that an example

12  of a reasonable accommodation under Maryland

13  law is permitting an employee to use paid or

14  unpaid sick leave, disability leave, medical

15  leave or other leave which is available under

16  the employer's existing policies?

17      A    I'm sorry.  You were breaking up

18  during the middle of that question.

19           If you could repeat that question,

20  please?

21      Q    Okay.  Do you agree that an example

1  of reasonable accommodation under Maryland law

2  is permitting an employee to use paid or unpaid

3  sick leave, disability leave, medical leave or

4  other leave which is available under the

5  employer's existing policies?

6      A    **Yes.**

7      Q    Okay.  What is your current address?

8      A    **My work address?**

9      Q    No.  Your home address.

10      A    **I don't see why that's relevant for**

11  **me to provide my home address.**

12      Q    Well, you've already told me there's

13  another person out there walking around with

14  your same name.  I need to identify you.

15          What is your home address?

16      A    **I will not provide that at this time.**

17          MR. LEBOWITZ:  Okay.  Are we going to

18  call the judge?

19          MS. HOFMANN:  Are you asking me?

20          MR. LEBOWITZ:  We're going to call

21  the judge because he won't give me his home

1          Okay.  So you are aware, are you not,

2   that NJ, Mr. Asong, sent an FMLA form to

3   Ms. Bryant on October 4th, 2018, correct?

4          **A**     **Yes.**

5          Q     And if we take a look at the form --

6   I'll shrink it back down -- was this the form

7   that the city was using in 2018 for FMLA leave?

8          **A**     **If you could stop right there for a**

9   **second.   Yes.**

10         Q     Okay.  Has it changed since?

11         **A**     **It has not.**

12         Q     Okay.  All right.  And the worker's

13  physician is supposed to fill this out, right?

14  Well, at least the --

15         **A**     **A portion of it, yes.**

16         Q     Section two down, yeah.  Okay.  And

17  in this e-mail, NJ asked Ms. Bryant to fill out

18  this form to return it to him.

19         Do you see that?

20         **A**     **Yes.**

21         Q     Okay.  So let me next show you --

1    **A    I do.**

2    Q    All right.  And this is what

3    Ms. Bryant submitted to the city in late

4    October of 2018, correct?

5    **A    I cannot say that that is the exact**

6    **document that was submitted because it wasn't**

7    **submitted to me.**

8    Q    Okay.  To your understanding, who was

9    it submitted to?

10    **A    It's my understanding it would have**

11    **been submitted to Mr. Asong.**

12    Q    Okay.  And did Mr. Asong pass it on

13    to you?

14    **A    Not this document.  He would have**

15    **passed along to me a letter for my signature**

16    **approving the FMLA request.**

17    Q    Okay.  And did that happen with

18    regard to Ms. Bryant?

19    **A    I believe it did.**

20    Q    Okay.  Do you remember what you did

21    with the letter?

1   again?

2       **A      Yes.**

3       Q      Okay.  All right.  Now, independent

4   of this form, though, you were aware of

5   Ms. Bryant's need for medical leave before late

6   October, correct?

7       **A      Before when?**

8       Q      Before late October when this was

9   submitted.

10          So this was submitted to Mr. Asong --

11  I can make it bigger -- October 25th.  You knew

12  before then that Ms. Bryant was in need of

13  medical leave, correct?

14      **A      Correct.**

15      Q      Okay.  You, in fact, knew by at least

16  the first week of October, correct?

17      **A      I can't say specifically when I knew,**

18  **but that sounds about right.**

19      Q      Okay.  I can refresh your

20  recollection.  Bear with me.  All right.  Sorry

21  for the delay.

1    **her going out shortly after Workday [sic].  It**

2    **would have been late September 2018.**

3          Q    Okay.  And, more specifically, when

4    did you first learn that her -- she required

5    surgery on her foot?

6          **A    That wasn't until late October.  It**

7    **wasn't until, excuse me, after the paperwork**

8    **came back in.**

9          Q    Okay.  Well, referring back to this

10   e-mail that's copied to you from Ms. Holdridge

11   to Mr. Asong:  If you could follow up with

12   deputy director La'Tonya Bryant on Friday

13   regarding the completion of her FMLA paperwork.

14          So you knew at this point that she

15   was seeking -- requesting FMLA paperwork if she

16   needed it.

17          What was your understanding as to why

18   she needed it then?

19          **A    Shortly after Workday, Ms. Bryant**

20   **requested to take a one-month vacation to use**

21   **vacation leave for a month.**

1        I expressed to her that being new to

2   the agency, that she was one of the executives

3   in the agency, I could not approve for her to

4   be on vacation for a month.

5        She expressed to me that she was

6   extraordinarily tired because the agency had

7   just moved from the Baltimore Street building

8   to our current location.

9        And while, you know, the move was

10  going on, there was also a lot of planning and

11  execution for Workday Baltimore 2018, and that

12  she was spent.

13       I indicated to her that while I

14  understood that, I couldn't approve a one-month

15  vacation.

16       She indicated at that time that her

17  foot was bothering her as well.  And at that

18  point she was wearing a boot.

19       And so what I said to her is if your

20  leave is related to your injury, then you can

21  put in a request for FMLA.

1    And if your doctor, you know, fills

2 out the paperwork, you can take FMLA leave.

3    And that's what started this process.

4 I was actually the one that suggested FMLA

5 leave and was pushing to get that FMLA

6 paperwork in so that she could have that time

7 off.

8    Q    Okay.  Now, you initially -- I don't

9 have it as one of the exhibits.  I can track it

10 down.

11    But you initially filed -- you

12 initially signed like a leave slip where it

13 said, "Respite" on it.

14    Do you remember that?

15    A    Yes.

16    Q    Okay.  And how did that come about?

17 What was that issue?

18    A    It was that same discussion.  And

19 what I told her is I could approve a couple

20 weeks for vacation.

21    And that would give her time to --

1  you know, if she needed to go to the doctor to

2  get her FMLA paperwork in.  And if the doctor

3  said she needed to be out, she could be out on

4  FMLA.

5         But it was that same discussion

6  around wanting to take a month of vacation

7  leave for what she classified as respite, which

8  was a time to recover from the move.

9         There was a move in which she was the

10 administrative person who was on site when the

11 movers moved from the Baltimore Street location

12 to the Redwood Street location.

13        It required late evening -- her to be

14 there late evenings and some weekends.  And

15 then there was Workday -- I mean WorkBaltimore,

16 excuse me -- which also necessitated work

17 beyond the traditional work hours, to plan and

18 execute that convention.

19    Q    Okay.  And just for the record, I

20 know what you were saying, but a few times you

21 said Workday.  I assume you meant

1    for an in-range adjustment to create parity

2    within an agency.

3          Those are the only other two ways in

4    which a salary would be increased for someone

5    in MAPS.

6          Q    Okay.  All right.  When you were

7    working along with Ms. Bryant -- so once you

8    came on over to the department of HR as the

9    interim director -- how often did you interact

10   with her at work?

11          And you can, you know, explain it on

12   a weekly or daily basis.  Whatever makes the

13   most sense.

14          A    Initially we met more frequently

15   because, again, we were coming -- it was --

16   there was a lot of turmoil in the agency.

17          I was new to the agency.  And so I

18   was leaning on Ms. Bryant and Jacia Smith, who

19   was the other person acting in a deputy

20   capacity for institutional knowledge and for

21   where we were on certain projects and the like.

1    So we would have senior team

2  meetings.  And, you know, we would get together

3  in my office.  Or I would go into their office.

4  And we would meet more frequently.

5    When we moved to 7 East Redwood,

6  which would have been, I want to say, late

7  September of 2018, our offices were fairly

8  close.

9    Ms. Bryant's office was down the

10  hall, directly down the hall from mine.

11  Ms. Bryant's -- Ms. Smith's office was off to

12  my right.

13    And so we would -- it wasn't uncommon

14  for us to, like, coalesce in one of our offices

15  or in my office a couple times a week.

16    Q    Okay.  And during this time period

17  where you were personally actively working with

18  her, what did you think of her in terms of her

19  performance?

20    A    I thought it was fine.  There was

21  nothing remarkable at the time.  There -- and,

1  again, keep in mind we worked together in the

2  same space for less than two months, right?

3         So my impression of her, you know,

4  was that we -- you know, I was going to try to

5  work with her and with Ms. Smith to the best of

6  my ability.  I felt that a certain level of

7  stability at the top of the agency was a good

8  thing.

9         I didn't think that it was

10 necessarily healthy for the organization to see

11 organizational change at the top levels that

12 quickly with respect to the deputy directors.

13        And so I looked to her and to

14 Ms. Smith to make the transition a smooth one

15 and to get the agency back on track.

16     Q    Okay.  And when you went to her and

17 requested information from her, was she good at

18 providing that for you and getting it to you?

19     A    Yes.  La'Tonya was responsive.

20     Q    Okay.  Did you find her to be

21 professional in the workplace?

1    **A      Yes.**

2    Q      Did you think when you two were

3    working together day in and day out that she

4    had integrity?

5    **A      From my perspective, yes.**

6    Q      Okay.  Did you ever hear her say

7    something nasty about someone else, you

8    personally hear her?

9    **A      Not to my recollection.**

10   Q      Okay.  Did you ever personally hear

11   her say something unfair about someone else?

12   **A      I don't know if it would be unfair,**

13   **but I did get the impression that the chief of**

14   **employee benefits, that she was annoyed with**

15   **him.**

16   Q      Okay.

17   **A      And that, you know, he was like a**

18   **squeaky wheel.**

19   Q      And when you say that -- go ahead.

20   **A      No.  No.  Go ahead.**

21   Q      You said chief of employee benefits.

1    committee.  It was an HR committee.  And I also

2    was on the AM revision policy and the civil

3    service rule revision policy, that I served on

4    with Mary.

5         Those committees consisted of Mary

6    Talley, Jacia Smith.  I believe La'Tonya may

7    have been on some of those meetings as well.

8    Gary Gilkey from the law department, myself,

9    Pervis Lee, and others from the policy and

10   compliance team.  I think Jerusalem Tekie was

11   on that team and some others.

12        And we would have meetings monthly or

13   bimonthly to discuss changes to the civil

14   service rules and the city's administrative

15   manual policies.  And that's the extent of my

16   work with Mary.

17        Q    Okay.  Have you communicated with her

18   since her employment with the city ended?

19        A    I have not.

20        Q    Okay.  Did you ever talk with her

21   about Ms. Bryant?  I know you said you were in

1   some of these meetings together, but did you

2   talk to Ms. Talley specifically about

3   Ms. Bryant?

4       A    I did not.

5       Q    Okay.  And what did you think of

6   Ms. Talley based upon your working with her?

7       A    I knew that she was very demanding.

8   You know, you hear a rumor, but what I knew of

9   her was that she was demanding.  I found her to

10  be extraordinarily professional.

11           I mean, I didn't have a problem with

12  her.  I didn't work with her intimately.  But

13  that was my impression of her.  She was very

14  professional.  She was very demanding.  A bit

15  of a perfectionist.  That was pretty much it.

16      Q    Did you hear her speak critically

17  about other workers?

18      A    I did not personally, no.

19      Q    Did you hear that from other people

20  about her?

21      A    Yes.

1  **director of human resources.**

2      Q    Okay.

3      **A    So I wasn't meeting with leadership**

4  **in July but for the meeting where the chief of**

5  **staff informed them of the change.**

6      Q    Okay.  All right.  Give me one

7  second.  All right.  Let me see if I can help

8  you figure this out.  I'm actually going to

9  talk about this visit more with you later.  But

10 while we're on the subject, bear with me one

11 minute.

12          So I do plan to have substantive

13 questions for you about this.  But just on this

14 one particular topic of when you started

15 communicating with, you know, upper level folks

16 at DHR.

17          (Plaintiff's Deposition Exhibit E

18 marked for identification.)

19          BY MR. LEBOWITZ:

20     Q    Is this your handwriting on

21 Exhibit E?

1    **A    It is.**

2    Q    Okay.  So you'll see here there's a

3    reference to 7/19/18 at the top.  And it says

4    Jacia, La'Tonya and me.

5         And then if I scroll down, there's

6    two parts of the exhibit.  There's also a

7    typewritten part, although I'm not quite sure

8    frankly it's from the same meeting.  There's a

9    reference to July 2018 with kind of an agenda

10   with handwriting on it.

11        So this was what I was trying to

12   figure out.  Did you have a meeting in late

13   July?

14   **A    Apparently I did.  I thought it was**

15   **August.  But this says July 29th.**

16   Q    Okay.  And then there was another

17   e-mail, which I can try to dig up.

18   **A    This would have been -- where you see**

19   **July 29th, if I'm not mistaken, yeah, that**

20   **would have been the date, I guess.  It would**

21   **have been the meeting with the chief of staff,**

1  **because I would have put her on there if she**

2  **was there.**

3       Q    Yeah.  And then there's an e-mail on

4  a slightly different date.  Hang on one second.

5  Let me see if I can find it.

6          There's an e-mail -- I found it.  All

7  right.  Give me one second.  All right.  So

8  there is also this document.  This is

9  Exhibit U.

10          (Plaintiff's Deposition Exhibit U

11  marked for identification.)

12          BY MR. LEBOWITZ:

13       Q    I'll zoom in.  It's only the top half

14  of the page that matters.

15          Okay.  So this is an e-mail exchange

16  the next day.  See, that doesn't make any sense

17  because the 29th is a Sunday.  I don't know.

18          This one on July 30th you address to

19  Ms. Smith and Ms. Bryant saying that Kim will

20  not be available this afternoon.  She asked me

21  to meet with you to get an understanding of

1      A     I don't know.

2      Q     Okay.  All right.  Next I'm going to

3   turn to Lisa Watkins.  Did you personally work

4   with Ms. Watkins?

5      A     I did.

6      Q     Okay.  And in the fall of 2018, or I

7   guess the summer into the fall of 2018, what

8   were her duties?

9      A     Ms. Watkins was assigned to our

10  policy and compliance division.  She was the

11  liaison for FMLA leave for the Department of

12  Public Works, which is our largest operational

13  agency.  And she was handling their FMLA

14  requests and making sure that the letters went

15  out per the policy and working with DPWHR as

16  their liaison.

17     Q     DWHR, you mean DPWHR?

18     A     DPWHR.

19     Q     Okay.

20     A     The Department of Public Works office

21  of HR.

1  which, again, the content is all pretty much in

2  the middle, although take a look at the date

3  obviously, March 29th, 2019.

4        I can make this bigger, but I'll just

5  scroll -- well, I guess I don't have to scroll.

6  Okay.  If you can take a look at this.

7  **A    Could you scroll back up, please?**

8  **Okay.**

9  Q    So is that your signature on this

10  letter?

11  **A    Yes.**

12  Q    Okay.  And she asks in here for the

13  opportunity to resign with the possibility of

14  applying for reinstatement if and when she was

15  able to return to work.

16        And you indicate in the letter that

17  if she didn't provide a compelling reason as to

18  why DHR should not proceed with her

19  termination -- why wasn't that a compelling

20  reason?

21  **A    That was not a compelling reason.  An**

1    employee can always resign.  She could have

2    opted to resign before the writing of this

3    letter.

4              She could have visited with the

5    employee retirement system before the

6    pretermination hearing scheduled -- hearing was

7    scheduled.

8              And so she didn't take any necessary

9    actions to do any of this until she received a

10   pretermination letter.

11             And so we felt that there was no

12   compelling reason why DHR should not move

13   forward with the discharge.

14        Q    When did the city hire her

15   replacement?  So this was March 29th, 2019.

16        A    DHR did not hire a replacement for

17   this position.

18        Q    To this day?

19        A    To this day.

20        Q    All right.

21        A    I would have to look.  I think this

1    were like sisters.

2             And Ms. Talley indicated that that

3    was unacceptable because, again, there were

4    people in the office who gave believing that

5    her sister had died.

6             And Ms. Talley noted that it was very

7    problematic that Ms. Bryant did not see the

8    issue or the error in that misrepresentation.

9    And made note of it.

10            That was something that I did review

11   along with the IG's report when I was

12   determining what the appropriate level of

13   discipline should be.

14        Q    Okay.  So now it's true that

15   Ms. Bryant wasn't disciplined at all for that

16   situation with the bereavement leave, correct?

17        A    Correct.

18        Q    In fact, I don't believe Ms. Bryant

19   was ever disciplined at any time prior to her

20   termination; is that your understanding?

21        A    That's my understanding.

1    Q    Okay.  So the notes -- so that's the

2  notes for Ms. Talley.

3    You said you also looked at your

4  prior notes just in relation to your meetings?

5    A    Yes.

6    Q    Okay.  Was there something in there

7  that had value on this issue?

8    A    No.

9    Q    Okay.

10    A    As I told you, I had no problems with

11  Ms. Bryant's performance while I was there with

12  her.

13    You know, I found her to be, you

14  know, an acceptable and valuable member of the

15  senior leadership team of the agency while I

16  was there.

17    Again, this OIG report was dropped in

18  my lap like a bomb.  And I had to deal with it.

19    Q    Okay.  So in terms of the OIG

20  report -- we're going to talk about it in

21  greater depth -- but just focusing on the

1    documents that you reviewed at this point.

2            You reference attachments.  So I

3    don't know what those attachments were.

4            And so let's take a step back.  Which

5    OIG report are you referring to, the one from

6    July or the one from September or both?

7    **A     This would have been the one from**

8    **September.  The one from July -- this is**

9    **important -- the one from July, it also**

10   **references behavior by Jacia and La'Tonya.**

11           **We had a meeting very early on when**

12   **the office was still on Baltimore Street,**

13   **before the move.  And we were going through the**

14   **priority issues of the agency.**

15           **They expressed to me that they didn't**

16   **feel that the report was fair, because they**

17   **were also victims of workplace harassment by**

18   **Mary Talley.  They felt they were somehow**

19   **coerced into going along with her.**

20           **And I expressed to them that there**

21   **was -- at that time, there was no intention of**

1    any adverse employment action for either of

2    them.

3              And I asked if there was anything

4    else that I should know.  And both of them

5    answered in the negative.  Everything that I

6    needed to know was out.

7              So when this report in September came

8    out, I was telling everybody that there's

9    nothing else to worry about, that the

10   leadership team is stabilizing and stabilized.

11             And then this OIG report came out in

12   September, the follow-up report.

13        Q    Okay.  You didn't see it in

14   September, but it's dated September, correct?

15        A    Yeah.

16        Q    Okay.  And then is it fair to say

17   that the July report, the initial report,

18   didn't factor into your thinking?

19        A    It did not.

20        Q    Okay.  So then turning to the

21   September report.  What were the attachments?

1         IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MARYLAND

3    LA'TONYA T. BRYANT,              :

4              Plaintiff,      :   Civil Case No.

5              vs.             :   MJM-21-0545

6    MAYOR & CITY COUNCIL OF         :

7    BALTIMORE,                      :

8              Defendant.      :

9                      - - - - - - -

10                    Volume II

11      DEPOSITION of QUINTON M. HERBERT, ESQUIRE

12              (by Zoom conference)

13             Monday, August 22, 2022

14                   9:00 A.M.

15

16

17

18   Job No:  CRC 73752

19   Pages 155 - 263

20   Reported by:  Barbara A. Conner

21

```
 1              A P P E A R A N C E S

 2


 3    ON BEHALF OF THE PLAINTIFF:

 4              NEIL R. LEBOWITZ, ESQUIRE

 5              LEBOWITZ LAW FIRM

 6              8180 Lark Brown Road

 7              Suite 201

 8              Elkridge, Maryland  21075

 9              (410) 730-9010

10


11


12    ON BEHALF OF THE DEFENDANT:

13              ELISABETH B. HOFMANN, ESQUIRE

14              BALTIMORE CITY DEPARTMENT OF LAW

15              100 North Holliday Street

16              Suite 101

17              Baltimore, Maryland  21202

18


19


20


21
```

1          So, exhibit K, I'm going to shrink it down

2     just so it will fit on the screen.

3          Exhibit K is the financial disclosure form

4     for Ms. Bryant.  It says, "Date received:  April 30,

5     2015," and it goes from Bates 2423 to 2427.  So, I want

6     to go back to the first page.  I assume, Mr. Herbert,

7     you've seen this before, this document?

8          **A     I assume so.  If it was in the documentation**

9     **that was provided in discovery, I've seen it.**

10         Q     So, at the top, as I believe I noted, it's

11    dated April 30, 2015.  Do you see that?

12         **A     I do.**

13         Q     And in part B, about the middle of the

14    page -- I can make it a little bigger -- Ms. Bryant

15    indicated on this form that the period covered was

16    January 1, 2015 to December 31, 2015.  Do you see that?

17         **A     Yes.**

18         Q     Is that, in your view, is that a mistake?

19         **A     I can't say whether or not it's a mistake on**

20    **her part.  What I can say is that if the date of the**

21    **document is April 30, 2015, one would think that that**

1    **would cover the prior year of January 1 through December**

2    **31 of 2014, but I can't speak to what was in**

3    **Ms. Bryant's mind when she filled this document out.**

4          Q      So, referring back to that date of April 30,

5    2015, I can go back and show that footnote to you again,

6    if you need me to, but would you agree that this date

7    was prior to the date that Ms. Bryant, Ms. Quiera

8    Bryant, signed the contract?

9          **A      I can't remember what date she signed the**

10   **contract.**

11         Q      The footnote indicates Quiera Bryant, going

12   back to exhibit S, page seven, "Quiera Bryant signed a

13   one year performance contract on November 23, 2015," and

14   I can show you the actual contract, too, if you want to

15   see it.

16         **A      Yes, again, I don't have any firsthand**

17   **knowledge of this, I was not at DHR when Ms. Bryant,**

18   **when Ms. Quiera Bryant, was there, so I cannot say**

19   **whether or not she signed a contract on November 23,**

20   **2015, but I will -- I can say that April the 23 -- April**

21   **30, 2015 is before November 23, 2015.**

1    Q    Okay.  All right.

2         Next I'm going to go to exhibit M.

3         So, exhibit M is the financial disclosure

4    form completed by Ms. Bryant, the date received March

5    27, 2017, and I'll scroll through it here.

6         This is exhibit M.  It runs from Bates 2428

7    to 2434.

8         Now, if we go back to the first page, do you

9    see about the middle of the page -- I can shrink it down

10   again so it'll fit a little better -- about the middle

11   of page, again, part B, she indicates that it covers the

12   ongoing calendar year in relation to the date that she

13   signs.  So, it says January 1, 2017 to December 31,

14   2017.  Do you see that?

15   A    I see that.

16   Q    And based upon the footnote that we looked

17   at, had Quiera Bryant's time working as one of the

18   Smokey Crush & Leaf characters had ended before January

19   1, 2017?

20   A    According to the footnote, yes, but I don't

21   have any firsthand knowledge of that.

1    Q    On this particular form -- so, again, let's

2    see -- in three places, so on page four, under schedule

3    six, "Family members employed by the city," she checked

4    the box for "Your spouse or child."  Do you see that?

5    **A    Yes.**

6    Q    And then on the sixth page, do you see that

7    she does list Quiera Bryant at the top of the form?

8    **A    I see that.**

9    Q    She indicates here that she's working for the

10   Baltimore City Parking Authority.  Do you see that?

11   **A    Yes.**

12   Q    Are you at all familiar with Quiera Bryant's

13   employment with the Baltimore City Parking Authority?

14   **A    I am not.**

15   Q    And then if we scroll down to the last page,

16   there's an address, but it's blocked out.  Okay.  All

17   right.

18        So, we've looked at the financial disclosure

19   forms dated, basically, in the early months of 2015 and

20   then early on in 2017.  Are you aware that Ms. Bryant's

21   disclosure form for 2016 was not produced by the city?

1    **A      It is my understanding that there was not one**

2  **submitted for 2016.**

3    Q      And what is that understanding based on?

4    **A      The fact that the office of -- the Ethics**

5  **Board did not have one on file for her for 2016.**

6    Q      Why do you say that?

7    **A      We requested it.**

8    Q      Who is we?

9    **A      We is myself and counsel.**

10    Q      Will you allow for the possibility that the

11  Ethics Board lost it or mislocated it?

12          MS. HOFMANN:  I'll object to the question.

13    **A      I can't speak to what the Ethics Board --**

14  **what happens in the Ethics Board.  What I can say is**

15  **that they did not have one on file for 2016 for**

16  **Ms. Bryant.**

17    Q      And do you know what they did to try to find

18  it?

19    **A      I do not.  And I will also say that I believe**

20  **the OIG requested the ethics form as well throughout the**

21  **course of their investigation and were told the same**

1    **the document says, that's all I can say.**

2          Q      And then if we go to page 2952, which is the

3    last page of the exhibit, it's entitled Designated

4    Approvers For Transactions Using Funds.  Do you see a

5    list of folks here?

6          **A      Yes.**

7          Q      And it's listed in order, Ms. Talley,

8    Mr. Gulhar and then Ms. Bryant.  Do you see those?

9          **A      Yes.**

10         Q      So, this demonstrates that there were other

11   folks designated to approve transactions using funds,

12   correct?

13              MS. HOFMANN:  I'll object, but the witness

14   can answer.

15         **A      I assume.  I don't know.**

16         Q      I'll next go to exhibit 6.

17              Exhibit 6 is Bates stamped 2921 through 2924.

18   Take a look at this document.  You should still be able

19   to scroll.

20              That's the end.

21         **A      All right.**

1    Q    On the second page, as of the date of this

2    letter, which was September 1, 2020, it says that all

3    these folks, except for Mr. Robossy, remain active

4    employees.  So, that leaves Mr. Gulhar, Ms. Rammushana

5    and Tindal and Mr. Shaw.  Are those four folks still

6    employed by the city?

7    **A    They are.**

8    Q    And then with regard to Mr. Robossy, do you

9    have any knowledge as to why he resigned on May 7, 2018?

10   **A    I do not.**

11   Q    Next, we're going to go to exhibit C.

12        So, exhibit C is a two page document.  It's

13   an email, October 10, 2018, from Ms. Ashton to you, with

14   a draft letter, the email's pretty brief, and then

15   there's the attached letter.  So, this one I can

16   probably scroll.  Just take a look at the email and then

17   I'll scroll down for you.

18   **A    Okay.**

19   Q    Well, I have to make it a little smaller to

20   fit it all in, but do you see it says up here "To DHR

21   staff"?  You got that part?

1    **comprehensive reorganization, where we went to a one**

2    **deputy, two assistant deputy model, and I also would not**

3    **have wanted to put a memo out indicating that Ms. Bryant**

4    **was on medical leave.  I would have redacted that,**

5    **probably.  So, I don't know if this memo actually went**

6    **out.  It may have been something that I shared in an all**

7    **staff meeting as opposed to sending out a memo, I don't**

8    **recall.**

9        Q    Next, I want to go to exhibit E.  Let me

10   shrink this down a little bit.

11            I think we took a brief look at this last

12   time trying to flesh out the timeline a bit, but I have

13   some questions about this document.  It's actually two

14   documents put together.  I don't see a Bates stamp on

15   the bottom of the first one.

16            Yeah, these don't have Bates stamps.

17            But it runs -- let's see, one, two, three,

18   four, five, six, seven, eight -- eight pages.

19       **A    A-huh.**

20       Q    I'm going to have very particularized

21   questions, but, I mean, you're welcome to look at the

1  whole thing from start to finish, if you want.  I'll go

2  back up to the top.

3          That's the end.

4      **A**      **Okay.**

5      Q      So, I have some preliminary questions in

6  terms of what these are.  One is, obviously, an entirely

7  handwritten document, the second half of this exhibit is

8  a typewritten and handwritten document.  Is all of the

9  handwriting yours?

10     **A**      **Yes, appears to be.**

11     Q      And then in terms of the typed part, do you

12  know who wrote that?

13     **A**      **I do not.**

14     Q      And having looked at this, I'm going to have

15  particularized questions, but, overall, why was this

16  meeting held?

17     **A**      **This meeting was held, it would have been**

18  **after Ms. Talley submitted her letter of resignation, it**

19  **would have been after I would have -- Jacia and La'Tonya**

20  **would have been advised that I was going to be coming**

21  **over in an acting capacity, or an interim capacity, and**

1  this would have been a meeting for me to get an

2  understanding of high level where we were with

3  outstanding projects, office by office, to understand

4  what the ouch points were, what the major projects that

5  they were working on and what the deliverables and

6  deadlines, immediate deliverables and deadlines, that

7  were in front of us were.

8      Q    The particularized question I have -- I want

9  to try and keep my mouth close to the mic here --

10  towards the top of the first page, it says, "Chiefs are

11  different I-N is important having a vested interest

12  going forward," do you know what that's referring to?

13     A    It was a note from, I believe, Jacia and

14  La'Tonya expressing that the chiefs each had different

15  and unique personalities, and that in order to be

16  successful, that we were going to need to have buy-in

17  from the chiefs in the new leadership and that that was

18  going to be very important and critical in the agency's

19  success moving forward.

20     Q    And the next note says, "Director head of the

21  labor process for a number of things that can be moved

1  the leadership in the Convention Center showed

2  favoritism to certain individuals over them.

3      Q      And my understanding, from a prior witness,

4  is that the city, at least at that time, and, I assume,

5  currently, but I'll break it down, the city at that time

6  didn't have an anti-nepotism policy, correct?

7      A      It did not.  I don't believe it did, no.

8      Q      Does it now?

9      A      It does not.

10     Q      So, it was just an allegation by someone

11  about nepotism?

12     A      Correct.

13     Q      Do you know the outcome of that one?

14     A      I believe it was unfounded.

15     Q      The next page, towards the bottom, there's a

16  starred comment here, "WorkBaltimore-need to

17  significantly reduce budget."  What was the issue there?

18     A      The issue there is that -- and, again, this

19  is me coming in at the very end, tail end, of the

20  process -- very limited funds had come in for

21  WorkBaltimore.  The fundraising goals had not been met.

1    think this runs till the end.  Let's see here.  So, City

2    357 to -- oh, no, it changes.  City 357 to 366 and then

3    it goes on to a series of additional charts and a bar

4    graph.  Okay.

5          So, in terms of the document entitled 2017

6    WorkBaltimore Convention Expenses/Payments, which is

7    marked City 357, if you look at the second page of each

8    of these graphs -- well, actually, it is on the first --

9    there's a reference to Coleek Shaw.  Do you know if it

10   was Mr. Shaw that prepared this document?

11   **A      I do not.**

12   Q      Do you know who prepared it?

13   **A      No, I do not.**

14   Q      And this document, 2017 WorkBaltimore

15   Convention Expenses/Payments, what is this purporting to

16   show, to your understanding?

17   **A      My understanding is that this is -- it shows**

18   **the expenses for WorkBaltimore 2017 and the payments**

19   **that were made and any outstanding balances, if any, for**

20   **those goods or services.**

21   Q      So, looking at some of the particular

1    entries; number 18, on Bates 357, says, "Clear Channel

2    Outdoor," and then it goes on to say that there was an

3    Innovation Fund payment of $28,308.  There we go.  What,

4    if anything, do you know about that expenditure?

5        **A       I don't know anything about that expenditure.**

6    **Again, this would have been before I came to DHR.  It**

7    **appears to be billboard advertising that was paid for**

8    **out of the Innovation Fund.**

9        Q       And then number 25, I think it's Teltronic.

10   Let me make it a little bigger.  Teltronic references a

11   payment out of the Innovation Fund of $906.30.  What, if

12   anything, do you know about that one?

13       **A       I don't know anything about it.  These**

14   **probably were radios that were distributed to people who**

15   **were volunteers at the convention to communicate**

16   **throughout the Convention Center and I don't see where**

17   **that is an Innovation Fund expenditure.**

18       Q       I'll go down the line with my little cursor.

19               Do you see the 90630?

20       **A       A-huh.**

21               **Okay, got it.**

1     Q     Next one, number 26, Signs By Tomorrow

2   Baltimore, shows an Innovation Fund payment of

3   $4,090.95.  What, if anything, do you know about that

4   one?

5     A     I don't know anything about that.  I assume

6   that would have been for signs and banners that were

7   hung in the Convention Center for the convention, but,

8   again, this predates my tenure with DHR.

9     Q     Moving down to Bates 359, category H now

10  isn't shown, but if you scroll back up, what it means,

11  if you scroll back up to Bates 357, you see that it's

12  the Innovation Fund.

13        So, going back down to Bates 359, number 51,

14  Baltimore City Recreation and Parks, there's a reference

15  to a payment of 650 out of the Innovation Fund.  What,

16  if anything, do you know about that one?

17    A     I don't know anything about it.  It looks

18  like the -- in the description, it references a rental

19  of audio -- of AV equipment and the setup and the

20  teardown of that same equipment.

21    Q     And then this is the last one I have on these

1    charts.  Number 59, Promotions Unlimited, shows a $470

2    payment out of the Innovation Fund.  What do you know

3    about that one?

4        **A      I don't know anything.  I have no personal**

5    **knowledge about this expenditure, except for what's in**

6    **the document itself.  It looks like payment for raw**

7    **material that was purchased from Promotions Unlimited.**

8    **So, these were probably swag items that were available**

9    **for convention use.**

10       Q      So, I have some questions about Ms. Bryant,

11   and some of them I think you touched on already, but I

12   wanted to make sure that I touched all the bases, if you

13   will.

14              So, I think you talked about this already,

15   but during the time you worked with Ms. Bryant, did you

16   see her in a walking boot?

17       **A      I did.**

18       Q      And did you talk to her about why she was

19   wearing it?

20       **A      I did not initially.  I may have mentioned**

21   **it -- I remember the first time that I think I saw her**

1          MR. LEBOWITZ:  All right, see you then.

2          (Recess.)

3     Q     We're back on the record.  I wanted to next

4  turn your attention to exhibit Y.  I'll screen share in

5  a moment here.

6          So, I'm showing you what's been marked as

7  exhibit Y.  It's a two page document, Bates 174 to 175.

8  And the early emails we saw before, the first one, the

9  last time we met, the first one was from Ms. Caffrey to

10  Ms. Bryant about looking into Smokey Crush & Leaf.

11  Obviously, feel free to read it again now.

12          And then this is the one where Ms. Caffrey

13  copied you and Ms. Morton, or sent it to you and

14  Ms. Morton, saying that she corresponded with

15  Ms. Bryant, and then there's this one we saw as well,

16  where you provide -- I think we did -- where you provide

17  responsive information.  I don't have questions about

18  any of these, I'm just scrolling through them.

19          Then at the top, there's an email to you from

20  Mr. D'Angelo.  Take a look at this one.

21     A     Okay.

1    Q    I think there are further emails about

2  communicating with the OIG, but this one references a

3  meeting and saying, "If you'd like to meet, I'd be happy

4  to share some of those items." Did you meet with

5  Mr. D'Angelo in response to this email?

6    A    I can't recall. I don't remember meeting

7  with Mr. D'Angelo about any preliminary findings, but I

8  can't remember if I did or didn't.

9    Q    Do you know if you responded to this email?

10    A    I can't recall.

11    Q    Did you meet with Mr. D'Angelo at any time?

12    A    No. I believe -- I don't believe so. I

13  believe that when I met, had a meeting about this

14  report, I met with Ms. Caffrey. It may have been

15  Mr. D'Angelo and Ms. Caffrey, but Ms. Caffrey took the

16  lead in the meeting that I had with the OIG.

17    Q    Then next I'm showing you exhibit AA. This

18  is also, I believe, a two pager. Yeah. So, this one

19  goes from Bates 987 to 988. At the bottom, it's the

20  same email to Ms. Bryant from Ms. Caffrey.

21    A    A-huh.

1    Yes, that's it.

2    So, a couple questions about this.  Well, the

3    first is to note something.  I had mentioned this last

4    time.  The starting emails that accompany each of these

5    attachments are October 10, 2018.  This one says 2:21

6    PM.  This one says 6:21 PM.  I had mentioned earlier

7    that some of your emails seem to be later in the

8    evening.  I don't know if that refreshes your memory on

9    this issue at all.

10    So, the first question I had is, there's this

11    one and then there's this one that says 10/11/18, Julie

12    Colucci and has her signature on it.  Do you know why

13    this one has her signature, with a date?

14    **A    I do not.**

15    Q    And then do you know what the issue was here?

16    **A    What the issue was?**

17    Q    Yes.  What were you addressing here?  It's an

18    email from Ms. Tindal to you.

19    **A    I do know that I had given a directive that**

20    **we begin paying back the Innovation Fund loan because I**

21    **knew at that time that we had not paid anything back on**

1    the loan and there was a flood fund that Ms. Bryant had

2    indicated that the agency was going to be recouped for

3    loss, losses that the agency sustained as a result of a

4    flood in the building that we moved out of, and so some

5    of those funds were used to make this disbursement to

6    the Innovation Fund.

7        Q    You were aware of that happening back in

8    realtime?

9        A    Yes.

10       Q    And Ms. Bryant's employment ended about a

11   month after this email, but were there further payments

12   made to the Innovation Fund loan, to the repayment of

13   it?

14       A    I believe there were.  I can't say when they

15   were, but I believe there were additional payments that

16   were made.

17       Q    And are you aware of a directive given by

18   Ms. Talley, prior to your tenure, that the innovation

19   loan fund did not have to be repaid?

20       A    I was not aware of such a directive, and, in

21   fact, the Innovation Fund was self-sustaining funds to

1　**I believe that there may have been some discussion with**

2　**the Mayor about when this letter -- when I was -- before**

3　**this letter came out, like right before she sent me this**

4　**letter, and the Mayor indicated to me that it would be**

5　**my decision to make, but that I would -- she made no**

6　**bones about it, that I would be responsible for the**

7　**decision that I made.**

8　　　Q　　Do you recall anything else about that

9　conversation?

10　　**A　　I do not.**

11　　　Q　　And then the second, well, I guess,

12　technically, it's the third phrase in that letter, it

13　references appropriate disciplinary action.  What were

14　the forms of disciplinary action available to you as HR

15　director in this situation?

16　　**A　　That was up to my discretion.  It could have**

17　**been anything from, anything from no discipline to**

18　**termination.**

19　　　Q　　So, those would be at the opposite ends of

20　the spectrum.  What else could you have done?  What's

21　available to you?

1   A    Anything in -- anything in that -- anything

2   in that in between, what I felt was appropriate.

3   Q    Some of these examples are obvious, I get

4   that, but can you articulate what some of those things

5   could be.

6   A    A suspension, loss of leave or placed on a

7   PIP.  None of those were appropriate in light of the

8   allegations that were contained in the report.  In my

9   review, discharge was the appropriate level of

10  discipline.

11  Q    In terms of, just to go back, though, on some

12  of those disciplinary actions that were available to

13  you, in terms of a suspension, could you have done a

14  paid or unpaid suspension?

15  A    Yes.

16  Q    And in terms of the loss of leave, were there

17  limits or how much could be taken?

18  A    No.  Typically, loss of leave is used for

19  salaried employees for disciplinary matters that do not

20  involve harassment or workplace violence.  To be in

21  compliance with the FLSA, you have a loss of leave as

1    **person that submitted a disclosure form for the year**

2    **before her daughter was employed by the agency in which**

3    **she served as a deputy director and the year after her**

4    **daughter completed service in the agency where she was a**

5    **deputy director, but for that year where she daughter**

6    **worked for an agency where she was the deputy director,**

7    **she did not submit an authorization form disclosing**

8    **that.**

9        Q      You didn't talk to Ms. Bryant directly about

10   that, correct?

11       **A      I did not.**

12       Q      Let's go next to the OIG's report, which is

13   exhibit S.  We looked at it earlier.  Let's see.  It

14   would be in here.

15              No, it wouldn't.  Sorry.

16              I'm missing one.  I'm going to have to stop

17   sharing.  One of them jumped off Acrobat, for some

18   reason.  It performed an acrobatic act.  Hang on one

19   second.

20              You can scroll.  I have relatively particular

21   questions, it's a lengthy, single-spaced document, but I

1    don't know if you've looked at it recently, but you're

2    welcome to look at it now.  This is exhibit S.

3              That's the end.

4              Let me go back for one second.

5              So, let me first draw your attention to --

6    let's see.  So, the third paragraph on page two starts

7    with "15 DHR employees."

8        A    A-huh.

9        Q    The second sentence says, "Employees

10   complained that the initiative was too time-consuming

11   and that they did not have sufficient time to fulfill

12   their normal job duties in addition to their

13   WorkBaltimore responsibilities."  Can you tell me what,

14   if anything, you know about that.

15       A    The magnitude at which the planning and

16   execution of the WorkBaltimore convention demanded was,

17   essentially, a second full-time job.  Many staff

18   complained that they could not do what they were getting

19   paid to do for the city because they were spending most

20   of their -- most, if not all, of their workday working

21   on WorkBaltimore.

1  these up yourself?

2      A     I did not.  I looked overall at the report --

3  the spreadsheets, I mean -- and I think that it was

4  pretty self-explanatory what the finding of the OIG was.

5      Q     And you said that there was a reference in

6  the reports to more being spent out of the Innovation

7  Fund than was available under the fund, is that correct?

8      A     No, no.  No.  More than what was approved.

9  There was more than a hundred thousand dollars in the

10  Innovation Fund; a hundred thousand dollars is what DHR

11  was approved for.

12      Q     So, more than what was approved?

13      A     Correct.

14      Q     Also, on page four, in the last paragraph, it

15  says that, "Despite acknowledging that she sent the list

16  of expenditures to the OIG, Bryant stated that she did

17  not create the list, nor did she review its content to

18  before sending it to the OIG."  Do you have any reason

19  to believe that that's inaccurate, she didn't create the

20  list?

21      A     I don't think -- I don't have any reason to

1  believe that that's not inaccurate, or that that's

2  inaccurate, but if she did not review the list before

3  sending it over -- keep in mind, if this is in October,

4  this is after WorkBaltimore has taken place, and as the,

5  at that time, Deputy Director For Administration, who

6  was responsible for the office's fiscal operation, and

7  as co-chair of the finance team, one of the approvers

8  for the expenditure, for her to say that she had not

9  reviewed this report post WorkBaltimore, it is quite

10  remarkable.

11      Q      Well, she says she didn't review it before

12  sending it to the OIG; it doesn't say that she never

13  reviewed it.  If you were given a request from the OIG

14  to turn over documents, would you augment them before

15  turning them over?

16      A      I wouldn't -- what do you mean augment them?

17      Q      Basically, it says that she just turned it

18  over.  They asked her for it and she turned it over.

19  How is that inappropriate?

20      A      It says -- what I read that to say is that

21  she did not review the document before she turned it

1          Exhibit F, this is a letter regarding Notice

2     of Separation, dated November 9, 2018.  Can you take a

3     look at this.

4          **A**     **Okay.**

5          Q     So, there's a reference in here to two

6     different matters.  One is the, quote, "Failure to

7     disclose a familial relationship to a contractural DHR

8     employee," and then the second one is, quote,

9     "Maintenance of financial records related to the 2017

10    WorkBaltimore Empowerment to Employment Convention,"

11    closed quote.  I guess we'll take them one at a time.

12         In terms of the failure to disclose a

13    familial relationship to a contractual DHR employee, why

14    did you cite that in this letter?

15         **A**     **Because of the findings of the OIG in their**

16    **report that Ms. Bryant failed to disclose, in a**

17    **disclosure form, during the relevant period, that her**

18    **daughter worked on a contractual basis for the agency in**

19    **which she served as deputy director, which creates the**

20    **appearance of a conflict of interest and that was not**

21    **disclosed.**

1    disclosed to the Ethics Board.

2            If it's disclosed to the Ethics Board and the

3    Ethics Board doesn't take an issue with it, we're not

4    sitting here today, probably.  But it wasn't and

5    Ms. Bryant was given ample opportunity.  She couldn't

6    recall whether she disclosed it or not, which, to me,

7    again, is something that you would remember.  I know who

8    I disclosed on my disclosure form.  I over-disclosed on

9    my disclosure form, for that reason.

10           And so I think that the fact that her --

11   initially, it was, "I can't recall whether I disclosed

12   it," and "I think that I submitted all of my disclosure

13   forms, I'm not sure," again, at best, it's negligence,

14   and, at worst, it's blatant dishonesty.  In any event,

15   it's unacceptable for someone at the executive level of

16   government, the deputy director of an agency, to provide

17   that as an explanation for the appearance of not fair

18   dealing or the appearance of a conflict of interest.

19       Q    Back in realtime, when you were looking at

20   this, were you aware that she had disclosed her

21   daughter's employment at the Parking Authority in 2017?

1      A      I was.  I was.  And that was a disclosure of

2    her employment at the Parking Authority and what it

3    did -- what that said to me, it confirmed, in my mind,

4    that Ms. Bryant knew that she had an obligation to

5    disclose, and for the year that her daughter worked in

6    the agency where she served as an executive leader, she

7    did not file a disclosure and disclose that fact.

8      Q      And you're basing that on the fact that one

9    was not turned over to you by the Ethics Office,

10   correct?

11     A      One was not turned over by the Ethics Office

12   and one was never produced by Ms. Bryant.  She was given

13   ample opportunity to produce what she submitted to the

14   Ethics Board, if she believed that she submitted it to

15   the Ethics Board.

16           I will say that Ms. Bryant never said, in her

17   interview with Ms. Caffrey, that she turned one in for

18   '16, she said she believed that she did, she couldn't

19   remember, and that's not the type of thing that one

20   forgets.  You either filed your disclosure forms or you

21   didn't.