1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MARYLAND

3     LA'TONYA T. BRYANT          *

4               Plaintiff        *

5     vs.                        * Civil Action No.:

6     MAYOR & CITY COUNCIL       * MJM-21-0545

7     OF BALTIMORE               *

8               Defendant        *

9     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

10          The videoconference deposition of JACIA

11    T. SMITH was taken on Friday, July 15, 2022,

12    commencing at 12:36 P.M., before Delcia Jones,

13    Notary Public.

14    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

15

16

17

18

19

20    REPORTED BY:

21    D. JONES

PLAINTIFF'S EXHIBIT
P

1    APPEARANCES:

2

3         NEIL R. LEBOWITZ, ESQUIRE

4         Lebowitz Law Firm

5         8180 Lark Brown Road, Suite 201

6         Elkridge, Maryland  21075

7         410-730-9010

8            On behalf of the Plaintiff

9

10        ELISABETH B. HOFFMAN, ESQUIRE

11        Baltimore City Department of Law

12        100 North Holliday Street, Suite 101

13        Baltimore, Maryland 21202

14        elisabeth.hoffman@baltimorecity.gov

15           On behalf of the Defendant

16

17

18

19

20

21

1    stay on until after that.

2        Q    Do you remember who asked you to stay?

3        A    I can't remember who exactly asked me

4    to stay, but that happened -- the arrangement

5    that I would stay until after WorkBaltimore, and

6    then I would start Rec and Parks.

7        Q    Okay.  When in October did you go over

8    to Rec and Parks?

9        A    The 15th, middle of the month,

10   mid-October.  I am not certain.

11       Q    Was there a gap in your service, in a

12   sense, did you take any time off between being in

13   the HR Department and going over to Rec and

14   Parks?

15       A    I don't recall.  I don't recall.

16       Q    Okay.  Bear with me.  When you worked

17   for the HR Department, and, I guess, you said you

18   still are engaged in the HR function in terms of

19   supervising the HR team, did the City hire both

20   W-2 employees as well as independent contractors?

21       A    Yes.

1    Q    The office move happened, though, just

2  before you transferred out; correct?

3    **A    That's correct, yes.**

4    Q    And what did you think of Ms. Bryant

5  when you worked with her?

6    **A    Well, I thought she was a good**

7  **colleague, professional, hard worker.**

8    Q    Did you consider her to be someone that

9  had integrity?

10   **A    Yes.**

11   Q    Did you ever hear her say something

12 nasty about someone else?

13   **A    Did I ever hear her say something nasty**

14 **about someone else.   Not that I can recall.**

15 **Nothing remarkable, no.**

16   Q    Okay.  Did you ever hear her say

17 something unfair about someone else?

18   **A    Unfair?**

19   Q    Yes.

20   **A    Not that I can -- no.**

21   Q    Did you also work for Mary Talley?

1       **A     As I understood it, there were**

2  **donations and sponsorships that were being**

3  **collected, so it was my understanding that they**

4  **helped keep account of what money was being spent**

5  **on WorkBaltimore in relation to actual general**

6  **fund dollars and donation dollars.**

7       Q     Okay.  In terms of the accounting

8  information that you just described, coming out

9  of the Finance Committee, did you use that

10  information to assist you in your role in

11  relation to WorkBaltimore?

12       **A     Not that I can recall.  So the finance**

13  **side of the house is not -- wasn't my portfolio,**

14  **per se, much more strategic and operational, so**

15  **finance is not something -- I would, most likely,**

16  **have situational awareness of it, but there is**

17  **nothing that I would delve too deep, and that**

18  **wasn't in my wheelhouse.**

19       Q     Okay.  Either in your role with the

20  WorkBaltimore Steering Committee or by virtue of

21  attending committee meetings, were you aware of a

1   $100,000 loan taken for WorkBaltimore in 2017

2   from the Innovation Fund?

3       **A      Yes, yes.**

4       Q      Okay.  And were you present during

5   meetings at which the subject of the payback of

6   this loan was discussed?

7       **A      Yes.**

8       Q      And are you aware that there was a

9   directive from Ms. Talley that the loan did not

10  have to be paid back?

11      **A      Yes.**

12      Q      Tell me what you know about that.

13      **A      It was my understanding that the**

14  **Innovation Fund is a pot of money the City, the**

15  **agencies, have access to for innovative things.**

16  **It was my understanding that we had been**

17  **instructed by the administration that there was**

18  **no -- that loan need not be repaid.**

19      Q      Okay.  It was Ms. Talley that delivered

20  that information; is that correct?

21      **A      That is correct.**

1    Q    Did you hear anyone else say that?

2    **A    Not that I can explicitly recall.**

3    Q    Okay.  And did Ms. Talley convey where

4    she received that information?

5    **A    I believe she received that information**

6    **from the Mayor's Office, whatever that meant in**

7    **this context.**

8    Q    Okay.  At the Steering Committee

9    meetings, did you take notes personally?

10   **A    Yes.**

11   Q    Do you know if you still have them?

12   **A    No.**

13   Q    No, you don't know or no, you don't

14   have them?

15   **A    No, I don't have them.**

16   Q    Were minutes generated as a result of

17   the meetings, the Steering Committee meetings?

18   **A    At times there were meeting minutes.**

19   **I'm not certain that it persisted throughout the**

20   **entire life of the project.**

21   Q    Okay.  With regard to the Steering

1    set of notes that I have from a meeting between

2    you, Ms. Bryant and, I believe, it's Mr. Gulhar,

3    and I'll get clarity from you, in July, 2018,

4    where there was a reference to nepotism.  It's my

5    understanding that there was, and still is, no

6    official nepotism policy in place with respect to

7    employment with the Baltimore City government;

8    correct?

9         **A    That is correct.**

10        Q    What is your understanding as to why

11   Ms. Talley's employment with the City came to an

12   end?

13        **A    I believe her employment came to an end**

14   **because the administration was being responsive**

15   **to a collection of employee concerns about Ms.**

16   **Talley's leadership style.**

17        Q    Okay.  And where did you learn that

18   from?  What is the source of that information?

19        **A    The source of what?**

20        Q    What you just said.

21        **A    Why Mary was terminated?**

1    Q    Do you recall who the subject of the

2    investigation was?

3         MS. HOFFMAN:   Objection.

4    Q    You can go ahead.

5    **A    Reginald Moore.**

6    Q    Was there, to your knowledge, and I

7    understand you may not know, was there a -- I

8    know on the Baltimore City website there is a

9    listing of publicly-issued findings by the OIG.

10   Do you know if that one was made public?

11   **A    Not aware.**

12   Q    Okay.  You said that it wasn't

13   substantiated.

14   **A    Correct.**

15   Q    What was the accusation?

16        MS. HOFFMAN:  Object again.

17   **A    Just that there had been hires that**

18   **were family members of the director.**

19   Q    And you said that it was -- well, let

20   me ask it this way.  Putting aside whether it was

21   proper or improper, were there hires of family

1    health challenges that required her to, just

2    generally, understanding what was happening in

3    the agency, after my departure, that she had some

4    leave that she needed to take care of some

5    medical issues, but --

6         Q     Did you, personally, work directly with

7    Ms. Watkins?

8         A     I did.

9         Q     And what were her duties?

10        A     She actually administered FMLA for the

11   agency while she was under my supervision, so she

12   managed the FMLA process.

13       Q     And I understand your testimony, a

14   moment ago, that you -- that this issue arose

15   after you left the Department of Human Resources.

16   But, during that time or since, have you become

17   aware of any issues that she had with taking

18   medical leave?

19       A     I mean, unfortunately, I know that Ms.

20   Watkins passed away and that, it was my

21   understanding, that the illness would have been

1  understanding?

2      **A      I don't recall.**

3      Q      Okay.  Have you personally taken a

4  period of medical-related leave during your

5  employment with the City?

6      **A      No.**

7      Q      Have you had the need to do so but put

8  it off?

9      **A      No.**

10     Q      With respect to Ms. Talley, in

11 particular, tell me what you know, either by way

12 of hearing it from her directly or from others,

13 about her having an issue with workers taking

14 leave from work.

15     **A      Can you repeat that?**

16     Q      Sure.  With respect to Ms. Talley, tell

17 me what you know, either by hearing it from her

18 directly or from others, about her having an

19 issue with workers taking leave from work.

20     **A      Generally, Ms. Talley, attendance to**

21 **work was important to Ms. Talley.**

1      Q     Explain that. Explain what you mean by

2 that.

3      **A     Her expectation was that people were in**

4 **place and on duty to do their assigned work.**

5      Q     And did you hear her express

6 disappointment with a given worker, or workers,

7 taking leave?

8      **A     Yes.**

9      Q     Okay. How many times would you say

10 that happened?

11      **A     I'm not sure I can quantify it, but**

12 **what she viewed as excessive leave, she was vocal**

13 **about.**

14      Q     Okay. What sorts of things would she

15 say when she was vocal about it?

16      **A     I can't recall verbatim what she would**

17 **have said about it, but just general displeasure**

18 **about excessive leave usage.**

19      Q     Okay. Are you aware of any concerns --

20 well, let me ask it this way. Did you hear Ms.

21 Talley express concerns about leave taken or

1  wanted to be taken by Ms. Bryant?

2       **A     Not that I can recall.**

3       Q     Did you have conversations with Ms.

4  Bryant, when you were both working for Ms.

5  Talley, regarding Ms. Talley taking issue with,

6  as you said, excessive leave?

7       **A     Yes.**

8       Q     Okay.  Tell me about those

9  conversations.

10      **A     Ms. Bryant and I did not share Ms.**

11 **Talley's views as it related to employees taking**

12 **leave.  I think we had a more generous view of**

13 **work/life balance and employees taking leave.**

14      Q     Okay.  Now, this view held by Ms.

15 Talley, was it also held, to a lesser -- well,

16 was a similar view to Ms. Talley held by folks in

17 the HR Department?

18      **A     The staff of HR?**

19      Q     Yes.  The chiefs.  You mentioned you

20 and Ms. Bryant, that you had the chiefs.

21      **A     No.  I think they took leave and**

1  different times being, like, just two days?

2  **A     No.   Two different episodes.**

3  Q     Okay.  And how long was each episode?

4  **A     I can't recall.**

5  Q     Did you talk to her about why she was

6  wearing it?

7  **A     I'm sure I did, but I do not recall.**

8  Q     Okay.  When you both worked together,

9  did you talk to her about a then-upcoming

10 surgery?

11 **A     Yes.**

12 Q     And did you talk to her about any

13 issues that she was having with her foot?

14 **A     Yes.**

15 Q     Did you see her limp?

16 **A     Yes.**

17 Q     Did you see her put her foot up on a

18 chair in meetings?

19 **A     Yes.**

20 Q     And, timing-wise, I don't know if

21 you'll be able to assist me with this; if you

1          THE WITNESS:  My air-condition alarm is

2     going off and I need --

3          MR. LEBOWITZ:  Do you want five

4     minutes?

5          THE WITNESS:  Five minutes will be

6     perfect.

7          MR. LEBOWITZ:  Okay.  I'll see you in

8     five minutes.

9                    (RECESS)

10          MR. LEBOWITZ:  Back on the record.

11     Q    So I asked you, before we took a break,

12     about whether you talked with folks employed by

13     the City about Ms. Bryant's termination prior to

14     said termination.  You said, regarding the

15     subject of the termination, said no.

16          So my next question is, what about

17     since -- well, on or since November 9, 2018, have

18     you talked with the people employed by the City

19     about her termination?

20     **A    I do recall receiving several phone**

21     **calls from DHR employees, you know, just plain**

1  shock or disbelief or just, you know, more

2  concerned about Ms. Bryant's departure.

3       Q     Do you recall who contacted you?

4       A     I'm pretty sure I spoke with NJ,

5  Jerusalem, Sandie Curtis.  Those are the only

6  ones that I can recall.

7       Q     So how did you first become aware that

8  she had been terminated?

9       A     I think, through the grapevine or

10 through the Baltimore Grill.  I don't think there

11 was any official notification besides just

12 learning of it through regular City channels.

13      Q     Okay.  And you just listed three people

14 that you said contacted you, and you referenced

15 expressions of shock and disbelief.  When were

16 these communications?

17      A     Would have been soon after it was made

18 public that she was terminated.

19      Q     And what were your feelings when you

20 first learned that she was terminated?

21      A     Similar.  Little bit of shock.

1    Q    Okay.  Why were you shocked?

2    A    I thought Ms. Bryant was really good at

3 her job, so her being terminated was just

4 shocking.

5    Q    Back when you first found out about the

6 termination and said that -- and felt that it was

7 shocking, did you know at that time in realtime

8 that she was on medical leave?

9    A    No.  Wait.  Did I know she was on

10 medical leave?  Yes.

11    Q    Yes.

12    A    That was why -- well, that was the

13 cause of her termination.  No, there isn't a

14 connection between the two.

15    Q    Say that again.

16    A    So I understood that she was on medical

17 leave, yes.

18    Q    Okay.  And what did you say about

19 "cause"?

20    A    I said I didn't -- I wasn't aware of a

21 connection between the medical leave, given the

1    **A    Yes.**

2    Q    Okay.  Tell me what you know.

3    **A    I know that La'Tonya's daughter was**

4    **involved in the Smokey Crush Campaign and -- yes.**

5    **And the second part where WorkBaltimore, at the**

6    **time, was likely involved in the financial for**

7    **WorkBaltimore, because that was her role as**

8    **deputy, but that is --**

9    Q    I'm sorry.  I don't want to cut you

10   off.  Were you done?

11   **A    That is it, yes.**

12   Q    Okay.  So, in terms of the first issue,

13   the daughter being involved in Smokey Crush, how

14   do you know about that?

15   **A    I feel like it may have come up, well,**

16   **obviously it did, during the OIG's investigation,**

17   **and just offhand hearing that -- I mean, that it**

18   **wasn't a secret, like La'Tonya's daughter doing**

19   **the acts or the appearances on the Smokey Crush**

20   **wasn't -- it was known to Director Talley at the**

21   **time.  It wasn't like a covert operation.**

1  **understanding they are sent over to Ethics and**

2  **they wind up in some database and are used at**

3  **random, you know, ensure that public officials**

4  **are disclosing their financial interests and**

5  **things like that.**

6  Q    Okay.  So, the first part, I need some

7  clarity on that.  The Department of Human

8  Resources was working on the forms themselves?

9  **A    No, no, no, no.  So the Department of**

10 **Human Resources was assisting the Ethics board in**

11 **determining which positions are subject to**

12 **financial disclosures.**

13 Q    I see.  Are you personally aware of any

14 worker having been terminated for an issue on one

15 of these forms, on one of the financial

16 disclosure forms?

17 **A    I'm not aware, no.**

18 Q    Bear with me.  We've covered some of

19 this ground, so I'm just looking at my notes.

20     We talked about this a little bit, but

21 I need a little more clarity.  In terms of your

1    covering 50 percent."  Do you know what this is

2    referring to?

3         **A    Yes.  There was a flood in the building**

4    **and we were working to get it reimbursed from the**

5    **insurance for the damage we confronted.**

6         Q    Okay.  Do you know if the money

7    eventually came in from the insurance company?

8         **A    That is my understanding, yes.**

9         Q    Do you know what was done with the

10   money?

11        **A    I think they bought the furniture and**

12   **moved, or it was used to support the move to**

13   **Redwood.**

14        Q    All right.  Next, there is a reference

15   to "WorkBaltimore - need to significantly reduce

16   budget."  Do you recall who made the comment,

17   about the need to significantly reduce budget?

18        **A    No.**

19        Q    Okay.  Do you remember what the

20   conversation was about with respect to the

21   budget?

Deposition of Jacia T. Smith

La'Tonya Bryant vs. Mayor & City Council of Baltimore

1  working on it."  They may have been talking about

2  the call center people who were working with

3  WorkBaltimore.  So we had employed a cadre of

4  temporary employees who were operating a phone

5  bank, essentially, for WorkBaltimore.

6      Q    And do you know what funds were used to

7  pay them in the past?

8      A    I don't know.

9      Q    Okay.  The last thing is, there is a

10  reference to Mr. Gulhar's cell phone number.  Do

11  you know why that was written down here?

12      A    I do not.

13      Q    All right.  Next on the typewritten

14  notes, we talked about the DPW investigation

15  already.

16          A little further down, below flood

17  reconciliation, it says WorkBaltimore.  Do you

18  recall what was discussed in relation to

19  WorkBaltimore?

20      A    It's my understanding that this

21  document was from a meeting that we had after

Office (410) 821-4888
CRC Salomon, Inc.

2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com - info@crcsalomon.com

Facsimile (410) 821-4889
Page: 91

1  Mary's departure.  We were trying to see all of

2  the things necessary for where we worked and

3  everything, so this is like a cadre of things

4  that were happening and needed immediate

5  attention, so WorkBaltimore was probably among

6  the list of things that needed to be discussed.

7       Q     Do you remember what was discussed in

8  relation to WorkBaltimore?

9       A     I don't remember specifically, no.

10      Q     Next, I'll scroll down here, this is

11 page 2.  There is a section Employee Benefits

12 Division, and then it says Chief, Ray Gulhar.  Do

13 you see that?

14      A     Yes.

15      Q     And then, within that list, there is a

16 reference to the 2018 WorkBaltimore Convention

17 and then immediately below that, 2017

18 WorkBaltimore Close-out.  Do you know what the

19 WorkBaltimore Close-out discussion was about?

20      A     Just recalling, trying to reconcile all

21 of the expenditures and the deposits, so just

1   **marrying the books at the end of the program.**

2      Q     Okay.  And was this a process you were

3   personally involved in?

4      **A     By virtue of being on the Steering**

5   **Committee, so I am aware of it but not involved**

6   **with.**

7      Q     Okay.  And either as part of or

8   independent of this meeting, do you know of any

9   issues with reconciling the books?

10     **A     Not that I can recall.**

11     Q     That is it for that exhibit.

12           Next, we have another lengthy exhibit.

13  We might even want to take a break for you to

14  read it, if you want to go through the whole

15  thing, but, again, I'm going to have particular

16  questions.

17           Next, I'm going to show you what has

18  been marked as Exhibit J, which is the report of

19  the investigation involving Ms. Talley.  If you

20  could -- let me give you -- see if you still can

21  scroll.  Yes.  So, if you want to take a look at

1    Q    Was there any time after Mary Talley

2  left City employment that you recall the $100,000

3  Innovation Fund loan being discussed with DHR

4  employees, so after Mary Talley left?

5    **A    After Mary Talley.  Not that I can**

6  **recall specifically, except for conversations**

7  **around the payback and that it was, it was not**

8  **required.**

9    Q    Okay.  So those conversations about the

10 payback that was not required, were still going

11 on after Mary Talley left?

12   **A    I believe, I believe they resurfaced,**

13 **like they had to re-inquire, inquiry.**

14   Q    Okay.  And again, as best as you

15 recall, if -- whatever you recall of these

16 conversations, do you recall who those

17 conversations were had with or what context they

18 were had in, if they were had with particular

19 meetings?

20   **A    Not -- perhaps the team meeting.  I**

21 **have a fuzzy memory as it relates to who the**