**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

LA'TONYA T. BRYANT,                    *

       Plaintiff,                    *

    v.                                    *          Civil No. MJM-21-0545

MAYOR AND CITY COUNCIL                 *
OF BALTIMORE,
                                       *
       Defendant.                    *

\* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM OPINION</u>

This case arises from an employment dispute. Following the termination of her employment with the City of Baltimore, La'Tonya T. Bryant ("Plaintiff") sued Mayor and City Council of Baltimore; Quinton M. Herbert, individually and in his official capacity; and City of Baltimore, Department of Human Resources alleging employment discrimination under both Maryland and federal law.[1] The Complaint contains thirteen counts:

  (1)    Count I – Violation of the Maryland Fair Employment Practice Act (Failure to Accommodate);

  (2)    Count II – Violation of the Americans with Disabilities Act, as Amended (Failure to Accommodate);

  (3)    Count III – Violation of § 504 of the Rehabilitation Act, as Amended (Failure to Accommodate);

  (4)    Count IV – Violation of the Maryland Fair Employment Practices Act (Disability Discrimination);

---

[1]     Plaintiff originally filed her case in the Circuit Court for Baltimore City, Maryland. (ECF 2). On March 3, 2021, the defendants sought removal of the case to this Court pursuant to 28 U.S.C. § 1441(a), invoking federal question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367. (ECF 1). There is no dispute that Plaintiff has exhausted her administrative remedies.

(5)     Count V – Violation of the Americans with Disabilities Act, as Amended (Disability Discrimination);

(6)     Count VI – Violation of § 504 of the Rehabilitation Act, as Amended (Disability Discrimination);

(7)     Count VII – Violation of the Maryland Fair Employment Practices Act (Retaliation);

(8)     Count VIII – Violation of the Americans with Disabilities Act, as Amended (Retaliation);

(9)     Count IX – Violation of § 504 of the Rehabilitation Act, as Amended (Retaliation);

(10)    Count X – Violation of the Family and Medical Leave Act (Interference);

(11)    Count XI – Violation of the Family and Medical Leave Act (Retaliation);

(12)    Count XII – Violation of the Maryland Fair Employment Practices Act (Age Discrimination); and

(13)    Count XIII – Violation of Age Discrimination in Employment Act, as Amended (Age Discrimination).

The claims against Herbert and City of Baltimore, Department of Human Resources have been dismissed with prejudice. (ECF 24).

Mayor and City Council of Baltimore ("Defendant" or "City") filed a post-discovery motion for summary judgement on all counts.[2] (ECF 66). Plaintiff filed a memorandum in opposition to the motion (ECF 75), and Defendant filed a reply memorandum (ECF 78). The Court has reviewed the filings and finds that no hearing is necessary. L.R. 105.6. For the reasons stated below, Defendant's motion will be granted.

---

[2]     The parties have consented to proceed before a United States magistrate judge pursuant to 28 U.S.C. § 636(c). (ECF 38 & 39).

I.        **Factual Background**[3]

Defendant hired Plaintiff to serve as the Chief of Staff to the Director of the Baltimore City

Department of Human Resources ("DHR" or "HR") in August 2012. (ECF 75-3 at 4). Plaintiff

was promoted to Deputy Director of HR Administration in early 2015 and remained in that position

until her termination on November 9, 2018. (*Id.*; ECF 66-19). As Deputy Director, she continued

to report to the Director of DHR, Mary Talley, until summer or fall of 2018. (ECF 75-3). During

the relevant period, there were two deputy directors under Talley—Plaintiff and Jacia Smith,

Deputy Director of HR Operations. (Bryant Dep. 10:13–16). As Deputy Director of HR

Administration, Plaintiff was responsible for DHR's budget, staffing, "contracts and

solicitations[,] and partnership with the contracts office[,]" as well as logistics and facilities

management. (Bryant Dep. 10:6–12). Talley left DHR in late July or early August 2018, and

Herbert has led the department since that time. (Herbert Dep. 20:10–21:10). Plaintiff was never

subjected to any discipline during her tenure as Deputy Director. (Herbert Dep. 129:18–21).

A.  **Tobacco Cessation Campaign**

In 2015, to improve the health and well-being of Baltimore City residents, DHR launched

a Tobacco Cessation Campaign. (ECF 75-32). The campaign involved two costumed mascots

named Smokey Crush, a crushed-up cigarette, and Leaf, a tobacco leaf, attending events and

visiting agencies to pass out smoking cessation materials and perform a song and dance to create

awareness for smoking cessation programs. (*Id.*; Bryant Dep. 23:4–14). Plaintiff's daughter,

Quiera Bryant, was hired in November 2015 as a contractor to perform as one of the characters on

---

[3]        The facts described herein are derived from the exhibits submitted by the parties and are viewed in
the light most favorable to Plaintiff, as the non-moving party. *See Iraq Middle Mkt. Dev. Found. v.
Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) (noting that summary judgment is only appropriate if the
Court finds no genuine dispute of material fact after "viewing the evidence in the light most favorable to
the non-moving party"). With the exception of deposition transcripts, exhibits are generally cited to page
numbers assigned by the Court's electronic filing system.

a rotational basis, making $100.00 per performance. (ECF 66-9; ECF 75-32). Candidates for the mascot positions were required to audition, and multiple performers were hired. (Bryant Dep. 23:15–26:12). In her role at DHR, Plaintiff participated in a few auditions but was not present when her daughter auditioned. (*Id*.) Talley and other colleagues of Plaintiff, such as Lisa Evans and Julie Colucci, were aware that Plaintiff's daughter was going to audition.[4] (*Id*.; Colucci Dep. 40:8–10) When Plaintiff's daughter was hired, Talley signed the mascot agreement on behalf of the City.[5] (ECF 75-32).

Plaintiff was required to file a financial disclosure form with the Baltimore City Ethics Board every year. (Bryant Dep. 34:6–11). Plaintiff testified that she filed the financial disclosure form every year of her seven-year tenure working for the City. (Bryant Dep. 34:13–15). Plaintiff's financial disclosure forms dated April 30, 2015, and March 27, 2017, did not disclose Quiera Bryant's mascot agreement with the City.[6] (ECF 66-15; ECF 66-16). Plaintiff's 2017 financial disclosure form, however, did disclose Quiera Bryant's employment with Baltimore City Parking Authority. (ECF 66-16).[7]

### B. WorkBaltimore

In the fall of 2017 and 2018, DHR hosted WorkBaltimore: Empowerment to Employment Convention, an annual event "intended to attract participation from the full spectrum of job-seekers[,]" to "connect Baltimore City residents with a high volume of local and diverse employers

---

[4]    Colucci testified that throughout the time of the Tobacco Cessation Campaign, it was difficult to attract performers to audition, and there were open auditions held where no one would appear. (Colucci Dep. 37:8–38:12).

[5]    This is a one-year performance contract. Quiera Bryant's first performance for DHR occurred on November 9, 2015, and her last performance was on April 8, 2016. (ECF 66-9 at 7, n.11).

[6]    The 2016 disclosure form is not included in the record.

[7]    The City does not have an anti-nepotism policy. (Herbert Dep. 188:3–9).

across multiple industries[,]" and to "underscore the benefits of living and working in Baltimore City." (ECF 75-10 at 1). Based on directives from then-Mayor of Baltimore, Catherine Pugh, regarding strategic initiatives to address Baltimore's problems, Talley and the DHR team, including Plaintiff, came up with the concept of WorkBaltimore in 2017. (Bryant Dep. 13:8–15:15; ECF 66-9 at 2). Before the job fair, there would be 30 days of pre-convention activities, including multiple trainings and job readiness opportunities for the citizens of Baltimore. (Bryant Dep. 16:20-17:3). DHR employees organized and ran WorkBaltimore. (ECF 66-9 at 2–3; ECF 75-15).

In 2017, every DHR employee was required to participate in one of the event planning committees for WorkBaltimore. (ECF 66-9 at 2; ECF 75-15). Plaintiff was responsible for logistics, including acquiring the space for the convention and pre-convention trainings. (Bryant Dep. 16:5-18). She also served as the co-chair of the Finance Committee, and Rajesh Gulhar, chief of the Employee Benefits Division, served as the chair of the committee. (ECF 75-10 at 1, 4). The planning and execution of WorkBaltimore was so demanding that many DHR "staff complained that they could not do what they were getting paid to do for the [C]ity because they were spending . . . most, if not all, of their workday working on WorkBaltimore." (Herbert Dep. 227:9–21).

### C.  Innovation Fund

WorkBaltimore was funded through fundraising efforts by DHR, DHR's general fund, and a one-time loan of $100,000.00 from the City's Innovation Fund. (Bryant Dep. 17:8–19:11). The loan from the Innovation Fund was made pursuant to a letter of agreement, dated April 21, 2017, between DHR and the Bureau of the Budget and Management Research within the Department of Finance for the City of Baltimore. (ECF 66-11). The loan was required to be repaid by June 30, 2018, unless an extension was approved by the Budget Chief at DHR's request, and any extension request was due by May 1, 2018. (ECF 66-11 at 2). DHR was responsible for tracking all revenue

related to the project and required to provide a pre-event report detailing how the $100,000.00 was spent and the status of DHR's fundraising efforts. (*Id.*) The target report date was September 1, 2017. (*Id.*) Each party to the agreement named a project monitor, and Plaintiff was designated the project monitor for DHR. (*Id.*) The signatory for DHR was Talley. (*Id.*)

The loan was not repaid on time. According to Plaintiff and Smith, Talley issued a directive providing that the loan did not have to be repaid. (Bryant Dep. 28:7–29:9; Smith Dep. 35:4–36:7). It was Plaintiff's and Smith's understanding that Talley received that assurance from the Mayor's Office. (*Id.*) As of September 2018, DHR had made no repayments and had not requested any extension. (ECF 66-9 at 4). Nonetheless, Plaintiff testified that she had always believed that DHR would repay the loan and that she intended to repay the loan from funds the department would receive for losses sustained in a flood. (Bryant Dep. 30:17–31:6; *see also* Bryant Dep. 33:2–34:5). Herbert "issued a directive in either September or October of 2018" that the Innovation Fund be repaid.  (Herbert Dep. 245:1–13). Herbert testified that some funds DHR received for the flood were used to make a payment on the loan. (Herbert Dep. 213:17–214:6).

Starting in 2019, WorkBaltimore was transitioned from DHR to the Mayor's Office of Economic Development. (ECF 66-12).

### D.  Office of the Inspector General Investigation and the Interim Report

In 2018, the Office of the Inspector General for Baltimore City ("OIG") received a complaint alleging that members of the DHR executive leadership team—which included Talley, Smith, and Plaintiff—were harassing and humiliating DHR employees. (ECF 66-5 at 1). OIG conducted an internal investigation and, as part of the investigation, interviewed 42 individuals, including 20 current DHR employees, 12 former employees, seven senior-level managers for other City agencies, and the DHR executive leadership team. (ECF 66-5 at 2). On July 17, 2018, the

OIG released an Interim Report of its investigation. (*Id*. at 1) The OIG found "a culture of fear" at DHR that "appears to have been created by Talley's actions."  (*Id*. at 14). Talley resigned shortly after the Interim Report was released, and Herbert was asked to replace Talley as Director of DHR, initially on an interim basis. (Herbert Dep. 20:4–21:10).

Herbert testified that, at the time he stepped into the Director role, "there was a lot of turmoil in the agency." (Herbert Dep. 85:6–86:15). Herbert met with Plaintiff and Smith often, relying on them for their institutional knowledge and details of the agency's many projects. (*Id*.) Plaintiff testified that she "would have given [Herbert] an overview of WorkBaltimore, Innovation Fund, our work budget standing[,]" and "[t]he flood" during their introductory meeting on the agency's priorities. (Bryant Dep. 89:7–18).

According to Herbert, the issues related to the OIG's Interim Report were raised during an early meeting with Plaintiff and Smith, and both Plaintiff and Smith expressed to Herbert that the report was not fair "because they were also victims of workplace harassment by Mary Talley [and] felt they were somehow coerced into going along with her." (Herbert Dep. 130:19–132:12). Herbert advised Plaintiff and Smith that, "at that time, there was no intention of any adverse employment action for either of them." (*Id*.) He also asked Plaintiff and Smith "if there was anything else that [he] should know[,]" to which Plaintiff and Smith "answered in the negative." (*Id*.). Herbert further explained that he intended "to try to work with [Plaintiff and Smith] to the best of [his] ability." (Herbert Dep. 86:16–87:15). He "felt that a certain level of stability at the top of the agency was a good thing[]" and "didn't think that it was necessarily healthy for the organization to see organizational change at the top levels that quickly with respect to the deputy directors." (*Id*.) Herbert "looked to [Plaintiff and Smith] to make the transition a smooth one and to get the agency back on track." (*Id*.) Herbert testified that he thought Plaintiff's performance

7

during this period was "fine[,]" that she was "responsive" and professional in the workplace, and that she had integrity.[8] (Herbert Dep. 86:16–88:5).

Smith decided to transfer to Recreation and Parks in or around July and August 2018. The transfer did not occur until October 2018 because, due to the amount of work that remained for WorkBaltimore 2018, she "was asked to stay on until after that." (Smith Dep. 10:2–12, 12:12–13:1).

### E.  Plaintiff's Leave

In late September 2018, shortly after WorkBaltimore 2018 and DHR's move to a new location, Plaintiff asked to take a vacation or hiatus period of three or four weeks to recover from the work required for the move and for WorkBaltimore.  (Bryant Dep. 54:7–57:15; ECF 75-3 at 7; Herbert Dep. 60:9–63:18). Herbert indicated to Plaintiff that he could not approve a month-long vacation for her because he was "new to the agency [and Plaintiff] was one of the executives in the agency[.]" (Herbert Dep. 60:9–61:18). Herbert testified that Plaintiff "indicated at that time that her foot was bothering her as well" and that "she was wearing a boot." (*Id.*)

Plaintiff notified Herbert and Smith about a possible surgery needed for her right foot. (Bryant Dep. 54:7–57:15; ECF 75-3 at 7). She had a torn Achilles tendon, an injury she sustained in September 2017. (Bryant Dep. 51:16–21). She received physical therapy for a year, with "sort of wavering success[,]" and was "in and out of the boot." (Bryant Dep. 52:1–15). Around September 2018, Plaintiff and her physician discussed surgery, and Plaintiff decided that she wanted to have the surgery after WorkBaltimore and DHR's move to the new location. (Bryant Dep. 52:1–53:21). According to Plaintiff, when she told Herbert about the pending surgery, he "expressed displeasure about it[]" through "a gesture and a moan." (Bryant Dep. 75:5–20).

---

[8]      Plaintiff's last performance appraisal was "satisfactory." (ECF 75-4).

Plaintiff further testified that Herbert "made that sort of scoffing reaction when [she] told [Herbert] [she] would have to take off additional time for surgery[,]" but Herbert did not tell her he would prevent her from taking leave for the surgery. (Bryant Dep. 77:2–11). According to Plaintiff, she did not have any conversation with Herbert where the Family and Medical Leave Act ("FMLA") was discussed. (Bryant Dep. 77:12–17).

According to Herbert, upon learning that Plaintiff intended to address her foot injury during her requested leave, he advised Plaintiff that, if her leave was related to the foot injury, then she could request FMLA leave and, if her physician completed the paperwork, she could take FMLA leave. (Herbert Dep. 60:9–63:18). Herbert testified that he "push[ed] to get that FMLA paperwork in so that [Plaintiff] could have that time off." (*Id*.) Herbert further stated that he advised Plaintiff he "could approve a couple weeks for vacation[,]" which "would give her time to . . . to go to the doctor to get her FMLA paperwork in." (*Id*.)

On October 3, 2018, Herbert approved Plaintiff's request for 19 days off, described as a "respite," set to begin on October 8, 2018, and run until November 2, 2018. (ECF 66-13). Herbert also asked Njukang Asong, the DHR member responsible for facilitating FMLA paperwork, to email Plaintiff a FMLA request form. The form was sent to Plaintiff on October 4, 2018. (ECF 75-25 at 2).

On or around October 10, 2018, at Herbert's direction, Joanne Ashton, Chief of HR Shared Services and Recruitment, drafted a memorandum on his behalf ("October Memo") addressing staffing issues:

> With the transfer of Deputy Jacia Smith to Parks and Recreation and the medical leave for Deputy La'Tonya Bryant, members of the leadership team will report directly to me until a replacement is named for Deputy of HR Operations and Deputy Bryant returns to the office: Sandy Curtis, Ray Gulhar, Margo Brunner-Settles, Tonya Brinkley, Jason Ingram and Joanne Ashton.

(ECF 75-29 at 2). On October 26, 2018, Plaintiff submitted FMLA paperwork indicating that the estimated period of incapacity due to her medical condition was from November 8, 2018, to February 8, 2019. (Bryant Dep. 50:5–16; ECF 75-26 at 2). Herbert did not personally receive Plaintiff's FMLA paperwork but acknowledged that, upon receipt of the paperwork, Asong would have sent Herbert a letter for his signature approving the FMLA leave request and the letter "should have been sent out" once approved. (Herbert Dep. 56:2–57:8).

Plaintiff underwent foot surgery on November 6, 2018. (Bryant Dep. 116:7–12).

**F. OIG's Final Report**

In the course of its investigation and leading to the finalization of its Interim Report, the OIG received three additional anonymous emails "which raised additional issues regarding DHR operations." (ECF 66-5 at 2). The Interim Report noted that the OIG was continuing to investigate those issues, and that they would be addressed separately in a later, final report. (*Id.*).

The OIG completed its Final Report on September 21, 2018. (ECF 66-9 at 1). In addition to the initial claims of harassment by DHR leadership, the Final Report addressed "additional areas of concern" involving the time and resources spent on WorkBaltimore and the Tobacco Cessation Campaign. (*Id.*). With respect to WorkBaltimore, the OIG found "numerous errors in DHR's internal WorkBaltimore financial documents, which were provided to the OIG by [Plaintiff]." (*Id.* at 8). The Final Report states that financial documents obtained from Plaintiff

> contained more than $37,000 worth of expenses purportedly covered by the Innovation Fund, which were not reflected in the general ledger for DHR's Innovation Fund accounts. [Plaintiff] could not explain these discrepancies[] and advised the OIG that she was not involved in the financial planning for WorkBaltimore. Additionally, she reported that she did not prepare or review the documents before sending them to the OIG. [Plaintiff's] statement that she was not involved in the financial planning for WorkBaltimore was contradicted by: the DHR report listing her as the co-chair of the financial committee for WorkBaltimore in 2017; the Letter of Agreement, which named her as the project monitor for the Innovation Fund loan; and [Plaintiff's] acknowledgement that her

position as Deputy Director of Administration requires that she oversee her agency's budget and fiscal operations.

(*Id*.) Regarding the discrepancies, the Final Report specifically states that a list of expenditures provided by Plaintiff "included a number of payments that did not appear on the Innovation Fund's general ledger[]" and the general ledger "contained several expenses that were omitted from [Plaintiff's] list." (*Id*. at 4). "According to the general ledger, as of August 15, 2018, DHR spent $102,152.24 from the Innovation Fund accounts. This figure is much lower than what is reflected in the documentation provided by [Plaintiff], which showed that DHR spent $139,887.48 from the Innovation Fund account." (*Id*.) As to the Tobacco Cessation Campaign, the Final Report states:

> The OIG investigation determined that [Plaintiff's] daughter was selected as one of the first performers for the Smokey Crush and Leaf initiative. While [Plaintiff] advised the OIG that the decision to hire her daughter was authorized by Former-Director Talley, the hiring of an executive level employee's immediate family member creates the appearance of nepotism and a conflict of interest. As Deputy Director of DHR, [Plaintiff] should have been particularly aware of how the hiring of her daughter . . . would be perceived by others in City government. Additionally, the OIG determined that [Plaintiff] failed to disclose her daughter's employment with DHR in any of her financial disclosure forms filed with the City's Ethics Board.

(*Id*. at 8). The Final Report continues: "When asked about her failure to disclose her daughter's employment with DHR, [Plaintiff] reported that she thought she had made such a disclosure. She also stated that she believed that she had filed a financial disclosure form every year that she was employed with DHR." (*Id*. at 7). Additionally, "[u]pon review of [Plaintiff's] financial disclosure forms, the OIG determined" that (1) her "financial disclosure form filed in April of 2015 erroneously purported to cover the timeframe of January 1, 2015 through December 31, 2015"; (2) she "failed to file a financial disclosure form in 2016"; and (3) her "financial disclosure form filed in March of 2017 erroneously purported to cover the timeframe of January 1, 2017 through

December 31, 2017." (*Id.*) The Final Report was submitted by an OIG Special Agent and approved by the Inspector General. (*Id.* at 9).

### G.  Decision to Terminate Plaintiff

The Final Report was sent to then-Mayor Pugh, and on October 26, 2018, the Mayor referred the Final Report to Herbert, requesting that the OIG brief him directly and that he determine the appropriate disciplinary action for Plaintiff. (ECF 66-17). Herbert received the Final Report on November 2, 2018. (ECF 66-19). On November 9, 2018, Herbert sent Plaintiff a letter informing her that her employment with the City was terminated effective immediately, citing the Final Report:

> As you are aware, you serve at the pleasure of the Director of Human Resources. On Friday, November 2, 2018, I received a copy of a report completed by the Office of the Inspector General for Baltimore City ("O.I.G."). The investigation conducted by the O.I.G. focused *inter alia* on your failure to disclose a familial relationship to a contractual DHR employee and maintenance of financial records related to the 2017 WorkBaltimore: Empowerment to Employment Convention. After considering both the findings of the O.I.G. investigation and the information you provided in response to its inquiry, you are hereby terminated. Your termination is effective immediately.

(ECF 66-19).

In his deposition, Herbert explained that Plaintiff's familial relationship to a contractual DHR employee "create[d] the appearance of a conflict of interest" and Plaintiff was obligated to disclose this information. (Herbert Dep. 239:5–240:11). Herbert further testified:

> [Plaintiff] was given ample opportunity to provide a copy of the disclosure form if she felt that she disclosed it and, for some reason, the Office of Ethics did not have it, that form was never produced for the relevant period of time; and to me that was, that was a failure to disclose, and I say that keeping in mind that this was just a couple of months after I had come to the agency, after there had been a barrage of negative press about the agency, and to me veracity is a major issue and this was an issue of veracity for me, and truthfulness.

(*Id.*) To Herbert, Plaintiff's failure to produce the financial disclosure form in which she claimed to disclose the relationship and failure to provide responses to questions posed by OIG investigator was "at a minimum, . . . negligent on [Plaintiff's] part and, at worst, . . . blatantly dishonest." (Herbert Dep. 241:3–11). Additionally, Herbert noted Plaintiff's claim, according to the OIG report, that she "couldn't recall whether she disclosed [the relationship with her daughter] or not," explaining that this information "is something that you would remember." (Herbert Dep. 242:9–243:18). Herbert testified that, "under any scenario," Plaintiff's alleged conduct "was unacceptable for someone in executive leadership[,]" noting the "very fragile" state of the agency and "general mistrust . . . of the executive leadership" by the employees. (Herbert Dep. 241:3–11; 242:9–243:18). Herbert testified that at the time of Plaintiff's termination, he was aware that Plaintiff had disclosed her daughter's employment at the Parking Authority in 2017. (Herbert Dep. 243:19–244:7). This disclosure "confirmed, in [Herbert's] mind that [Plaintiff] knew that she had an obligation to disclose, and for the year that her daughter worked in the agency where she served as an executive leader, she did not file a disclosure and disclose that fact." (*Id.*) Herbert further clarified that his testimony was based on the fact that Plaintiff "was given ample opportunity to produce what she submitted to the Ethics Board, if she believed that she submitted it to the Ethics Board." (Herbert Dep. 244:8–21).

With respect to Plaintiff's maintenance of financial records related to the 2017 WorkBaltimore convention, Herbert testified that the "overdraw from the Innovation Fund" and failure to repay the funds "merited disciplinary action, and in light of all of the circumstances [presented to him]," he believed that "discharge was the appropriate action[.]" (Herbert Dep. 246:12–247:2). Herbert was focused on the fact that Plaintiff "was responsible for the overall financial operation of the agency, and that the buck stops with her with respect to [repaying the

Innovation Fund.]" (Herbert Dep. 245:1-246:11). In his deposition, Herbert was asked whether was aware of the fact that, based on a reconciliation conducted by DHR,[9] the actual spending from the Innovation Fund was $101,000.00 instead of over $139,000.00, as reflected in financial documents Plaintiff produced, according to the Final Report. Herbert testified, "even if that is true, that's a thousand dollars more than DHR was approved for to spend from the Innovation Fund." (Herbert Dep. 247:1–9).

Herbert further testified that before he reached the decision to terminate Plaintiff, he "spoke to OIG," and he also reviewed a note authored by Talley about her conversation with Plaintiff concerning an alleged misrepresentation Plaintiff made in April 2016.[10] (Herbert Dep. 248:8–249:3). Herbert "g[ave] some weight to [the alleged misrepresentation] in determining that the discharge was appropriate." (Herbert Dep. 252:8–253:3). Regarding Plaintiff's performance, Herbert testified that he "had no problems with [her] performance" and found Plaintiff to be "an

---

[9]     Colucci testified that she conducted a reconciliation of the WorkBaltimore expenses, where she "compared all of the receipts and any invoices to any money that was raised, any expenses that [DHR] paid and created a worksheet, a workbook, to outline those to make sure . . . we paid everything and everything was accounted for." (Colucci Dep. 64:2–16). Colucci did not recall any discrepancies or issues during the reconciliation process. (Colucci Dep. 64:17–20).

[10]     In April 2016, Talley had a conversation with Plaintiff that apparently led her to believe that Plaintiff misrepresented the nature of her relationship to a person who had recently passed away. (Bryant Dep. 41:6–45:14). Apparently, Plaintiff had previously reported to Talley that Plaintiff's niece was murdered. Talley told the DHR division chiefs about the tragedy and suggested that a colleague collect donations from DHR staff. (ECF 66-7; Bryant Dep. 42:9–17). On Friday, April 1, 2016, during a casual conversation, Plaintiff told Talley that the mother of the deceased was not her "real sister" and explained to Talley about "her 'blended' family's relationships and dynamics (*i.e.*, step and half-blood relationships)." (ECF 66-7 at 1). Talley perceived that information as problematic, partly because in her view, "the employees within DHR sacrificed their time and/or money (through donations)" based on the impression that the mother of the deceased is Plaintiff's "actual blood sister." (*Id.*) The following Monday, "Talley wrote up a note detailing her conversation with Plaintiff, a copy of which was kept in Plaintiff's personnel file." ("Talley's Note"). (ECF 66-7; Herbert Dep. 126:16–129:13). In the two-page note, Talley expressed her concern with Plaintiff's misrepresentation as well as Plaintiff's reaction to being asked to speak about it. (*Id.*) Plaintiff never received Talley's Note or any write-up. (Bryant Dep. 44:15–20). Plaintiff testified that the mother of the deceased is her stepsister. (Bryant Dep. 42:3–8, 44:1–14).

acceptable and valuable member of the senior leadership team of the agency while [he] was there." (Herbert Dep. 130:1–18). Notwithstanding, Herbert stated, "this OIG report was dropped in my lap like a bomb. And I had to deal with it." (*Id.*) Herbert further testified that the OIG's Interim Report did not factor into his decision to terminate Plaintiff. (Herbert Dep. 132:16–19).

Following Plaintiff's termination, Herbert restructured DHR and moved away from the two-deputy model to a one-deputy system, with one Deputy Director and two Assistant Deputies. (Herbert Dep. 177:14–179:1). Tonya Brinkley,[11] Chief of the HR Information System division, was promoted to be Herbert's sole Deputy Director at DHR. (*Id.*; ECF 75-22 at 1). Smith's position as a deputy director was never filled, and instead two assistant deputy positions were created and filled. (Herbert Dep. 178:14–179:1).

## II.     **Legal Standard**

Under Rule 56 of the Federal Rules of Civil Procedure, a court shall grant a party's summary judgment motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020). To avoid summary judgment, the non-moving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment. *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no

---

[11]     Brinkley was born on in 1964, and Plaintiff was born in 1967. (ECF 66-20 at 5).

genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing law[,]" and a genuine issue as to material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). A party can establish the absence or presence of a genuinely disputed fact through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

To defeat the motion for summary judgment, "the opposing party must set forth specific facts showing that there is a genuine issue for trial." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019) (citing *Anderson*, 477 U.S. at 248). "Unsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987). "The mere existence of a scintilla of evidence in support of the plaintiff's position" is likewise insufficient to overcome a defendant's motion for summary judgment. *Anderson*, 477 U.S. at 252. A plaintiff opposing summary judgment must present "evidence on which the jury could reasonably find for the plaintiff." *Id*.

Summary judgment is proper if "a party fails to establish the existence of an element essential to that party's case" or "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Perkins*, 936 F.3d at 205 (quoting *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991)). The court must view all the facts,

including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. Ltd*., 475 U.S. at 587, but the court is not to weigh the evidence, make credibility determinations, or decide the truth of disputed facts, *Anderson*, 477 U.S. at 249; *see also Wilson v. Prince George's Cnty.*, 893 F.3d 213, 218–19 (4th Cir. 2018); *Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Ordinarily, in the face of conflicting evidence, such as competing affidavits, summary judgment is not appropriate because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

## III.    Analysis

### A.  Applicable Law

#### 1.  The *McDonnell Douglas* Framework

In an employment discrimination and retaliation case under Title VII or other similar statutes, the plaintiff may defeat summary judgment through one of two methods. The plaintiff may offer "direct or indirect" evidence of discrimination or retaliation under "ordinary principles of proof." *Burns v. AAF-McQuay, Inc*., 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997). This refers to proof that offers "direct evidence of a stated purpose to discriminate and/or indirect evidence of sufficient probative force to reflect a genuine issue of material fact." *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001) (cleaned up, citation omitted). It could be "evidence of conduct or statements that both reflect directly the alleged discriminatory

attitude and that bear directly on the contested employment decision." *Id.* at 391–92 (citation omitted).

Alternatively, the plaintiff may follow the burden-shifting framework articulated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793 (1973); *see also Smith v. CSRA*, 12 F.4th 396, 416 (4th Cir. 2021). Under the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case of discrimination or retaliation. *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see also Abilt v. Central Intelligence Agency*, 848 F.3d 305, 315 (4th Cir. 2017). The burden at this stage "is not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Although the precise formulation of the required *prima facie* showing will vary in "differing factual situations[,]" *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff is generally required to show that the employer took adverse action against a plaintiff "under circumstances which give rise to an inference of unlawful discrimination[,]" *Burdine*, 450 U.S. at 253.

If the plaintiff establishes a *prima facie* case, a presumption of illegal discrimination or retaliation arises, and the burden of production shifts to the employer to rebut this presumption by producing evidence that it acted for a legitimate, non-discriminatory reason. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011); *see also Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000). The employer "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254 (citation omitted). "This burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves*, 530 U.S. at 142 (internal quotation marks and citation omitted). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted[.]" *Burdine*, 450 U.S. at 255. At this

point, the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510 (1993).

To prevail, the plaintiff must then prove, by a preponderance of evidence, "that the [employer's] proffered reason was not the true reason for the employment decision" and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also Reeves*, 530 U.S. at 143; *Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011). It is important to note, however, that the *McDonnell Douglas* proof scheme is "a procedural device, designed only to establish an order of proof and production." *Hicks*, 509 U.S. at 521. "The ultimate burden of persuading the trier of fact" remains with the employee "at all times." *Burdine*, 450 U.S. at 253.

Some courts have opined that "the relevance of the *prima facie* case under *McDonnell Douglas* at the summary judgment stage is limited." *Equal Emp. Opportunity Comm'n v. Manufacturers & Traders Tr. Co.*, 429 F. Supp. 3d 89, 120 (D. Md. 2019). The U.S. Court of Appeals for the District of Columbia Circuit observed that "[w]hen resolving an employer's motion for summary judgment or judgment as a matter of law in employment discrimination cases, district courts often wrestle with the question whether the employee made out a prima facie case." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008). "But judicial inquiry into the prima facie case" at the summary judgment stage "is usually misplaced." *Id*. The court reasoned that, at this juncture, "the employer ordinarily will have asserted a legitimate, non-discriminatory reason for the challenged decision—for example, through a declaration, deposition, or other testimony from the employer's decisionmaker" and "once the employer asserts a legitimate, non-discriminatory reason, the question whether the employee actually made out a prima facie case is 'no longer relevant' and thus 'disappear[s]' and 'drops out of the picture.'" *Id*. (citing *Hicks*, 509

U.S. at 510). Thus, "where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Id*. at 494.

> Rather, in considering an employer's motion for summary judgment or judgment as a matter of law in those circumstances, the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of [a protected classification]?"

*Id*.

Similarly, the U.S. Court of Appeals for the Fourth Circuit has opined that "[c]ourts must . . . resist the temptation to become so entwined in the intricacies of the [*McDonnell Douglas* ] proof scheme that they forget that the scheme exists solely to facilitate determination of 'the ultimate question of discrimination *vel non*.'" *Merritt*, 601 F.3d at  295 (quoting *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991)). As Judge Hollander has observed, "[o]n several occasions where the employer proffered evidence of a legitimate reason for its adverse action in its motion for summary judgment, the Fourth Circuit has assumed, without deciding, that the plaintiff established a prima facie case." *Manufacturers & Traders Tr. Co*., 429 F. Supp. 3d at 120 (citing cases).

In addition to claims brought under Title VII of the Civil Rights Act of 1964, courts have applied the *McDonnell Douglas* framework to claims brought under the Americans with Disabilities Act of 1990 ("ADA"), Section 504 of the Rehabilitation Act of 1973, the Age Discrimination in Employment Act ("ADEA"), the Family and Medical Leave Act ("FMLA"), and the Maryland Fair Employment Practices Act ("MFEPA"). *See*, *e.g*., *Cowgill v. First Data*

*Techs., Inc.*, 41 F.4th 370, 379–80 (4th Cir. 2022) (ADA); *Hannah P. v. Coats*, 916 F.3d 327, 342 (4th Cir. 2019) (Rehabilitation Act); *Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 550–51 (4th Cir. 2006) (FMLA); *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006) (ADEA); *Wise v. Gallagher Basset Servs., Inc.*, 228 F. Supp.2d 671, 674 (D. Md. 2002) (MFEPA).

### 2.  The Americans With Disabilities Act[12]

The ADA was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities[,]" and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities[.]" 42 U.S.C. §§ 12101(b). The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA also bars employers from retaliating against employees for seeking these statutory protections. 42 U.S.C. § 12203(a)-(b). It prohibits retaliation against an employee "because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." 42 U.S.C.A. § 12203(a). Citing the Supreme Court in the analogous Title VII context, the Fourth Circuit has commented that "[t]he substantive [discrimination] provision seeks to prevent *injury* to individuals based on who they are, *i.e.*, their status. The antiretaliation provision seeks to prevent *harm* to individuals

---

[12]     "Both the Rehabilitation Act and the Maryland FEPA apply the same standards as the ADA." *Miller v. Maryland Dep't of Nat. Res.*, 813 F. App'x 869, 874 (4th Cir. 2020) (citing *Hooven–Lewis v. Caldera*, 249 F.3d 259, 268 (4th Cir. 2001); *George v. Md. Dep't of Corr. Serv. Div. of Pretrial Det. Serv.*, Civ. No. WMN-14-2808, 2015 WL 847416, at *4 n.5 (D. Md. Feb. 25, 2015), *aff'd*, 615 F. App'x 164 (4th Cir. 2015)). "Accordingly, the Rehabilitation Act and the Maryland FEPA claims need not be analyzed separately." *Id*. Rehabilitation Act and the MFEPA claims are analyzed using standards set forth in the ADA and related case law. *Id.*

based on what they do, *i.e.*, their conduct." *Adams v. Anne Arundel Cnty. Pub. Sch.*, 789 F.3d 422, 431 (4th Cir. 2015) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006)).

A "qualified individual" is defined in the ADA as a person who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). A disability is defined as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment[.]" *Id.* § 12102(1); *see Gentry v. E. W. Partners Club Mgmt. Co.*, 816 F.3d 228, 239 (4th Cir. 2016) (quoting 29 C.F.R. § 1630.2(k)(1)). The term "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer.]" 42 U.S.C. § 12112(b)(5)(A); *see Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 344 (4th Cir. 2013).

### B.  Failure to Accommodate Claims (Counts I, II & III)

In Counts I, II, and III, Plaintiff claims that Defendant terminated her "shortly after her FMLA leave began and well before its scheduled conclusion" and therefore "clearly failed to accommodate" her as required by the MFEPA (Count I), the ADA (Count II), and the Rehabilitation Act (Count III). "Both the Rehabilitation Act and the Maryland FEPA apply the same standards as the ADA." *Miller v. Maryland Dep't of Nat. Res.*, 813 F. App'x 869, 874 (4th Cir. 2020) (citing *Hooven–Lewis v. Caldera*, 249 F.3d 259, 268 (4th Cir. 2001); *George v. Md. Dep't of Corr. Serv. Div. of Pretrial Det. Serv.*, Civ. No. WMN-14-2808, 2015 WL 847416, at *4 n.5 (D. Md. Feb. 25, 2015), *aff'd*, 615 F. App'x 164 (4th Cir. 2015)).

Under the ADA, an employer is required to make "reasonable accommodations" for the known physical or mental limitations of a qualified disabled individual, unless the accommodation would impose an undue hardship on the operation of the business. 42 U.S.C. § 12112(b)(5)(A). The use of accrued paid leave or providing unpaid leave for necessary treatment can be a form of a reasonable accommodation. *See Hannah v. United Parcel Serv., Inc*., 72 F.4th 630, 636 (4th Cir. 2023). To establish a *prima facie* case for failure to accommodate, Plaintiff must show: "(1) that [she] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." *Wilson v. Dollar General Corp*., 717 F.3d 337, 345 (4th Cir. 2013) (internal alterations and quotation marks omitted).

Defendant states that the first three prongs of Plaintiff's *prima facie* case are met, but Plaintiff cannot establish the final prong. (Def.'s Mem. Supp. Summ. J. at 14). The Court agrees that Plaintiff cannot show that Defendant refused to make accommodations.[13] In late September 2018, Plaintiff asked for three or four weeks of vacation. She also indicated that "her foot was

---

[13]    Courts have held that "placing an employee on FMLA or other sick leave or accommodating an injury or condition without more does not constitute evidence that the employer perceived that employee as disabled for purposes of the ADA." *Wilkins v. J.C. Penney Corp*., No. 3:11-CV-989(VLB), 2013 WL 3816588, at *7 (D. Conn. July 22, 2013). The Second Circuit opined that an employer allowing an employee to take leave under the FMLA without more does not demonstrate that employer regarded the employee as disabled and therefore "this evidence is not enough to defeat the summary judgment motion." *Price v. Mount Sinai Hosp*., 458 F. App'x 49, 52 n. 2 (2d Cir. 2012); *see also O'Reilly v. Consolidated Edison Co. of New York, Inc*., 374 F.Supp.2d 278, 288 (E.D.N.Y. 2005) ("although defendant approved sick leave for plaintiff based on the injury to her Achilles tendon and her representations to her doctors, this does not constitute evidence that they perceived plaintiff as being disabled within the meaning of the ADA, since . . . a temporary impairment does not constitute a 'disability' for ADA purposes") (internal quotation marks omitted); *Miller v. McHugh*, 814 F. Supp. 2d 299, 317–18 (S.D.N.Y. 2011) (holding that employer's grant of temporary accommodations for employee did not demonstrate that employer believed that employee was suffering from a disability that substantially limited her ability to engage in a major life function). Here, the Court assumes, without deciding, that Plaintiff was an individual who had a disability within the meaning of the ADA.

bothering her" and that she may need a surgery. (Bryant Dep. 54:7–57:15; Herbert Dep. 60:9–63:18). While Herbert's and Plaintiff's testimonies vary as to what was said in their discussion regarding Plaintiff's foot surgery, there is no evidence indicating that Herbert denied Plaintiff's request for leave to address her medical condition. Evidence in the record shows that on October 3, 2018, Herbert approved Plaintiff's request for a "respite" period of 19 days, (ECF 66-13), and asked Asong to email Plaintiff a FMLA leave request form, (ECF 75-25 at 2). Plaintiff submitted her FMLA paperwork on October 6, 2018, stating that the estimated period of incapacity due to her medical condition would be from November 8, 2018, to February 8, 2019. (Bryant Dep. 50:5–16; ECF 75-26 at 2). Plaintiff testified that Herbert did not tell her that he would prevent her from taking leave for her surgery. (Bryant Dep. 77:9–11). Additionally, the October Memo from Herbert to DHR staff specifically noted Plaintiff's medical leave and anticipated return to the office. (ECF 75-29 at 2). Moreover, no evidence suggests that medical leave was not approved for Plaintiff or that she was on unapproved leave when she had her foot surgery on November 6, 2018.

Plaintiff seems to suggest that the termination of her employment somehow amounts to Defendant's refusal to make reasonable accommodations for her medical condition. (Pl. Opp'n at 32). She fails to cite any legal authority to support this proposition. There is no evidence in the record to suggest that Plaintiff's termination was related in any way to her medical condition or her request for FMLA leave.

Plaintiff has presented no evidence to show that Defendant refused to approve her request for medical leave. Accordingly, Defendant's motion will be granted as to Plaintiff's claims for failure to accommodate.

### C.  Disability Discrimination Claims (Counts IV, V & VI)

In Counts IV, V and VI, Plaintiff claims that Defendant discriminated against her by

terminating her employment shortly after her disability-related leave began, in violation of the MFEPA (Count IV), the ADA (Count V), and the Rehabilitation Act (Count VI). As previously noted, the MFEPA and the Rehabilitation Act "apply the same standards as the ADA." *Miller*, 813 F. App'x at 874; *George*, 2015 WL 847416, at *4 n.5.

The ADA bars the discharge of a qualified employee because she is disabled. *Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 328 (4th Cir. 2014). To establish a *prima facia* claim of disability discrimination, a plaintiff must prove "(1) that she has a disability, (2) that she is a 'qualified individual' for the employment in question, and (3) that [her employer] discharged her (or took other adverse employment action) because of her disability." *Jacobs*, 780 F.3d at 572 (citing *EEOC v. Stowe–Pharr Mills, Inc.*, 216 F.3d 373, 377 (4th Cir. 2000) (internal quotation marks omitted)). To satisfy to the second element, the plaintiff needs to show that she was "performing her job at a level that met her employer's legitimate expectations" at the time of termination. *Id*. at 574 (internal quotation marks omitted).

"If a plaintiff establishes a *prima facie* case of unlawful discrimination, a presumption of illegal discrimination arises, and the burden of production shifts to the employer to produce evidence of a legitimate, non-discriminatory reason for its adverse action." *Manufacturers & Traders Tr. Co.*, 429 F. Supp. 3d at 119 (citation omitted). If the employer does so, the burden then shifts back to the plaintiff to show by a preponderance of evidence that defendant's proffered reason was pretextual, and that unlawful discrimination was the true reason. *Id*. at 121. "[T]he plaintiff cannot seek to expose [the employer's] rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it" because "[t]he former would not create a genuine dispute, the latter would fail to be material." *Id*. (citation omitted). "Rather, to show pretext, a plaintiff must proffer

sufficient evidence such that a reasonable trier of fact could conclude that the employer's explanation is false or unworthy of credence, and that discrimination was the true reason for the adverse employment action." *Id*. (citation omitted).

"When the question at issue is whether the decision maker acted with discriminatory animus, only the perception of the decision maker is relevant to the question." *Id*. at 121–22 (citation omitted). "In assessing a defendant's proffered reasons, the Fourth Circuit has repeatedly observed that it is not a court's province to decide whether an employer's reason for terminating an employee was wise, fair, or even correct, ultimately, so long as it truly was the reason for the employee's termination." *Id*. at 122 (citation omitted). Simply put, "an employment discrimination claim is not a vehicle for substituting the judgment of a court for that of the employer." *Id*. (citation omitted).

To prove employment discrimination on account of her disability, the plaintiff "must establish [her] disability was the 'but-for' cause of an adverse employment decision." *Davis v. W. Carolina Univ*., 695 F. App'x 686, 688 (4th Cir. 2017) (citing *Gentry v. E. W. Partners Club Mgmt. Co*., 816 F.3d 228, 235 (4th Cir. 2016)). "In other words, causation requires disability to be more than *a* motivating factor: it must be the *only* motivating factor." *Id*. "If an employer acts with a mixed motive—both a discriminatory and non-discriminatory reason—then the employer is not liable." *Id*.

"A plaintiff may not rely solely on [her] own assertions of discrimination to persuade a trier of fact." *Manufacturers & Traders Tr. Co*., 429 F. Supp. 3d at 122 (quoting *Adams*, 640 F.3d at 560) (cleaned up). "When a plaintiff fails to present any other evidence—beyond baseless speculation—that [the employer's] stated reason was pretextual, [the] trier of fact would be hard-pressed to conclude that [the plaintiff] established pretext." *Id.* at 122 (quotation marks omitted).

Moreover, "when a plaintiff has presented nothing sufficient to raise a material issue of fact to place before the fact finder, her claim will not survive a motion for summary judgment." *Id.* at 122–23. But "if a plaintiff presents evidence or legitimate argument that could persuade a rational fact finder to disbelieve the defendant's justification for its employment decision, summary judgment in favor of the employer is not appropriate." *Id.* at 123.

Assuming *arguendo* that Plaintiff could establish a *prima facie* case of unlawful discrimination, Defendant articulates a legitimate, nondiscriminatory reason: "Plaintiff was fired as a direct result of the findings from the Office of the Inspector General's internal investigation, which implicated her integrity and truthfulness." (Def.'s Mem. Supp. Summ. J. at 15–16). This reason is consistent with the termination letter authored by Herbert, which cites the issues raised by the OIG's Final Report as the basis for termination: "failure to disclose a familial relationship to a contractual DHR employee and maintenance of financial records related to the 2017 WorkBaltimore" convention. (ECF 66-19). The termination letter states, "After considering both the findings of the O.I.G. investigation and information you provided in response to its inquiry, you are hereby terminated." (*Id.*)  Plaintiff has the burden of showing that Defendant's proffered reason was pretextual, and that unlawful discrimination was the true reason. Plaintiff cannot meet that burden.

### 1.  Defendant's Nondiscriminatory Reasons

In an effort to rebut the issues raised in the OIG Final Report, Plaintiff argues that  multiple witnesses testified that they were told by Talley that the Innovation Fund need not been repaid; evidence suggests that "Gulhar was at least as responsible as [Plaintiff] for matters related to tracking and managing the financing of WorkBaltimore, if not more so since he was actually the chair of the finance committee"; and a reconciliation for WorkBaltimore was completed in January

2019 after Plaintiff's termination, and nothing unusual was found.[14] (Pl. Opp'n at 7–13).

Plaintiff also regards the issue related to the disclosure of her daughter's (Quiera Bryant's) contractual relationship with the DHR as a "red herring." (Pl. Opp'n at 24). Plaintiff argues that "there's no non-speculative evidence" Plaintiff failed to make this disclosure; the proposition that Plaintiff would try to hide her daughter's "role as an independent contractor performing on occasion for the Smokey Crush and Leave campaign is objectively absurd" because several people at DHR, including Talley and Smith, were aware of her role for the program; Defendant did not have "any anti-nepotism policy that would have applied to [Plaintiff]"; and the disclosure was not necessary because Plaintiff's daughter was an independent contractor and not an "employee by the City." (Pl. Opp'n at 20–24).

First, most of Plaintiff's arguments simply challenge the validity of the OIG's investigation and findings. They do not call into question what Herbert, the decision maker responsible for Plaintiff's termination, understood and perceived regarding Plaintiff's character and integrity after reviewing the OIG's Final Report. *See Powell v. Biscuitville, Inc.*, 858 F. App'x 631, 633 (4th Cir. 2021) ("in determining whether [plaintiff] engaged in the misconduct, '[i]t is the perception of the decision maker which is relevant.'") (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996)). These arguments do not suggest that the non-discriminatory reasons given for the decision to terminate Plaintiff, supported by Herbert's testimony and termination letter, were a pretext for discrimination. First, the fact that OIG's investigation may not have been as thorough as Plaintiff would have liked or expected does not establish pretext, so long as the

---

[14]     Plaintiff also argues that before receiving the Final Report, Herbert had "previously been fully briefed about WorkBaltimore 2017 and the Innovation Fund loan situation." (Pl. Opp'n at 19). Herbert had received information related to these matters, (Pl. Opp'n at 12 n.14), but there is no evidence to suggest that he was aware of discrepancies in DHR's financial accounting of its use of Innovation Funds in connection with WorkBaltimore before receiving the Final Report.

investigation was not "obviously inadequate." *See Powell*, 858 F. App'x at 633. Plaintiff has presented no evidence indicating that the OIG's investigation was inadequate in any way that would have been obvious to Herbert. The OIG's Interim Report details the methodology of its investigation, which involved interviewing 42 individuals—the DHR executive leadership team, 20 current DHR employees, 12 former employees, and seven senior-level managers for other City agencies. (ECF 66-5 at 2). Herbert had no reason question the adequacy of the OIG's investigation or the validity of the findings made in the Final Report.

Second, in making the decision to terminate Plaintiff's employment, Herbert did not solely consider the findings in the OIG's Final Report. Herbert also considered Plaintiff's responses to OIG's inquiry and found Plaintiff's responses inconsistent with other evidence, which implicated Plaintiff's integrity and was considered by Herbert "unacceptable for someone in executive leadership." (Herbert Dep. 241:3–11). Plaintiff's disputes with findings in the Final Report do not call into question what effect those findings had on Herbert's perception of Plaintiff's character and integrity or his decision as to what disciplinary action to take.

Plaintiff also argues that Herbert failed to follow Defendant's own policy on discipline when terminating Plaintiff. (Pl. Opp'n at 35). Plaintiff argues that Defendant's disciplinary policy "calls for giving the 'employee a full chance to explain his or her actions'" and "Herbert didn't even speak with Plaintiff before her termination." (Pl.'s Opp'n at 35 (quoting (ECF 75-39 at 1)). However, evidence of any failure on Herbert's part to comply with departmental policy, without more, does not undermine the proposition that the nondiscriminatory reasons offered for terminating Plaintiff were the true reasons for that decision. *See e.g.*, *Manufacturers & Traders Tr. Co.*, 429 F. Supp. 3d at 128 (finding "no basis to doubt the veracity of the [employer's] explanations or to infer that discrimination was the real reason for [the employee's] termination"

even when the employer "did not rigidly comply with its own rule" and "[i]t is possible that it may not have treated [the employee] fairly"). In the absence of any evidence to suggest that the true reason for the decision to terminate Plaintiff was unlawful discrimination, it is not for this Court to decide whether that decision was wise, fair, or even correct. Plaintiff's arguments fall short of establishing that Defendant's legitimate, nondiscriminatory reasons were not the true reasons for the decision to terminate Plaintiff.

### 2. Comparator Evidence

Although not required as a matter of law, evidence that other employees who were similarly situated to the plaintiff, but not members of the plaintiff's protected class, were treated more favorably than the plaintiff is "especially relevant" to a showing of pretext. *Cowgill*, 41 F.4th at 381 (citing *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 719 (4th Cir. 2013); *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 545 (4th Cir. 2003)). While there is no bright-line rule, relevant considerations for determining whether a proposed comparator was similarly situated to the plaintiff include "whether the plaintiff and comparator dealt with the same supervisor, [were] subject to the same standards and[,] . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* (citations omitted). "[T]he plaintiff must provide evidence that the proposed comparators are not just similar in *some* respects, but 'similarly-situated in all respects.'" *Spencer v. Virginia State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019), as amended (Mar. 26, 2019).

Plaintiff proposes Rajesh Gulhar and Jacia Smith as comparators. She argues that Gulhar was just as responsible, if not more responsible, for the financial issues related to WorkBaltimore detailed in the OIG Final Report. (Pl. Opp'n at 33). First, neither Gulhar nor Smith was a subject of the Final Report, and there is no evidence that Gulhar was a subject of complaints or allegations

30

that led to the OIG investigation and resulted in the Final Report. Furthermore, the financial issues raised in the Final Report specifically concerned the use of the Innovation Fund loan on WorkBaltimore. Although Gulhar was chair of the Finance Committee for WorkBaltimore, Plaintiff was designated DHR's project monitor for the use of the Innovation Fund loan on the convention. No evidence has been presented to suggest that Smith had any role in managing or overseeing finances in connection with WorkBaltimore. The Final Report did not only reflect findings of financial discrepancies regarding the use of the Innovation Fund loan on WorkBaltimore; it also concerned an alleged failure by Plaintiff to disclose her daughter's contractual relationship with DHR. There is no evidence that Gulhar or Smith failed to disclose any employment or contractual relationships any of their relatives had with DHR. Therefore, Plaintiff has failed to establish that her proposed comparators were similarly situated to her with respect to the issues raised in the Final Report and Herbert's termination letter.[15] The evidence concerning Plaintiff's proposed comparators fails to support any reasonable inference of discrimination.

### 3.   Temporal Proximity

Plaintiff heavily relies on "the exceedingly close timing of the sequence of events" leading to her termination. (Pl. Opp'n at 30). This argument misses the point. First, while close temporal proximity tends to show causation at the *prima facie* stage, *Jacobs*, 780 F.3d at 579, it is not sufficient to establish that a plaintiff's medical condition or request of medical leave was a "but for" cause of her termination. *Morgan v. Wells Fargo Bank, Nat. Ass'n*, 585 F. App'x 152, 153 (4th Cir. 2014) (citing *Dugan v. Albemarle Cnty. Sch. Bd.*, 293 F.3d 716, 722 (4th Cir. 2002)).

---

[15]   Insofar as Plaintiff proposes as a comparator Lisa Watkins, another former DHR employee who was also terminated, there is insufficient evidence in the record for the Court to determine the circumstances of her termination. It is undisputed however that Watkins was not a subject of the OIG's Final Report.

More importantly, "[w]here, as here, the actions that led to Plaintiff's termination began before her disability and/or FMLA leave became potential issues, an inference of improper motive does not arise." *James v. Verizon*, 792 F. Supp. 2d 861, 868 (D. Md. 2011) (quoting *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006)) (cleaned up). The OIG's investigation that resulted in the Final Report, which led to Plaintiff's termination, began months before Herbert started his tenure as Director of DHR and before he learned about Plaintiff's medical condition and received her request for medical leave. Herbert received the Final Report after Plaintiff's request for medical leave was approved and while she was on leave. No evidence indicates that Herbert influenced the content or timing of the Final Report at any point. Before reaching Herbert, the Final Report was first sent to the Mayor's Office, and on October 26, 2018, the Mayor referred the Final Report to Herbert, requesting that he determine the appropriate disciplinary action for Plaintiff. Herbert considered the findings in the Final Report, reviewed Plaintiff's personnel file, and discussed issues raised in the Final Report with the OIG investigator before deciding whether to terminate Plaintiff. The timing and sequence of events does not support a reasonable inference of disability discrimination.

Plaintiff argues that evidence in the record supports the proposition that her absence from the workplace for medical leave upset Herbert and motivated him to terminate her. (Pl. Opp'n at 17-19). She cites her own testimony that Herbert expressed displeasure upon learning about her need for leave, as well as Colucci's testimony and the October Memo indicating that Plaintiff's leave resulted in an increased workload. An increase in workload is a natural consequence of an employee taking leave and cannot sustain a reasonable inference that an employer was improperly motivated by it to take adverse action against the employee. Plaintiff's testimony that Herbert made "a gesture and a moan" when he learned about Plaintiff's need for surgery, without more,

also falls short of generating a genuine dispute as to whether Herbert later decided to terminate Plaintiff on account of her medical condition or leave. There is no evidence that Herbert stood in the way of Plaintiff taking the medical leave or refused or hesitated to approve it.

Herbert's receipt of the Final Report occurred between his learning of Plaintiff's need for medical leave and his decision to terminate Plaintiff and supports the legitimate, non-discriminatory reasons provided for that decision. *See Alston v. Holy Cross Health, Inc*., Civ. No. DLB-20-2388, 2023 WL 2743332, at *12 (D. Md. Mar. 31, 2023) ("[plaintiff's] evidence of temporal proximity is weakened by . . . [a] legitimate intervening event that occurs after the protected activity and provides grounds for an adverse action"). No evidence suggests that Herbert gave Plaintiff's medical condition or leave any consideration in deciding to terminate her employment. "[T]he temporal proximity between Plaintiff's leave status and her termination is fully accounted for by non-invidious motivations and circumstances." *James*, 792 F. Supp. 2d at 868. Plaintiff's "unsubstantiated allegations and bald assertions" cannot establish that Defendant's proffered reasons for termination were a pretext for discrimination. *Evans*, 80 F.3d at 960–61.

In sum, Plaintiff has failed to raise a genuine dispute of material fact as to Defendant's reasons for terminating her employment and has failed to offer evidence that those reasons were pretextual. As such, Defendant's motion with respect to Counts IV, V, and VI will be granted.[16]

---

[16] Plaintiff also argues that Defendant cites and relies upon inadmissible documents—specifically, the OIG Interim Report, the OIG Final Report, and Talley's Note. (Pl. Opp'n at 28). "[H]earsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment." *Doe v. Bd. of Educ. of Prince George's Cnty*., 982 F. Supp. 2d 641, 650–51 (D. Md. 2013), *aff'd*, 605 F. App'x 159 (4th Cir. 2015) (citing *Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995)). However, Defendant does not offer the OIG reports or Talley's Note for the truth of the matters asserted therein. These documents are offered to establish what information Herbert had received or reviewed before deciding to terminate Plaintiff's employment and the effect they had on that decision. Consideration of the documents for this purpose does not violate the rule against hearsay. *See* Fed. R. Evid. 801(c) (defining "hearsay" as a non-testimonial statement "a party offers in evidence to prove the truth of the matter asserted in the statement").

### D.  Retaliation Claims (Counts VII, VIII & IX)

In Counts VII, VIII, and IX, Plaintiff claims that Defendant terminated her in retaliation for requesting and taking a medical leave, in violation of the MFEPA (Count VII), the ADA (Count VIII), and the Rehabilitation Act (Count IX). To establish a *prima facie* case of retaliation under the ADA, a plaintiff must show that "(1) she has engaged in protected conduct; (2) she suffered an adverse action after engaging in the protected conduct; and (3) there was a causal link between the protected conduct and the adverse action." *Laird v. Fairfax Cnty., Virginia*, 978 F.3d 887, 893 n.4 (4th Cir. 2020) (citing *Laber*, 438 F.3d at 432). A request for accommodation is a protected activity under the ADA. *Jacobs*, 780 F.3d at 577. Once the plaintiff establishes a *prima facie* case of retaliation, "[t]he 'employer then has the burden to rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason for its actions.'" *Lashley v. Spartanburg Methodist Coll.*, 66 F.4th 168, 174 (4th Cir. 2023) (quoting *Jacobs*, 780 F.3d at 578). "The burden then shifts back to [the plaintiff] to show that the proffered reason is pretext." *Id.* (quoting *Jacobs*, 780 F.3d at 578). "Importantly, [the plaintiff] 'always bears the ultimate burden of persuading the trier of fact that she was the victim of retaliation.'" *Id.* (quoting *Rhoads*, 257 F.3d at 392). The plaintiff must show that the protected conduct was the "but-for" cause of the adverse action. *Staley v. Gruenberg*, 575 F. App'x 153, 156 (4th Cir. 2014).

As discussed above in Part III.C *supra*, Plaintiff has not presented a genuine dispute of material fact as to Defendant's reasons for terminating her and has failed to demonstrate that those reasons were pretextual. There is no record evidence to suggest that Plaintiff was terminated because she requested leave and/or subsequently took leave to address her medical condition. Therefore, Defendant's motion with respect to Counts VII, VIII, and IX will be granted.

### E.  FMLA Interference (Count X)

In Count X, Plaintiff claims that Defendant interfered with her exercise of FMLA rights. The FMLA entitles eligible employees to take "12 workweeks of leave" during a 12-month period for a qualifying "serious health condition that makes the employee unable to perform the functions of" her job. *Adkins v. CSX Transportation, Inc.*, 70 F.4th 785, 795 (4th Cir. 2023). "When an employee requests FMLA leave, or when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances." 29 C.F.R. § 825.300(b)(1). If the employer determines that the requested leave will not be designated as FMLA-qualifying, "the employer must notify the employee of that determination." 29 C.F.R. § 825.300(d)(1). Employers are also required to furnish a "rights and responsibilities" notice to the employee "detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet these obligations" with respect to their FMLA leave. 29 C.F.R. § 825.300(c)(1).

"These rights are 'prescriptive,' and claims for violations of them are known as 'interference' or 'entitlement' claims, arising under 29 U.S.C. § 2615(a)(1)[.]" *Adkins*, 70 F.4th at 795. Section 2615(a)(1) provides that it is "unlawful for any employer to interfere with, restrain, or deny the exercise of[,] or the attempt to exercise, any right provided under" the FMLA. *Adkins*, 70 F.4th at 795 (quoting 29 U.S.C. § 2615(a)(1)). "[A]n employee has a cause of action against his employer under 29 U.S.C. § 2617 when [she] can prove that (1) the employer interfered with [her] exercise of FMLA rights and (2) the interference caused the employee prejudice." *Id.* (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)). "[T]o make out an FMLA interference claim, an employee must demonstrate (1) that [she] is entitled to an FMLA benefit;

(2) that [her] employer interfered with the provision of that benefit; and (3) that the interference caused [her] harm." *Id.* (citing *Adams*, 789 F.3d at 427). The FMLA "provides no relief *unless the employee has been prejudiced* by the violation." *Ragsdale*, 535 U.S. at 89 (emphasis added). In a case "where the plaintiffs sought and were granted . . . medical leave, during which they were fired for misconduct," the Fourth Circuit concluded that the plaintiffs "failed to establish the prejudice element of their FMLA interference claim." *Adkins*, 70 F.4th at 797.

Here, Plaintiff sought and was subsequently granted FMLA leave to address her medical condition. Plaintiff was terminated during her leave period for reasons unrelated to her medical condition or her FMLA leave. The FMLA "could not have precluded [Plaintiff's] loss of employment" for such unrelated reasons. *Id.* (citing *Vannoy v. Fed. Rsrv. Bank of Richmond*, 827 F.3d 296, 304–05 (4th Cir. 2016) ("The FMLA does not prevent an employer from terminating an employee for poor performance, misconduct, or insubordinate behavior")). Therefore, Plaintiff's interference claim under the FMLA fails, and summary judgment will be granted in favor of Defendant on this claim.

### F. FMLA Retaliation (Count XI)

In Count XI, Plaintiff asserts that she was retaliated against for exercising her FMLA rights. It is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the FMLA. 29 U.S.C. § 2615(a)(2). "Retaliation claims brought under the FMLA are analogous to those brought under Title VII." *Adams*, 789 F.3d at 429 (citation omitted). "Plaintiff must prove three elements to establish a prima facie case of retaliation: (1) 'she engaged in a protected activity'; (2) 'her employer took an adverse employment action against her'; and (3) 'there was a causal link between the two events.'" *Id.* (quoting *Boyer–Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (*en banc*)). If

the defendant offers a lawful explanation for the alleged retaliatory action, the plaintiff must demonstrate that the defendant's reason for taking the adverse action was pretextual. *Laing*, 703 F.3d at 719 (citing *McDonnell Douglas*, 411 U.S. at 802–04).

As explained in Part III.D *supra*, assuming *arguendo* that Plaintiff could establish a *prima facie* case of retaliation under the FMLA, Defendant has articulated a legitimate, non-discriminatory reason for her termination, and Plaintiff cannot show that Defendant's reason was a pretext for retaliation. Accordingly, Defendant's motion with respect to Plaintiff's FMLA retaliation claim will be granted.

### G.  Age Discrimination Claims (Counts XII & XIII)

In Counts XII and XIII, Plaintiff claims that Plaintiff's age was a cause or a motivating factor of her termination, thereby violating the MFEPA (Count XII) and the ADEA (Count XII).[17] The ADEA makes it unlawful for an employer to discriminate against an individual with respect to employment based upon the individual's age or to retaliate against an individual for engaging in activity protected by the ADEA. *See* 29 U.S.C. § 623(a), (d).

To establish a *prima facie* claim of discrimination under the ADEA, a plaintiff must show (1) age of at least 40 years, (2) an adverse employment action by the employer, (3) satisfactory job performance at the time of the adverse employment action, and (4) that she was replaced by "a substantially younger individual with comparable qualifications." *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 725 (4th Cir. 2019). The ADEA does not permit "a mixed-motives age

---

[17]     Both ADEA and MFEPA prohibit an employer from discharging an individual "because of ... age." *Hartman v. Univ. of Maryland at Baltimore*, 595 F. App'x 179, 181 (4th Cir. 2014). Both the Fourth Circuit and Maryland appellate courts have looked to federal law for guidance construing Maryland employment discrimination laws. *Weil v. Sunrise Senior Living Mgmt., Inc.*, Civ. No. RDB-20-701, 2021 WL 5742383, at *4 (D. Md. Dec. 1, 2021) (citation omitted). Therefore, the Court applies the same standards to Plaintiff's ADEA and MFEPA claims. *See, e.g.*, *Allen v. Baltimore Cnty. Bd. of Educ.*, Civ. No. ELH-21-1006, 2023 WL 5352416, at *26 (D. Md. Aug. 21, 2023).

discrimination claim." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009). Thus, the plaintiff must "establish that age was the 'but-for' cause of the employer's adverse action." *Id.* at 177; *see also Hartman v. Univ. of Maryland at Baltimore*, 595 F. App'x 179, 180–81 (4th Cir. 2014).

Here, Plaintiff cannot establish that she was replaced by a younger employee. To the contrary, there does not appear to be any dispute that Plaintiff was replaced as Deputy Director by Brinkley, who is *older* than Plaintiff. No evidence suggests that Defendant's termination of her employment had anything to do with her age. Therefore, Defendant's motion with respect to Counts XII and XIII will be granted.

## IV.       <u>Conclusion</u>

For the reasons stated above, Defendant's Motion for Summary Judgment (ECF 66) will be granted.

A separate Order follows.

   September 28, 2023                                    /S/
Date                                    Matthew J. Maddox
                                        United States Magistrate Judge